UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

| | | |
|---|---|---|
| ROBERT MURRAY, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | No. 4:18-cv-00202-BRW |
| Plaintiff, | ) ) ) | CLASS ACTION |
| vs. | ) ) ) | AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |
| EARTHLINK HOLDINGS CORP., SUSAN D. BOWICK, JOSEPH F. EAZOR, KATHY S. LANE, GARRY K. MCGUIRE, R. GERARD SALEMME, JULIE A. SHIMER, MARC F. STOLL, WALTER L. TUREK, WINDSTREAM HOLDINGS, INC., CAROL B. ARMITAGE, SAMUEL E. BEALL III, JEANNIE H. DIEFENDERFER, ROBERT E. GUNDERMAN, JEFFREY T. HINSON, WILLIAM G. LAPERCH, LARRY LAQUE, KRISTI MOODY, MICHAEL G. STOLTZ, TONY THOMAS and ALAN L. WELLS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | DEMAND FOR JURY TRIAL |

Lead Plaintiff Robert Murray ("Plaintiff"), individually and on behalf of all others similarly situated, by the undersigned counsel, respectfully brings this class action for violations of §§11, 12(a)(2) and 15 of the Securities Exchange Act of 1933 (the "1933 Act"), §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, against the herein named defendants. Plaintiff brings this federal class action against defendants upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which included, without limitation, the review and analysis of: (a) public filings with the SEC; (b) releases and other publications; (c) filings in other lawsuits regarding Windstream Holdings, Inc. ("Windstream"); and (d) securities analyst reports, news articles, websites, and other publicly available information. Plaintiff believes that substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1. This is a securities class action brought by Plaintiff and a proposed stockholder class against EarthLink Holdings Corp. ("EarthLink"), its former Board of Directors (the "EarthLink Board"), Windstream, its Board of Directors (the "Windstream Board") and certain of Windstream's officers (collectively, "Defendants"), for violations of the federal securities laws in connection with the Merger (defined below) between EarthLink and Windstream. The claims under the 1933 Act are brought on behalf of Plaintiff and all other persons or entities, except for Defendants, who purchased or otherwise acquired Windstream shares, pursuant and/or traceable to the Offering Documents (defined below). The claims

- 1 -

under the 1934 Act are brought on behalf of Plaintiff and all other persons or entities, except for Defendants, who held EarthLink stock on the record date for the Merger.

2.      On February 27, 2017, Windstream completed its merger with EarthLink, pursuant to the terms of the Merger Agreement dated November 5, 2016 (the "Merger"), whereby EarthLink merged into Europa Merger Sub, Inc., an wholly-owned subsidiary of Windstream Services, LLC, and survived, and immediately following, merged with Europa Merger Sub, LLC, a wholly-owned subsidiary of Windstream Services, LLC, with Merger Sub surviving and changing its name to EarthLink Holdings, LLC.

3.      Through the Merger, each share of EarthLink common stock was exchanged for .818 shares of Windstream common stock.   In the aggregate, Windstream issued approximately 93 million shares of its common stock in a transaction valued at approximately $1.1 billion.   Upon close of the Merger, Windstream's stockholders owned approximately fifty-one percent (51%) and EarthLink stockholders owned approximately forty-nine percent (49%) of the combined company, post-Merger Windstream.

4.      Before the Merger, EarthLink was a growing telecommunications company with solid and consistent operating results.   Pursuant to the Merger, all EarthLink shares were exchanged for Windstream shares purportedly worth $1.1 billion at the time, but were in fact almost worthless.   The Offering Documents, submitted to stockholders and used to effectuate approval of the Merger, repeatedly touted the past "successful transforming" of Windstream's business, the current stability and likely increase of Windstream's dividend, and represented that Windstream was a strong, successful business, including through the following statements:

1456292_1

- "Windstream [has] been successful recently in transforming [its] businesses, and the combined company likely will be able to build on these successes and accelerate progress";

- "the mergers will create a stronger, more competitive national telecommunications provider";

- "the transaction will . . . allow[] greater financial flexibility for strategic network investments and debt reduction and providing support for the continued payment of Windstream's existing dividend after closing of the transaction";

- "Dividend Practice:  Maintain Windstream annual dividend of $0.60 / share";

- "the amount of the dividend currently paid to EarthLink stockholders would likely increase following the transaction";

- "this dividend also represents a substantial increase in the annual dividend currently received by EarthLink stockholders"; and

- the ratio of Windstream shares to be received by EarthLink stockholders "pursuant to the merger agreement [is] fair from a financial point of view to the holders" of EarthLink common stock.

5.      The undisclosed truth, however, was that Windstream's business was crumbling, its debt was unstable, and its dividend was on the verge of being eliminated entirely.  The following bullet-points provide just a small flavor of Wall Street analysts' and market commentators' observations regarding Windstream's post-Merger performance. Each quote is preceded by Windstream's stock price at the close of that particular trading day[1]:

- February 27, 2017, *$39.25*:  Defendants complete the Merger and issue 93 million shares of Windstream common stock to EarthLink stockholders;

- March 27, 2017, *$26.35*:  "Moody's Investors Service, ('Moody's') has changed the ratings outlook for [Windstream]  to negative from stable

---

[1]      Historical stock prices described herein are adjusted for the 1-for-5 reverse stock split executed by Windstream on May 25, 2018.

following the company's weak 2016 results and 2017 guidance. . . . Moody's believes the downward trajectory of the business will persist and pressure Windstream's B1 rating." Moody's.

- May 5, 2017, *$24.00*: "Windstream reported disappointing results, missing both revenue and EBITDA expectations. . . . Windstream suffered weak results, falling short of our estimates across every revenue category." Jefferies Global Markets.

- August 3, 2017, *$11.90*: "The Death of Windstream. The elimination of the dividend is enough for most investors to throw in the towel." *Seeking Alpha*. "Elimination of the Dividend Sends Investors Out the Door." Jefferies Global Markets.

- September 7, 2017, *$10.75*: "[S]o much damage had been done to the [Windstream] stock that no management team would have ever knowingly done what they did if there hadn't been some house-on-fire problem inside the business that caused them to create such havoc to the equity market." Bank of America Merrill Lynch.

- November 3, 2017, *$8.90*: "Windstream Is In Critical Condition." *Seeking Alpha*.

- December 4, 2017, *$11.30*: Windstream's post-Merger "picture, thus far, has been a plunging stock price, losses and layoffs." *Arkansas Business News*.

- February 28, 2018, *$7.90*: "The outlook remains negative due to Moody's expectation of continued pressure on EBITDA, negative free cash flow including persistent restructuring costs, and low asset coverage relative to debt." Moody's.

- May 16, 2018:  *$7.20*: "Many investors are worried about [Windstream] going bankrupt given its sizeable debt maturities over the next few years, and Moody's downgraded its credit rating further into junk status . . . ." Kiplinger.

- July 22, 2018, *$3.37*:  "Hedge Funds Set to Face Off Over Debt-Ridden Windstream.  Aurelius Capital, Elliott Management take sides in [Windstream's] fight for survival." *Wall Street Journal*.

6.    As a result of the misrepresentations and omissions described herein, former EarthLink stockholders voted in favor of the Merger, thus permitting the Merger to close. Moreover, former EarthLink stockholders and others acquired shares of Windstream

- 4 -

common stock traceable to the false and misleading Offering Documents. Plaintiff and the stockholder class were damaged as a result.

7.     The claims asserted herein are based solely on strict liability and negligence, and are not based on any reckless or intentionally fraudulent conduct by or on behalf of the Defendants – *i.e.*, these claims do not allege, arise from, or sound in, fraud. Plaintiff specifically disclaims any allegation of fraud, scienter, or recklessness in these non-fraud claims.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the 1933 Act and §27 of the 1934 Act.

9.     This Court has jurisdiction over each defendant. Windstream operates and maintains its headquarters within this District. At least two of the Windstream Individual Defendants (defined below) reside in this District. Moreover, each of the Windstream Individual Defendants are officers and/or directors of Windstream, and thus have systemic and continuous activity in this District, enjoy benefits of the laws of Arkansas, and the exercise of jurisdiction is reasonable and foreseeable. EarthLink and the EarthLink Individual Defendants (defined below) are a corporation and/or individuals who have sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. EarthLink and the EarthLink Individual Defendants purposely decided to negotiate and enter into a merger with Windstream, a corporation in this District, knowing that the combined company would be located in this District, and that the result of the Merger would be that the

1456292_1

EarthLink Individual Defendants would obtain material benefits in the Merger, and previous EarthLink stockholders (including the EarthLink Individual Defendants themselves) would acquire stock in Windstream.  Thus, EarthLink and the EarthLink Individual Defendants purposely directed their actions towards Arkansas, and benefited from same, such that the exercise of jurisdiction is reasonable and foreseeable.

10.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Windstream's headquarters are located in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District, including the issuance of the Offering Documents and the issuance of Windstream common stock to Plaintiff and the Class.

## PARTIES

11.     Plaintiff was an owner of EarthLink common stock and received Windstream stock in exchange for his EarthLink stock as a result of the Merger, as evidenced by the Certification of Named Plaintiff Pursuant to Federal Securities Laws incorporated herein. ECF No. 1 at 38.

12.     Before the Merger, defendant EarthLink was a Delaware corporation that maintained its headquarters at 1170 Peachtree Street, Atlanta, Georgia 30309.  Its stock traded on NASDAQ under the symbol "ELNK."

13.     Defendant Susan D. Bowick ("Bowick") was a member of the EarthLink Board from May 2008 to the closing of the Merger.  Bowick participated in the preparation of the Joint Proxy/Prospectus and participated in the solicitation of proxies in support of the Merger Agreement.

- 6 -

14.     Defendant Joseph F. Eazor ("Eazor") was EarthLink's CEO and President, and a member of the EarthLink Board, from January 2014 to the closing of the Merger.  Eazor participated in the preparation of the Joint Proxy/Prospectus and participated in the solicitation of proxies in support of the Merger Agreement.

15.     Defendant Kathy S. Lane ("Lane") was a member of the EarthLink Board from July 2013 to the closing of the Merger.  Lane participated in the preparation of the Joint Proxy/Prospectus and participated in the solicitation of proxies in support of the Merger Agreement.

16.     Defendant Garry K. McGuire ("McGuire") was a member of the EarthLink Board from July 2011 to the closing of the Merger.  McGuire participated in the preparation of the Joint Proxy/Prospectus and participated in the solicitation of proxies in support of the Merger Agreement.

17.     Defendant R. Gerard Salemme ("Salemme") was a member of the EarthLink Board from October 2013 to the closing of the Merger.  Salemme participated in the preparation of the Joint Proxy/Prospectus and participated in the solicitation of proxies in support of the Merger Agreement.

18.     Defendant Julie A. Shimer Ph.D. ("Shimer") was the Chairman of the EarthLink Board from February 2014 to the closing of the Merger, and a member of the EarthLink Board from July 2013 to the closing of the Merger.  She was appointed to the Windstream Board in connection with the Merger.  Shimer participated in the preparation of the Joint Proxy/Prospectus and participated in the solicitation of proxies in support of the Merger Agreement.

19.     Defendant Marc F. Stoll ("Stoll") was a member of the EarthLink Board from April 2016 to the closing of the Merger.  He was appointed to the Windstream Board in connection with the Merger.   Stoll participated in the preparation of the Joint Proxy/Prospectus and participated in the solicitation of proxies in support of the Merger Agreement.

20.     Defendant Walter L. Turek ("Turek") was a member of the EarthLink Board from October 2015 to the closing of the Merger.  He was appointed to the Windstream Board in connection with the Merger.   Turek participated in the preparation of the Joint Proxy/Prospectus and participated in the solicitation of proxies in support of the Merger Agreement.

21.     Defendants EarthLink, Bowick, Eazor, Lane, McGuire, Salemme, Shimer, Stoll and Turek are collectively referred to as the "EarthLink Defendants."

22.     Defendants Bowick, Eazor, Lane, McGuire, Salemme, Shimer, Stoll, and Turek are collectively referred to as the "EarthLink Individual Defendants."

23.     Defendant Windstream is a Delaware corporation that maintains its headquarters at Little Rock, Arkansas.  Its stock trades on NASDAQ under the symbol "WIN."  Windstream is the issuer of the shares offered and sold in the Merger.

24.     Defendant Carol B. Armitage ("Armitage") was a member of the Windstream Board at the time of the Merger.  Armitage participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement and signed the Registration Statement.

25.     Defendant Samuel E. Beall III ("Beall") was a member of the Windstream Board at the time of the Merger.  Beal participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement and signed the Registration Statement.

26.     Defendant Jeannie H. Diefenderfer ("Diefenderfer") was a member of the Windstream Board at the time of the Merger.  Diefenderfer participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement and signed the Registration Statement.

27.     Defendant Robert E. Gunderman ("Gunderman") was Windstream's CFO at the time of the Merger.  Gunderman participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement and signed the Registration Statement.

28.     Defendant Jeffrey T. Hinson ("Hinson") was a member of the Windstream Board at the time of the Merger.  Hinson participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement and signed the Registration Statement.

29.     Defendant William G. LaPerch ("LaPerch") was a member of the Windstream Board at the time of the Merger.  LaPerch participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement and signed the Registration Statement.

30.     Defendant Larry Laque ("Laque") was a member of the Windstream Board at the time of the Merger.  Laque participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement and signed the Registration Statement.

31.     Defendant Kristi Moody ("Moody") was the Senior Vice President and Corporate Secretary of Windstream.  Moody participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement, and signed the Joint Proxy/Prospectus.  Plaintiff is informed and believes that Moody is an individual who resides in this District.

32.     Defendant Michael G. Stoltz ("Stoltz") was a member of the Windstream Board at the time of the Merger.  Stoltz participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement and signed the Registration Statement.

33.     Defendant Tony Thomas ("Thomas") is Windstream's CEO and President, and a member of the Windstream Board.  Thomas participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement and signed the Registration Statement.  Plaintiff is informed and believes that Thomas is an individual who resides in this District.

34.     Defendant Alan L. Wells ("Wells") is the Chairman of the Windstream Board and was a member of the Windstream Board at the time of the Merger.  Wells participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement and signed the Registration Statement.

- 10 -

35.     Defendants Windstream, Armitage, Beall, Diefenderfer, Gunderman, Hinson, LaPerch, Laque, Moody, Stoltz, Thomas, and Wells, are collectively referred to as the "Windstream Defendants."

36.     Defendants Armitage, Beall, Diefenderfer, Gunderman, Hinson, LaPerch, Laque, Moody, Stoltz, Thomas, and Wells, are collectively referred to as the "Windstream Individual Defendants."

## CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23.  The claims under the 1933 Act are brought on behalf of Plaintiff and all other persons or entities, except for Defendants, who purchased or otherwise acquired Windstream shares, pursuant and/or traceable to the Offering Documents, while the claims under the 1934 Act are brought on behalf of Plaintiff and all other persons or entities, except for Defendants, who held EarthLink stock on the record date for the Merger (the "Class").

38.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

39.     The Class is so numerous that joinder of all members is impracticable.  The precise number of Class members is unknown to Plaintiff at this time, but the names and addresses of the Class members can be ascertained from the books and records of EarthLink and through appropriate discovery.  As of the record date, January 23, 2017, there were more than 105.5 million outstanding shares of EarthLink common stock held by hundreds or thousands of individuals and entities scattered throughout the United States.

40.     There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member.  The common questions include, *inter alia*:

(a)     whether the Offering Documents contained materially false or misleading statements or omissions;

(b)     whether the EarthLink Defendants and the Windstream Defendants violated the federal securities laws as alleged in this Complaint, including violating §§14(a) and/or 20(a) of the 1934 Act;

(c)     whether the Windstream Defendants violated the federal securities laws as alleged in this Complaint, including violating §§11, 12(a)(2), and/or 15 of the 1933 Act; and

(d)     whether Plaintiff and the other members of the Class sustained damages and the proper measure of damages.

41.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interest adverse to the Class.

42.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

43.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class.

- 12 -

44.   Plaintiff anticipates that there will be no difficulty in the management of this litigation.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

45.   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## BACKGROUND OF THE COMPANIES

**EarthLink Was a "Strong, Consistently Performing Company" Before the Merger**

46.   EarthLink began operations in 1994 as a provider of nationwide internet services to residential customers.   In 1996, EarthLink expanded into the small to mid-sized business market.   In 2006, EarthLink expanded into the enterprise business market.   During 2010 through 2013, EarthLink acquired eight companies which transformed its business from being primarily an internet services provider to residential customers into a network, communications and IT services provider for business customers.

47.   In 2014 and 2015, EarthLink refocused its business strategy, with the intent "to be a leading managed network, security and cloud services provider for multi-location retail and service businesses."   Throughout 2015 and 2016, EarthLink management continued to successfully execute the company's business strategy.   During that period, EarthLink consistently announced strong financial results.

48.   On August 8, 2016, EarthLink announced its second quarter 2016 results.   In the press release announcing the results, Eazor stated: "'Our overall business performance continued to improve, we strengthened our balance sheet further with a new credit facility,

and we were recognized by Forbes as one of America's top 100 most trustworthy companies. Finally, in early July, we acquired Boston Retail Partners to expand our capabilities as a trusted advisor to retailers.'" In the earnings call, Eazor confirmed that "[w]e have generated positive net income for the second quarter in a row" and that EarthLink is a "strong, consistently performing company strategically, operationally and financially." On August 5, 2016, EarthLink shares closed at $6.98. On August 10, 2016, analyst Northland Capital Markets issued an update with a price target for EarthLink of $8.00 per share. EarthLink's publicly traded status as a strong, consistently performing company, however, was about to end. EarthLink's management soon began merger negotiations with Windstream.

**Background of Windstream**

49.     Windstream is a provider of network communications for consumers, businesses, enterprise organizations and wholesale customers. Windstream provides data, cloud solutions, unified communications and managed services to small business and enterprise clients. Windstream also offer bundled services, including broadband, security solutions, voice and digital television to consumers. Windstream supplies core transport solutions on a local and long-haul fiber network spanning approximately 147,000 miles, including network assets acquired in the Merger.

50.     During 2017, Windstream divided its business unit organizational structure into the following four groups:  (1) ILEC Consumer and Small Business; (2) Wholesale; (3) Enterprise; and (4) CLEC Consumer and Small Business. Those groups are described by Windstream as follows:

- ILEC Consumer and Small Business. The ILEC Consumer and Small Business segment includes approximately 1.5 million residential and

small business customers.  This segment generated $1.6 billion in revenue and $899 million in segment income, or contribution margin, during 2016.

- <u>Wholesale Segment.</u>  The Wholesale segment provides 100 Gbps bandwidth and transport services to wholesale customers, including telecom companies, content providers, and cable and other network operators.  The Wholesale business unit produced $631 million in annual revenue and $452 million in contribution margin in 2016.

- <u>Enterprise Segment</u>.  The Enterprise segment provides advanced network and communication services to enterprise customers throughout the continental United States.  During 2016, the Enterprise segment generated $2.0 billion in revenue and $319 million in contribution margin.

- <u>CLEC Consumer and Small Business</u>.  The CLEC Consumer and Small Business segment which, post-Merger, includes EarthLink's consumer business and small business customers residing outside of Windstream's ILEC footprint.  During 2016, this segment, which included only small business customers outside of Windstream's ILEC footprint, generated revenue of $484 million and contribution margin of $155 million.

51.     During the fourth quarter of 2017, Windstream reorganized its operations from four into just two groups: Windstream Enterprise & Wholesale and Consumer & Small Business.

52.     As of December 31, 2016, Windstream had over $4.8 billion in long-term debt outstanding, including current maturities.  One year later, by December 31, 2017, Windstream increased its debt load to a staggering $5.8 billion in long-term debt outstanding, including current maturities.  Many analysts now report in 2018 that Windstream is dangerously close to bankruptcy.

## BACKGROUND OF THE MERGER

53.     On October 3, 2016, Windstream and EarthLink entered into a confidentiality agreement that allowed both parties to exchange non-public information regarding each

- 15 -

company's financial conditions and prospects.  The companies in fact did so, including at an

October 4, 2016 due diligence meeting between Windstream's CEO Thomas, EarthLink's

CEO Eazor, and other top executives from both companies.  During that meeting, EarthLink

received key non-public financial and business information regarding Windstream.

54.     On October 5, 2016, following a Windstream Board meeting, Windstream

submitted an indication of interest to EarthLink contemplating a 0.7 exchange ratio (*i.e.,*

each share of EarthLink common stock would be exchanged for 0.7 Windstream shares).

Regarding that proposal, the Joint Proxy/Prospectus states: "In delivering the proposal, Mr.

Thomas highlighted some of the reasons for EarthLink to consider a potential combination,

including that the two companies could create more value together than apart, that EarthLink

stockholders would own approximately 45% of the combined company, that substantial

synergies would be expected from the combination and that the amount of the dividend

currently paid to EarthLink stockholders would likely increase following the transaction."

55.     The EarthLink Board met on October 7 and October 10, 2016 to review the

proposal and discuss, *inter alia*, Windstream's financial condition.  Following Windstream's

representation that its dividend "would likely increase following the transaction," the

EarthLink Defendants, on October 10, 2016, submitted a counterproposal with a 0.8

exchange ratio and inserted the following provision:  "the parties must mutually agree before

signing upon the dividend for the combined company."

56.     The very next day, October 11, 2016, Windstream submitted a counterproposal

at 0.75 and containing the following provision:  "maintenance of Windstream's existing

$0.60 per share dividend policy following the transaction, at the discretion of the

Windstream Board." On October 12, 2016, EarthLink submitted a counterproposal at 0.75 to 0.8, but dropped the contractual requirement for a continued dividend-level post-merger.

57.     Also on October 12, 2016, the parties opened up electronic data rooms and continued non-public due diligence of each other. As a result, on October 26, 2016, attorneys for EarthLink expressed alarm that under the current merger agreement, Windstream had no committed financing and made no representations or covenants as to Windstream's ability of funds-pre-closing to pay or otherwise discharge EarthLink's outstanding indebtedness.

58.     On October 29, 2016, Windstream verbally agreed to the 0.8 exchange ratio and confirmed the agreement in a revised draft merger agreement on October 31, 2016. The morning of November 4, 2016, Reuters published an article leaking the proposed transaction. On November 4, 2016, EarthLink's CEO Eazor called Windstream's CEO to, according to the Joint Proxy/Prospectus, "express concern regarding the proposed 0.8 exchange ratio in light of the market's reaction" thereto. Despite that "concern," the EarthLink Defendants thereafter completed the deal at an exchange ratio of just 0.818, which did not materially differ from the 0.8 exchange ratio that caused EarthLink concern.

59.     On November 5, 2016, the EarthLink Board met and during that meeting – only one month after Windstream's first indication of interest – the EarthLink Board unanimously approved the Merger. On November 7, 2016, EarthLink and Windstream announced the Merger.

## DEFENDANTS' MATERIALLY MISLEADING
## AND INCOMPLETE OFFERING DOCUMENTS

60.     On December 8, 2016, Windstream filed with the SEC on Form S-4 a registration statement to register 95,959,386 shares of Windstream common stock in connection with the Merger, amended on January 9, 2017, January 13, 2017, and declared effective on January 17, 2017 (the "Registration Statement").   On January 24, 2017, Windstream filed with the SEC under Rule 424(B)(3) a "joint proxy statement/prospectus," dated January 23, 2017 and mailed the same to EarthLink and Windstream stockholders on January 25, 2017 (the "Joint Proxy/Prospectus").  The Joint Proxy/Prospectus incorporated and formed a part of the Registration Statement.  The Joint Proxy/Prospectus also constituted a joint proxy statement for both EarthLink and Windstream under the 1934 Act.   On January 24, 2017, EarthLink filed the Joint Proxy/Prospectus with the SEC on Schedule 14A as a Proxy Statement Pursuant to Section 14(a) of the 1934 Act (the "Proxy").  The Proxy, which the EarthLink Defendants jointly issued with the Joint Proxy/Prospectus, stated that it was "solicited on behalf of the Board of Directors of EarthLink Holdings Corp."  The Registration Statement, Joint Proxy/Prospectus, and Proxy are collectively referred to as the "Offering Documents."

61.     The Offering Documents were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state the facts necessary to make the statements not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

62.     The Joint Proxy/Prospectus repeatedly touted post-Merger Windstream as a "stronger competitor" and that synergies from the Merger would result in debt reduction and

a continued dividend.   The Joint Proxy/Prospectus included the following among "Windstream's Reasons for the Mergers" and the "Recommendation of Windstream's Board of Directors":

- ***the mergers will create a stronger, more competitive national telecommunications provider*** with a nationwide network of approximately 145,000 fiber route miles;

  \*     \*     \*

- ***the expectation that the transaction will be significantly accretive to Windstream's adjusted free cash flow per share, allowing greater financial flexibility for strategic network investments and debt reduction and providing support for the continued payment of Windstream's existing dividend after closing of the transaction***; [and]

  \*     \*     \*

- the expectation that the similar operating structures and goals of the two companies will drive advancement of products and services, including SD WAN and UCaaS, ***allowing the combined company to be a stronger competitor in a market dominated by larger telecommunication providers***.

63.    Similarly, despite undisclosed headwinds faced by Windstream (as described below), the Joint Proxy/Prospectus described Windstream's successful "transforming" of its business and described the strength and stability of Windstream in glowing terms.  The Joint Proxy/Prospectus also touted a "substantial increase" in the dividend "currently received" by EarthLink stockholders.   The Joint Proxy/Prospectus included the following among "Earthlink's Reasons for the Mergers"; the "Recommendation of Earthlink's Board of Directors"; and the reasons for the EarthLink Defendants "to recommend that EarthLink's stockholders vote 'FOR' the merger proposal":

*Strategic Considerations*

- ***EarthLink and Windstream have been successful in recently transforming their respective businesses, and the combined company likely will be able to build on these successes and accelerate progress***;

\*          \*          \*

- ***The combined company will have a better revenue trajectory***; and

- ***The combined company will be a financially stronger company than either EarthLink or Windstream standing alone before the mergers, benefiting from a more diverse revenue base and an increase in free cash flow***;

\*          \*          \*

*Ability to Participate in Future Appreciation and Dividends*

\*          \*          \*

- ***consistent with Windstream's current dividend practice, the Windstream Board expects to maintain its annual dividend of $0.60 per share after the transaction closes, providing meaningful benefits to stockholders in the form of long-term capital returns***; and

- ***this dividend also represents a substantial increase in the annual dividend currently received by EarthLink stockholders***;

\*          \*          \*

*Alternatives*

\*          \*          \*

- Windstream was the most logical strategic partners in a consolidating industry in light of its complementary products and strategic position and the potential realization of synergies, such that ***a business combination with Windstream was most likely to provide the highest long-term value to EarthLink's stockholders***.

64.    Similarly, upon announcing the Merger, Defendants issued a press release stating that the Merger "'***further advances Windstream's strategy by creating a stronger,***

*more competitive business to serve our customers while increasing free cash flow and reducing leverage*.'"   That press release is part of the Offering Documents.

65.     Upon announcing the Merger, Defendants also issued a presentation with the following slide, which states that the Merger "***Improves Balance Sheet***," "***Reduces leverage, improves credit profile and provides more financial flexibility***," and that its "***Significant adjusted FCF accretion supports continued network investment, debt reduction and provides greater coverage of the dividend***."   That presentation is part of the Offering Documents.

66.     Despite the unsustainability of Windstream's dividend, the same presentation included the following statement:   "***Dividend Practice:  Maintain Windstream annual dividend of $0.60 / share***."   And despite the undisclosed issues faced by Windstream, that presentation also stated that Windstream "***Continued to optimize our balance sheet by reducing debt and lowering interest cost***."

67.     Despite the undisclosed unsustainability of Windstream's dividend, the Joint Proxy/Prospectus also included a table of "Unaudited Comparative Per Share Data," which included both companies' "historical per share data," as well as "pro forma information" intended to represent post-Merger Windstream's "Cash dividends declared per common share."   When describing the historical and pro forma numbers, the Joint Proxy/Prospectus twice stated, "***[p]ro forma same as historical, as no change in Windstream's dividend policy is expected as a result of the mergers***."   The analysis included the following table:

| | Year Ended December 31, 2015 | | | |
|---|---|---|---|---|
| | Windstream Historical | EarthLink Historical | Windstream Pro Forma | EarthLink Equivalent Pro Forma (1) |
| | (in millions, except per share data) | | | |
| Net income (loss) per common share: | | | | |
| Basic | $.24 | ($.42) | ($.20) | ($.16) |
| Diluted | $.24 | ($.42) | ($.20) | ($.16) |
| | | | | |
| Cash dividends declared per common share (2) | $.60 | $.20 | *$.60* | *$.49* |

(1)   *Represents Windstream's pro forma amounts adjusted by the exchange ratio of 0.818.*

(2)   *Pro forma same as historical, as no change in Windstream's dividend policy is expected as a result of the mergers.*

68.     Again, despite the undisclosed unsustainability of Windstream's dividend, the Joint Proxy/Prospectus stated the following in connection with Windstream's October 5, 2016 indication of interest to EarthLink:

> In delivering the proposal, Mr. Thomas highlighted some of the reasons for EarthLink to consider a potential combination, including that ***the two companies could create more value together than apart***, that EarthLink stockholders would own approximately 45% of the combined company, that substantial synergies would be expected from the combination ***and that the amount of the dividend currently paid to EarthLink stockholders would likely increase following the transaction***.

69.     The Joint Proxy/Prospectus also touted "fairness opinions" from contingently-compensated financial advisors, which reflected a continued dividend from Windstream. The Joint Proxy/Prospectus stated that the financial advisors' opinions provided support for the EarthLink Defendants' recommendation "FOR" the Merger.

70.     EarthLink's lead financial advisor, Foros Securities LLC ("Foros"), prepared a "Present Value of Future Share Price Analysis," which analyzed the present value of Windstream's stock price.  The analysis applied multiples to certain cash-flow metrics, then

discounted the share prices and "***dividends to be paid on Windstream common stock through December 31, 2018***" to present value, resulting in valuations for Windstream of ***$6.78 to $16.99*** and ***$4.02 to $18.93*** per share.  In that regard, the Joint Proxy/Prospectus stated:

> In arriving at the estimated implied per share prices for Windstream common stock, Foros applied multiples ranging from 5.5x to 6.0x to Windstream's estimated NTM Adjusted EBITDAR as of December 31, 2016, December 31, 2017 and December 31, 2018.  Foros then discounted the share prices and ***dividends to be paid on Windstream common stock through December 31, 2018 based on Windstream's current dividend policy*** to present value as of October 31, 2016 using a discount rate of 12.5%, which rate was selected based on Windstream's estimated cost of equity.  This analysis indicated a range of implied per share prices for ***Windstream common stock as of October 31, 2016 of approximately $6.78 to $16.99***, compared to the closing per share price of Windstream common stock on November 3, 2016 of $6.78.
>
> In arriving at the estimated implied per share prices for Windstream common stock, Foros also applied multiples ranging from 9.5x to 10.5x to Windstream's estimated NTM UFCF as of December 31, 2016, December 31, 2017 and December 31, 2018.  Foros then discounted the share prices and ***dividends to be paid on Windstream common stock through December 31, 2018 based on Windstream's current dividend policy*** to present value as of October 31, 2016 using a discount rate of 12.5%, which rate was selected based on Windstream's estimated cost of equity.  This analysis indicated a range of implied per share prices for ***Windstream common stock as of October 31, 2016 of approximately $4.02 to $18.93***, compared to the closing per share price of Windstream common stock on November 3, 2016 of $6.78.

71.     The Joint Proxy/Prospectus touted a similar valuation from Foros of the combined company, *i.e.*, post-Merger Windstream, by extending the current dividend policy out to December 31, 2018:

> *Present Value of Future Share Price-Based Analysis*
>
> Foros reviewed the implied per share values of EarthLink common stock on a stand-alone basis using a present value of future share price analysis described above, applying multiples ranging from 5.0x to 6.0x to EarthLink's estimated

NTM Adjusted EBITDA as of December 31, 2018, and discounting the resulting share price and dividends to be paid on the EarthLink common stock through December 31, 2018 based on EarthLink's current dividend policy to October 31, 2016 using a range of discount rates of 10.5% to 12.5%, which rates were selected based on EarthLink's estimated cost of equity. Foros also reviewed the implied per share value of the combined company's common stock using a present value of future share price analysis for the combined company's estimated future share price as of December 31, 2018.  For the present value of future stock price analysis of the combined company, Foros applied multiples ranging from 5.25x to 5.75x to the combined company's estimated NTM Adjusted EBITDAR as of December 31, 2018 based on the EarthLink Projections and the Windstream Projections as adjusted by EarthLink, including estimated synergies based on assumptions provided by EarthLink management.  Foros then discounted the share price and ***dividends to be paid on the combined company's common stock through December 31, 2018 based on the combined company's anticipated dividend policy to October 31, 2016*** using a range of discount rates of 11.5% to 13.5%, which rates were selected based on the combined company's estimated cost of equity.  The results of this analysis are summarized below:

| Implied Equity Value of EarthLink Common Stock and Cash Dividends on a Stand-Alone Basis | Implied EarthLink Per Share Value of Combined Company's Common Stock and Cash Dividends |
|---|---|
| $5.46 - $7.13 | ***$7.95 - $12.13*** |

72.     As a result of the foregoing analysis, the Joint Proxy/Prospectus touted Foros' conclusion that "***the exchange ratio was fair, from a financial point of view, to the holders of EarthLink common stock***."  EarthLink and eventually Windstream paid Foros $13.5 million for that opinion.

73.     Goldman, Sachs & Co. ("Goldman") acted as EarthLink's second financial advisor.  The Joint Proxy/Prospectus also enticed EarthLink stockholders through Goldman's "Illustrative Present Value of Future Stock Price Analysis," which utilized "***estimated per share dividends to be paid by Windstream through December 31, 2017 or 2018, as applicable***" and Goldman referenced "***an aggregate amount of estimated per share dividends to be paid by the pro forma combined company through December 31, 2017 or***

***2018, as applicable***." Goldman's analysis therefore indicated that the post-Merger Windstream would in fact continue to pay dividends through at least December 31, 2017.

74. The Joint Proxy/Prospectus additionally contained an "Illustrative Financial Contribution" analysis from Goldman, which also indicated that the post-Merger Windstream would continue to pay a divided through 2017 and 2018:

*Illustrative Financial Contribution Analysis*

Goldman Sachs analyzed the implied equity contributions of EarthLink and Windstream to the pro forma combined company, based on specific estimated future financial metrics including revenue, Adjusted EBITDA, ***dividend yield*** and levered free cash flows (which we refer to in this section of this joint proxy statement/prospectus as LFCF) ***for the next twelve months and for estimated fiscal years ending on December 31, 2017 and 2018***, as reflected in the Forecasts and using market data as of November 3, 2016. The analysis was conducted on a pro forma basis by applying (i) a blended multiple to EarthLink's and Windstream's respective revenue and Adjusted EBITDA metrics to arrive at an illustrative implied enterprise value as of the end of the next twelve months and December 31, 2017 and 2018 for each of EarthLink and Windstream and subtracting EarthLink's and Windstream's respective amounts of net debt as of such dates, as reflected in the Forecasts, to calculate an implied equity value for each of EarthLink and Windstream and (ii) ***a blended estimated yield to EarthLink's and Windstream's respective dividend and LFCF metrics to arrive at an implied equity value for each of EarthLink and Windstream***.

The analysis resulted in the following implied equity contribution of EarthLink and Windstream, respectively, to the pro forma combined company and the implied exchange ratio for a share of EarthLink common stock into Windstream common stock, in each case, using each financial metric for EarthLink and Windstream for the next twelve months ended November 2017 and the estimated fiscal years ending on December 31, 2017 and 2018:

| | Weighted Contribution to Pro Forma Combined Company | | Implied Exchange Ratio |
|---|---|---|---|
| | **Windstream** | **EarthLink** | |
| **Revenue** | | | |
| NTM | 48.8% | 51.2% | 0.901 x |
| 2017E | 49.0% | 51.0% | 0.894 x |
| 2018E | 43.6% | 56.4% | 1.110 x |

| EBITDA | | | |
|---|---|---|---|
| NTM | 54.6% | 45.4% | 0.712 x |
| 2017E | 53.8% | 46.2% | 0.738 x |
| 2018E | 47.6% | 52.4% | 0.944 x |
| *Dividend* | | | |
| *NTM* | *72.6%* | 27.4% | *0.325 x* |
| *2017E* | *72.0%* | 28.0% | *0.334 x* |
| *2018E* | *72.9%* | 27.1% | *0.320 x* |
| LFCF | | | |
| 2017E | 32.9% | 67.1% | 1.752 x |
| 2018E | 52.2% | 47.8% | 0.785 x |

75.    As a result of the foregoing analysis, the Joint Proxy/Prospectus touted Goldman's conclusion that "***the exchange ratio pursuant to the merger agreement was fair from a financial point of view to the holders (other than Windstream and its affiliates) of EarthLink common stock***." EarthLink and eventually Windstream paid Goldman $3.5 million for that opinion.

76.    Further, without disclosing the severity of Windstream's fundamental problems described herein, the Joint Proxy/Prospectus stated:

> The EarthLink board of directors (which we refer to as the EarthLink Board) has unanimously approved the merger agreement and the transactions contemplated thereby, including the mergers, and has determined and ***declared that they are advisable and are in the best interests of EarthLink and its stockholders***. ***The EarthLink Board unanimously recommends that EarthLink stockholders vote "FOR" the merger proposal***, "FOR" the EarthLink adjournment proposal and "FOR" the compensation proposal.

> \*       \*       \*

> Q:  How does the EarthLink Board recommend that EarthLink stockholders vote?

> A:  The EarthLink Board has unanimously approved the merger agreement and the transactions contemplated by the merger agreement, including the mergers, and has determined and ***declared that they are advisable and are in the best interests of EarthLink and its stockholders***. ***The EarthLink Board unanimously recommends that EarthLink stockholders vote "FOR" the***

- 26 -

*merger proposal*, "FOR" the EarthLink adjournment proposal and "FOR" the compensation proposal.

77.     Finally, the Joint Proxy/Prospectus cautioned EarthLink investors not to look elsewhere for information regarding Windstream, EarthLink, or the Merger:

> You should rely only on the information contained in or incorporated by reference into this joint proxy statement/prospectus.  No one has been authorized to provide you with information that is different from that contained in, or incorporated by reference into, this joint proxy statement/prospectus.  This joint proxy statement/prospectus is dated January 23, 2017, and you should assume that the information contained in this joint proxy statement/prospectus is accurate only as of such date.  You should assume that the information incorporated by reference into this joint proxy statement/prospectus is only accurate as of the date of such information. Neither the mailing of this joint proxy statement/prospectus to EarthLink stockholders or Windstream stockholders nor the issuance by Windstream of shares of common stock pursuant to the merger will create any implication to the contrary.

78.     The bold, italicized statements in ¶¶62-76 were materially false and misleading when made because they failed to disclose the following adverse facts:

(a)     that Windstream was suffering worsening revenue trends and was on pace to significantly miss market expectations in its legacy business;

(b)     that Windstream was seeing material declines in its wholesale and enterprise business sectors;

(c)     that Windstream was observing increased and aggressive competition and price cuts by larger telecommunications service providers and cable operators;

(d)     that Windstream did not have the operational capabilities, customer base, or products to reverse worsening revenue trends;

(e)     that Windstream's ability to service its increasing debt load had been materially impaired;

- 27 -

(f)     that Windstream's financial health and standalone business operations were deteriorating; and

(g)     that, as a result of (a)-(f) above, Windstream's dividend was unsustainable and likely to be cut or eliminated.

79.     Indeed, the Windstream dividend was already unsustainable at the time of the Merger negotiations.  Despite Windstream's representation on October 5, 2016 that its dividend "would likely increase following the transaction," the EarthLink Defendants, on October 10, 2016, submitted a counterproposal with a 0.8 exchange ratio and inserted the following provision: "the parties must mutually agree before signing upon the dividend for the combined company."  The Windstream Defendants recognized that this presented a problem.  So, the very next day, October 11, 2016, Windstream submitted a counterproposal at .075 and containing the following provision:  "maintenance of Windstream's existing $0.60 per share dividend policy following the transaction, at the discretion of the Windstream Board."  The new language, "at the discretion of the Windstream Board," essentially rendered the dividend requirement meaningless.  EarthLink then dropped the provision altogether.

80.     Analysts also observed that the unsustainability of the dividend was a fact which existed long before the eventual dividend cut.  On August 3, 2017, Windstream surprised the market by eliminating its dividend, sending shares plummeting.  On September 7, 2017, an analyst from BofA Merrill Lynch, David W. Barden, made the following statement to Windstream's CFO Gunderman at a Bank of America Merrill Lynch

- 28 -

Conference, which described the market's belief that Windstream had a preexisting "house-on-fire problem inside the business," leading to dividend cut that Windstream expected:

> And so, the equity market responded to the dividend cut with a 50% haircut on the stock. And I think, day 1, there was actually what I thought was maybe a fairly logical, for most of the day, fairly logical opposite reaction to the bond market, which was, okay, Windstream has more cash to deploy to the debt holders. It's a greater interest cover and the rest of it. ***But then, all of a sudden, they [investors] didn't believe that anymore. They actually believed that . . . so much damage had been done to the stock that no management team would have ever knowingly done what they did if there hadn't been some house-on-fire problem inside the business that caused them to create such havoc to the equity market, and the bond market got scared.*** Totally unanticipated on your part?

81.    Gunderman responded to simply state that "we were certainly surprised to see the reaction from the fixed income community," *i.e.*, the bond-holders, but Gunderman said nothing to indicate that the dividend cut itself was unexpected or unanticipated on Windstream's part. Gunderman also could not deny that Windstream had major, preexisting problems inside the business.

82.    Mounting problems and headwinds existed in Windstream's wholesale, enterprise, legacy and standalone businesses, which were also not disclosed in the Offering Documents. As described below, on May 4, 2017 – shortly after the close of the Merger – when Windstream reported "disappointing results, missing both revenue and EBITDA expectations" and "weak results, falling short of . . . estimates across every category," Windstream's CFO Gunderman stated, "[t]hat's something that we expected." On May 31, 2017, when asked about the "first-quarter results" that caused the stock to be "a little bit punished," Thomas clarified that certain Windstream customers had lost funding "on January 1 [2017]" (prior to issuance of the Joint Proxy/Prospectus). As further described

- 29 -

below, on June 8, 2017, Gunderman admitted that with respect to the unusually aggressive pricing compression in wholesale and enterprise, which depressed revenues, "I wouldn't say [it was] that, that unexpected." All of these problems snowballed throughout the remainder of 2017 and through 2018 and put mounting pressure on Windstream's operations and ability to make debt payments.

83.     Defendants' pronouncements regarding the Merger's ability to generate cash flow, reduce leverage, and cover the dividend created a misperception that Windstream was stable and its dividend secure. To illustrate, as noted above, Defendants' documents formally announcing the Merger on November 7, 2016 stated:

> Compelling Strategic and Financial Benefits:
>
> *        *        *
>
> ***Enhances balance sheet and increases free cash flow***: Including run-rate synergies, on a pro forma basis for the 12 months ended Sept. 30, 2016, the combined company would have a net leverage ratio of 3.2x. Further, the transaction will be significantly accretive to Windstream's adjusted free cash flow ***allowing greater financial flexibility*** for strategic network investments ***and debt reduction while increasing dividend coverage***.

84.     As a result, Merrill Lynch posted a flash note the same day stating: "We maintain our Buy rating, as we believe the dividend is secure and the current 8.3% yield is too high for the risk proposition the company presents." Three days later, and explicitly based on Defendants' Merger-related statement, *24/7 Wall Street* wrote, "it appears that the super-high dividend is safe for now. That is what the company and analysts are telegraphing." On November 18, 2016, again explicitly based on Defendants' Merger-related statements regarding increasing dividend coverage, Cowen & Company reported: "Windstream management remained adamant that the $0.60/share dividend is still important.

- 30 -

Windstream further pointed to the advantages of higher FCF (and improved coverage) that the merger will provide, which not only secures the dividend but makes it less of a burden as the influx of FCF will allow for plenty of capital discretionary opportunities such as de-leveraging, network expansion and other growth-related spending."   The Offering Documents fueled and then perpetuated that misperception.

85.     Similarly, on November 7, 2016, Thomas and Eazor held a call describing the status of Windstream's business and the Merger, stated: "With the achievement of the significant synergies, adjusted free cash flow increases meaningfully, in addition to providing great coverage to – greater coverage to the dividend, the enhanced cash flow is supported by continuous strategic network investments and lower leverage."   Cowen & Company issued a report regarding that call on November 18, 2016, stating, "[w]e came away more confident in . . . subsequent meaningful FCF growth (and dividend coverage) that we believe will ultimately get the stock to work."   A number of analysts reached similar conclusions based on similar comments in the Offering Documents.   The Offering Documents fueled and then perpetuated that misperception as well.

86.     The EarthLink Defendants acted negligently in issuing the Proxy and Joint Proxy/Prospectus.   The EarthLink Board discussed and received presentations from advisors (Foros and Goldman) regarding Windstream's business and financial health, or lack thereof, on October 7, 2016; October 10, 2016; October 12, 2016; October 17, 2016; October 21, 2016; October 26, 2016; October 31, 2016; November 4, 2016; and November 5, 2016.   The companies entered into a non-disclosure agreement on October 4, 2016, exchanged extensive data-rooms on October 12, 2016.   In fact, following that extensive non-public disclosure, on

- 31 -

November 4, 2016, EarthLink's CEO Eazor called Windstream's CEO to, according to the Joint Proxy/Prospectus, "to express concern regarding the proposed 0.8 exchange ratio in light of the market's reaction" to an article leaking the contemplated merger.  Despite that "concern," the EarthLink Defendants thereafter completed the deal at an exchange ratio of just 0.818, which did not materially differ from the .08 exchange ratio that caused concern.

87.    In addition, Item 11 of Form S-1 required the Registration Statement to furnish the information called for under Item 303 of Regulation S-K [17 C.F.R. §229.303], Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A").  As set forth in the December 29, 2003 interpretative release to Item 303 of Regulation S-K issued by the SEC (the "2003 Interpretive Release"), the purpose of MD&A is to provide investors with information necessary to an understanding of a company's results of operations, including the identification and disclosure of known trends, events, demands, commitments and uncertainties that are reasonably likely to have a material effect on a company's operating performance.

88.    The instructions to Item 303(a) of Regulation S-K required that the Registration Statement provide disclosure about and "focus specifically" on material events and uncertainties that would cause Windstream's reported financial information not to be necessarily indicative of future operating results, including "matters that would have an impact on future operations and [matters that] have not had an impact in the past" stating, in pertinent part, as follows:

> The discussion and analysis shall focus specifically on material events and
> uncertainties known to management that would cause reported financial
> information not to be necessarily indicative of future operating results or of
> future financial condition.  This would include descriptions and amounts of

(A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

89.     The 2003 Interpretive Release also provides that the Registration Statement was required to provide disclosure about known demands, events or uncertainties, except for those that management determined: (i) were not reasonably likely to occur; or (ii) would not have a material effect on Windstream's operating results.  The 2003 Interpretive Release states, in pertinent part, as follows:

> As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty is required unless a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.

90.     As described in detail above, the facts listed in ¶78 were not disclosed in the Joint Proxy/Prospectus, and thus the Registration Statement, as required under Item 303. Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503, requires, in the "Risk Factor" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."  The failure of the Registration Statement to disclose the issues described above violated Item 503 because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in shares of Windstream common stock speculative or risky.

91.     Although the Offering Documents included generic warnings that are applicable to any company with a dividend in the telecommunications sector, these conditional and speculative representations were themselves misleading because they failed

to disclose material adverse facts that ***already*** existed or were reasonably likely to occur and the specific risks and the magnitude of the risks that resulted in the massive losses described herein.  The boilerplate warnings were insufficient to negate the misleading impression created by the misrepresentations in the Offering Documents, alleged herein, that Windstream was a stable company with a stable and growing dividend.

## EVENTS FOLLOWING THE ISSUANCE OF THE JOINT PROXY/PROSPECTUS

92.     On February 24, 2017, pursuant to an uninformed vote, EarthLink and Windstream obtained shareholder approval of the Merger.

93.     On February 27, 2017, Defendants completed the Merger.  As a result, each share of EarthLink common stock was exchanged for .818 shares of Windstream common stock.  In the aggregate, Windstream issued approximately 93 million shares of its common stock in a transaction valued at approximately $1.1 billion.  Upon closing of the Merger, Windstream stockholders owned approximately fifty-one percent (51%) and EarthLink stockholders owned approximately forty-nine percent (49%) of the combined company.

**Windstream Repeatedly Posts Disappointing Numbers in the First Half of 2017**

94.     Almost immediately after the Merger's close, Windstream began posting weak results, leading to concerns about a declining business.  This temporal proximity further affirms that the undisclosed facts alleged herein existed before the Offering Documents were issued.  On March 1, 2017, two days after the close, Windstream issued its 2016 fourth quarter and annual consolidated results of operations.  The very next day, *Seeking Alpha* wrote that Windstream's most recent "results didn't exactly help the investment thesis for

- 34 -

Windstream.  The local telecom provider missed revenue estimates by a wide $30 million adding to general concerns about a declining business."  On March 27, 2017, Moody's announced that it had changed its ratings on Windstream's debt from "stable" to "negative" after "the company's weak 2016 results and 2017 guidance."  Moody's concluded that Windstream's "downward trajectory of the business will persist and pressure Windstream's B1 rating."

95.     The situation worsened.  On May 4, 2017, Windstream reported disappointing results for Q2 2017.  UBS reported: "Slow start to the year . . . WIN's 1Q results showed continued operational challenges.  Service revenues declined 6.6%, above mgmt's guidance of ~.4% for the yr.  Revenues fell across all segments, incl. consumer at -0.3%, Enterprise at -2.6%, Carrier at -8.9%, ILEC SME at 5.9%, and CLEC SME at -17.8%."  The same day, May 4, 2017, Robert E. Gunderman, Windstream's CFO, revealed, "[w]holesale has been of a bit of a headwind in terms of the [Windstream] legacy services and the pressures.  That's something that we expected, that's baked within our guidance for the year."  As Jefferies reported the following day, "Windstream reported disappointing results, missing both revenue and EBITDA expectations. . . .  Windstream suffered weak results, falling short of our estimates across every revenue category," including enterprise and wholesale.

96.     On May 31, 2017, Windstream CEO Thomas gave a presentation at the Cowen Technology, Media & Telecom Conference, followed by a Q&A with analysts, which included the following exchange:

Greg Williams – Cowen and Company Analyst:

Let's talk about 2Q versus 1Q and the seasonal effect.  ***Your first-quarter results left a little bit to be desired; the stock was a little bit punished for it***.

- 35 -

Again, with the RLEC concerns, folks are concerned about the overarching sector.

And starting with the enterprise revenue, it slipped down 3.9% Q over Q.  You guys continue to say you are chasing profitable growth.  ***But I think it slipped a little more than folks had hoped***.  How much of that slip was beyond chasing profitable growth?  Maybe explain what happened; where's the new trajectory as we think about enterprise revenue?

Tony Thomas – Windstream Holdings, Inc. – President and CEO

Yes, we talked about enterprise revenues being in the low-single-digit declines.  Our 1Q results were modestly below our expectations.  I think we saw a little bit of hangover from the election, a little bit of delay in decision-making.

*      *      *

Greg Williams – Cowen and Company – Analyst:

***Just first on the top line a little bit more, was there any sales hiccup with EarthLink at all?***

Tony Thomas – Windstream Holdings, Inc. – President and CEO:

***There was no sales hiccup at EarthLink.  We had a couple customers who were rural healthcare funded that lost their funding on January 1.  So that was a little bit of a hiccup, but that was actually legacy Windstream, nothing to do with EarthLink.  So that was a little bit of noise in the numbers in 1Q that created a little more pressure***.  But I still look forward in what I would call no foundational changes in the business.

97.    Defendants mailed the Joint Proxy/Prospectus to stockholders on January 25, 2017 and thus, this revenue problem existed prior to its mailing.

98.    Next, Windstream's CFO Gunderman fielded questions from analysts on June 8, 2017 at the Barclays High Yield Bond and Syndicated Loan Conference.  During that conference, Gunderman described increased competitive pressures, aggressive pricing from competitors, and headwinds in the carrier and wholesale business.  The following exchange occurred:

- 36 -

Jeffrey Alan Harlib – Barclays PLC, Research Division – MD:

Okay. Maybe talk about the wholesale segment. I know you thought revenue pressures would be somewhat higher in '17 than '16. Q1, they were somewhat worse than that. Just talk about whether it's network grooming, carrier consolidation, what are some of the effects there and how can you offset that?

Robert E. Gunderman – Windstream Holdings, Inc. – CFO:

Yes, and I think you hit on 2 things that have certainly been a headwind in our carrier and wholesale business. The consolidation and grooming that's occurring with our peers and our customers and certainly impacted our top line. I often say the same thing that we are doing on behalf of our enterprise and SMB businesses, where we buy access from other carriers, well, that's their wholesale revenues. We're doing the same thing to them. That's happening to us at some level. We spend a lot more than we sell in access services, and so there's a little bit of a hedge there. ***The other thing that certainly happened on the wholesale business is pricing compression has occurred***. As bandwidth consumption has gone up at a pretty rapid pace, the pricing per bandwidth has certainly come down. And so we've seen some of that sort of yield pressure, if you will, happen within wholesale. I'm proud of what the team has done in terms of selling more new logos, and selling more bandwidth to the content companies, to some extent, the cable companies who are now competing more aggressively on the enterprise side, where they don't have network. They use companies like us on the wholesale side to complete their network. We're doing a good job with that in expanding our network to capture those opportunities. I think that's going to pay dividends in the future for us. ***But in the near term, what we're seeing is the repricing and the renewal of our base. It's just been too much for us to overcome on top line, and we're still feeling some pressure on that this year***.

99.    Also during that same June 8, 2017 Barclays conference, Gunderman highlighted increased competitive pressures and aggressive pricing from the national cable competitors, and made clear that Windstream had "expected" this to occur. The Offering Documents did not disclose these facts as well. An analyst from Barclays asked the following question:

Jeffrey Alan Harlib – Barclays PLC, Research Division – MD:

Okay. I'd like to go through the different segments, business performance and outlook. Maybe we'll start with consumer SMB, ILEC. Clearly, the sublosses

- 37 -

have significantly moderated with the completion of Project Excel and speed upgrades.  Talk about how you further improved gross adds, reduced churn, how you're seeing cable competition from Comcast, spectrum and also video strategy?

100.    After a non-response from Gunderman, the Barclays analyst pressed further:

Jeffrey Alan Harlib – Barclays PLC, Research Division – MD:

Okay.  And just cable competition, Comcast especially.  What are you seeing from them?  And how are you positioned in the market?

Robert E. Gunderman – Windstream Holdings, Inc. – CFO:

Right.  So cable competition has been no less.  It's – Comcast and Charter are our 2 biggest competitors, actually, Charter being the largest at over 30% overlap for our business, Comcast in the kind of mid-teens range.  After that, it falls off pretty significantly from the national cable competitor standpoint.  Around 20% of our footprint today has no cable competition.  *And so where we see cable competition at the national level, they have been aggressive.  Charter, in particular, has been an aggressive competitor.  I wouldn't say that, that unexpected.  We did expect them to get – stay competitive in their markets, that they overlap with us*.  These markets are Lexington, Lincoln, some of those places.  Those are also places where we have brought more speed capability to the marketplace, to get more on parity with what they're offering.  *But it's aggressive.  I mean, there's an aggressive push out there with pricing, promoting price that's pretty low for the first year.*  We're doing the same thing.  I think we're holding our own in those areas.  As you look at our opportunity in those markets, we actually have what I call insurgent market share now because of some of the share losses that have happened over the past number of years.  And so we've been able to be aggressive with our pricing and really come after that share and try to win it back, and that's what we'll continue to you.  And then in the more rural markets, which is still a very significant part of our footprint, we could be more defensive in really protecting our base but also growing our base of customers in that wallet share that we have out there.  And so that's how we've gone into market recently.

101.    As described in detail herein, Gunderman was inaccurate about at least one thing:  Windstream was not "holding its own" in any of those areas.  Windstream's results were crumbling in the face of "expected" but unusually aggressive price cuts from national cable competitors.

**Windstream Shocks the Market and Eliminates Its Dividend**
**While Continuing to Release Disappointing Numbers**

102.    The unsustainability of Windstream's dividend was finally exposed on August 3, 2017.   On that date, Windstream announced that it was ending its quarterly stockholder dividend effective immediately.   The same day, Windstream also reported a $68 million 2Q 2017 loss (compared with net income of $1.5 million a year prior) and that operating income was $107 million, down 31% from $155 million in the same period a year prior.   UBS titled its analyst report the same day, "Revenues light; Dividend gone."

103.    These announcements were not well received.   *Seeking Alpha*, in an August 3, 2017 article entitled, "The Death of Windstream," explained that "the reason people owned this name, or other high risk telecoms, is for the bountiful dividend. . . .   The problem?   The elimination of the dividend is enough for most investors to throw in the towel."   And in an August 3, 2017 article entitled, "Windstream Stock Tumbles as Dividend Eliminated," *24/7 Wall Street* wrote:   "The company has missed profit estimates by big margins in each of the past four quarters and shares have plummeted from a high of [$52.25] last September to below [$17.50] this morning."   As noted, one analyst recorded the market's belief that "so much damage had been done to the stock that no management team would have ever knowingly done what they did if there hadn't been some house-on-fire problem inside the business that caused them to create such havoc to the equity market."

104.    Jefferies reduced its price target for Windstream stock from $25.00 to $12.50 per share on August 4, 2017, noting in bold text, "**Elimination of the Dividend Sends Investors Out the Door**" and stating that "investors sold [Windstream] shares aggressively on the news."   Jefferies also observed Windstream's underlying and more fundamental

problems, writing that "[t]he loss of high-margin legacy revenue, and declining broadband subscribers will continue to weigh on results and sentiment." On August 7, 2017, Deutsche Bank described the "headwinds across key segments," including "Residential share loss [and] SME/Enterprise slowdowns from slower spend."

105.   On August 11, 2017, UBS issued an analyst report entitled: "Windstream Corporation:  Dividend cut didn't solve all problems."  The report described Windstream's "weak 2Q results," lowered free cash flow by 12% and that "competitive pressures to continue to hurt the top-line."  UBS described the 2Q results as follows:

> WIN's 2Q results remained weak, missing our estimates by − 1%.  Service revenues fell 7.5% yoy, accelerating from a 6.6% decline in 1Q.  Weakness was driven by Enterprise (down 4.7% vs. -3.9% in 1Q – as data revenues fell for the first time), and continued declines in other segments.  Similarly, the 2017 revenue guide was lowered by -2% and EBITDA by 1% (exc. $120M revenue and $20M contribution from Broadview).  . . .

106.   UBS also stated: "We are concerned that challenging business trends along with sustained weakness in voice/wholesale continue to drive top line pressure.  While management had identified new cost cutting and synergy opportunities, we believe this will not be sufficient to stabilize EBITDA."  UBS also expressed concern about Windstream's ability to service its debt:  "We believe capital intensity needs to remain at mid-teens to drive profitable revenue growth on a sustainable basis, which combined with low-SD EBITDA declines does not leave much room for leverage to fall. . . .  Despite the recent dividend cut, worries remain about the company's ability to stabilize the top line and de-lever over time." UBS concluded by summarizing Windstream's performance as follows:

> WIN's standalone results have been under pressure, with a revenue decline of 7.5% in 2Q17, up from 4% in 2016 and 1-3% in recent years.  This has caused margins to fall from the high-30s several years ago to 33.5% in 2Q.  Revenues

have been declining across all segments, although contribution margin in Enterprise has been expanding with on-net growth. Capital intensity has been elevated with Project Excel (15%+ of revenue) but the project was completed in 2Q.

107.   On September 13, 2017, *Seeking Alpha* published an article entitled, "Windstream: Full Panic Mode." The summary stated, "Windstream sent the market into panic mode with a new capital allocation plan in August. Windstream made a surprise announcement to immediately eliminate the dividend and implement a stock buyback plan. The stock ended the prior day trading at $3.72 and has nearly lost 50% of the value as dividend investors flee the stock and the market extrapolates too many negatives from the dividend elimination." On September 29, 2017, *Dividend.com* described the 76% year-to-date drop in Windstream's stock price and wrote that, "[t]he 'nail in the coffin' for Windstream was when the company eliminated its dividend in early August . . . ."

**Windstream's Results Continue to Deteriorate;
Windstream Receives a Notice of Default**

108.   On October 18, 2017, an analyst at *Seeking Alpha* wrote a report entitled: "Windstream: There's Blood On The Streets." The report opened with the following points:

Summary

•      Short interest in Windstream has spiked to an all-time high.

•      This indicates that market participants are betting on its stock to fall further.

•      Its shares could stay distressed over the coming weeks due to the heightened selling pressure.

Shareholders of Windstream (NASDAQ: WIN) have had a painful last few months. Value of their holdings in the company has depreciated by almost 50% over the last quarter. After such a drastic downtrend, it's natural to ask if selling pressure in the scrip has subsided by now. But that's unfortunately not the case here. Latest data filing reveals that short interest in the company has

- 41 -

risen yet again to reach an all-time high.  And this continuing increase in selling pressure suggests that shares of Windstream could fall further.

109.   *Seeking Alpha* also observed:

Windstream has been posting dismal financials over the past few quarters.  It has missed the lower end of analyst estimates in six of the past seven quarterly results and discussions about its potential bankruptcy are becoming popular in most investing forums with each passing week. . . .  Windstream has gone from being a conservative income play to a speculative investment.

110.   Windstream continued to post disappointing results.  After Windstream pre-announced 3Q 2017 results, Deutsche Bank reported on October 31, 2017 that "Organic revenue trends are worsening:  Service revenue of $1.47bn was -0.8% vs. our estimate, and core trends are deteriorating."

111.   On September 21, 2017, Windstream received a notice of default from Aurelius Capital Master, Ltd., a holder of Windstream's 6 3/8% Senior Notes due 2023 issued under the indenture dated January 23, 2013.  The Notice stated that the transfer of certain assets and the subsequent lease of those assets in connection with the spinoff of Communications Sales & Leasing, Inc. (now known as Uniti Group, Inc.) in April 2015 constituted a Sale and Leaseback Transaction which did not comply with certain covenants. The Notice further stated that Windstream violated the restricted payment covenant under the Indenture by not delivering an officers' certificate as required by the Indenture and that it made a restricted payment in reliance on the restricted payment builder basket during the pendency of an alleged default which is prohibited by the Indenture.

112.   Moody's reported shortly thereafter, on September 26, 2017, that "Moody's views this disclosure as a negative event that raises uncertainty around Windstream and which could further impede Windstream's ability to access the capital markets.  If the issue

- 42 -

is not resolved quickly and in favor of the company, Windstream could encounter difficulties accessing funds to refinance its debt maturities, most notably the company's revolving credit facility and term loan B-6 which, under certain circumstances, both mature in April of 2020." The report continued: "Moody's believes that Windstream's limited financial flexibility exposes it to a potential deterioration of liquidity if the issue drags on for a prolonged period, especially if negative market forces continue to be amplified by the disclosure of the notice of alleged default." Windstream did not resolve the Aurelis notice-of-default issue quickly and the matter is currently in trial in the United States District Court for the Southern District of New York (as of the filing of this Amended Complaint). Windstream has conceded in court filings that an Event of Default and acceleration of debt would likely force Windstream into bankruptcy.

113.   On November 3, 2017, Moody's downgraded Windstream's debt to B2 and again reported that the "outlook remains negative" because "Windstream's weak revenues and EBITDA continue to weigh on its ratings, with year over year declines in the 4% to 5% range." Ten days later, November 13, 2017, *Seeking Alpha* issued a report entitled, "Windstream Is In Critical Condition," observing that "The reason the stock tanked, aside from facing extreme competitive pressures and financial issues, is that the company had eliminated its dividend all together back in August."

**Windstream's Debt Is Again Downgraded,
Announces a Reverse Stock Split**

114.   In February 2018, Windstream reported a fourth-quarter net loss of $1.84 billion, or $10.26 per share, compared to a net loss of $87 million, or 94 cents per share, in the same quarter of the prior year. Windstream stated that the charge "was primarily due to

- 43 -

changes in long-term, cash-flow projections driven by recent operational results and future assumptions as well as changes in cost of capital assumptions."

115.   On February 28, 2018, Moody's downgraded Windstream's debt to B3 and again reported that its "outlook remains negative." Moody's led the report with the following summary:

New York, February 28, 2018 – Moody's Investors Service, (Moody's) has downgraded the corporate family rating (CFR) of Windstream Services, LLC (Windstream) to B3 from B2 based on the company's sustained weak operating trends and a challenging debt maturity profile. Moody's has also downgraded Windstream's probability of default rating (PDR) to B3-PD from B2-PD, its secured rating to B3 from B2 and its unsecured rating to Caa1 from B3. Windstream's speculative grade liquidity rating (SGL) remains at SGL-2, reflecting good liquidity. ***The outlook remains negative due to Moody's expectation of continued pressure on EBITDA, negative free cash flow including persistent restructuring costs, and low asset coverage relative to debt***.

Windstream faces large debt maturities of over $1 billion each in 2020 and 2021 and strong negative market sentiment that poses very high refinancing risk. Windstream's revenues and EBITDA declined 5.5% (pro forma) in 2017 versus 2016. Moody's expects this trend to continue in 2018 and pressure cash flow and liquidity. Management expects an improvement in EBITDA trend in 2018 and a return to growth in 2019. Absent a change in EBITDA trajectory, the company's credit profile will remain stressed.

\*       \*       \*

Windstream's B3 corporate family rating reflects its scale as a national wireline operator with a large base of recurring revenues, offset by high leverage, a declining top line and margin pressure. ***Moody's believes that Windstream faces a continued erosion of EBITDA and cash flows as a result of prolonged prior underinvestment***. Moody's expects Windstream's pro forma EBITDA to decline in the low single digit percentage range for the next several years, although some of this impact could be offset by cost cutting and greater investment into the consumer segment. Moody's views Windstream as having limited leverage tolerance due to its low asset coverage following the 2015 sale and leaseback transaction of its outside plant and real estate assets to Uniti Group.

116.    Through early 2018, Windstream's results did not materially improve.  In a May 16, 2018 article entitled "10 Shaky Dividends That Could Harm Your Retirement," Kiplinger reported that "Windstream is experiencing major challenges that have sent its own stock price tumbling roughly 80% since the start of 2017.  Many investors are worried about the company going bankrupt given its sizable debt maturities over the next few years, and Moody's downgraded its credit rating further into junk status to B3 from B2 in February 2018."

117.    Effective as of the end of the trading day on May 25, 2018, Windstream completed a 1-for-5 reverse stock split of its issued and outstanding shares of common stock.

118.    The disaster continued.  On June 15, 2018, analysts noted that Windstream "has had an unpleasant year, to say the least.  Shares have shed three-quarters of their value in the past 12 months, as competitive pressures, difficult technology transitions, and a high debt load sent investors into a panic over possible insolvency."  The same analyst also noted that the most likely reason for the stock split is that "Windstream sought to avoid being delisted by the exchanges.  If a stock falls under $1 and stays there for 30 consecutive days, the exchanges can initiate a delisting process.  As Windstream's stock hit almost $1.20 per share prior to the split, that was likely too close for comfort for management."

119.    Five days after the reverse-split, Windstream proposed a consent solicitation for debt holders, asking them to allow Windstream to assume more junior debt and amend the credit agreements.  Analysts noted that "Windstream is having to do financial jiujitsu just to keep itself afloat at the moment, all while posting net losses of $156 million in its most recent quarter."

120.    Moody's again downgraded Windstream's debt, this time to "distressed" levels.  On June 19, 2018, in a report entitled "Moody's downgrades Windstream to Caa1, rates new second lien notes; outlook remains negative," Moody's stated as follows:

New York, June 19, 2018 – Moody's Investors Service (Moody's) has downgraded the corporate family rating (CFR) of Windstream Services, LLC (Windstream) to Caa1 from B3 and downgraded the probability of default rating (PDR) to Caa1-PD from B3-PD.  *The downgrade is based on the company's expected failure to meet its debt service obligations due to its commencement of debt exchange offers at significant discounts to par value with respect to certain series of its senior notes for second lien notes*.  Based on final acceptance levels and exchange allocations, *Moody's expects this would constitute a distressed exchange and would represent a material amount of unsecured debt*, likely totaling 12% or more of outstanding funded debt.  *Moody's views this planned action as evidence that Windstream's weak operating trends are worsening* and that the company's ability to transition to approximately stable EBITDA is proving more difficult than previously anticipated.  Furthermore, Moody's believes that *Windstream's capital structure has become untenable* and these exchanges aim to help the company delay or potentially avoid future payment defaults.  Moody's has assigned Caa2 ratings to the company's proposed second lien senior secured notes due 2024 and second lien senior secured notes due 2025.  Moody's has also downgraded Windstream's first lien secured rating to Caa1 from B3 and its unsecured rating to Caa2 from Caa1.  Windstream's speculative grade liquidity rating (SGL) is affirmed at SGL-2, reflecting good near term liquidity.  The outlook remains negative due to Moody's expectation of continued pressure on EBITDA, negative free cash flow including restructuring costs, and low asset coverage related to debt.

121.    As of December 31, 2016, Windstream had over $4.8 billion in long-term debt outstanding, including current maturities.  One year later, by December 31, 2017, Windstream increased its debt load to a staggering $5.8 billion in long-term debt outstanding, including current maturities.  Many analysts now report in 2018 that Windstream is dangerously close to bankruptcy.

122.    On July 26, 2018, the price of Windstream common stock closed at $3.72 per share, 90.5% below their price on the date of the Merger's closing.

## COUNT I

### For Violations of §14(a) of the 1934 Act and Rule 14a-9
### Promulgated Thereunder Against All Defendants

123.    Plaintiff repeats and realleges each allegation set forth herein.

124.    The Proxy and Joint Proxy/Prospectus were prepared, reviewed and/or disseminated jointly by all Defendants.  The Proxy and Joint Proxy/Prospectus contained materially misleading statements and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

125.    Defendants were jointly responsible for the misleading statements in the Proxy and Joint Proxy/Prospectus.  The Proxy and Joint Proxy/Prospectus purport to provide accurate information.  The Proxy and Joint Proxy/Prospectus purport to provide material information in support of their recommendation of the Merger.  Defendants were provided with or had unlimited access to copies of the Proxy and Joint Proxy/Prospectus and had the ability to prevent or correct the issuance of the statements Plaintiff alleges to be misleading.

126.    Defendants were at least negligent in filing the Proxy and Joint Proxy/ Prospectus with these materially false and misleading statements.

127.    As a direct result of Defendants' negligent preparation, review, and dissemination of the false and/or misleading Proxy and Joint Proxy/Prospectus, Plaintiff and the Class were induced to vote their shares and accept the inadequate Merger consideration in connection with the Merger.

128.    The false and/or misleading Proxy and Joint Proxy/Prospectus used to obtain shareholder approval of the Merger deprived Plaintiff and the Class of their right to a fully

- 47 -

informed shareholder vote in connection therewith and the full and fair value for their EarthLink shares.

129.    Thus, as a direct and proximate result of the dissemination of the false and misleading Proxy and Joint Proxy/Prospectus Defendants used to obtain shareholder approval of and thereby consummate the Merger, Plaintiff and the Class have suffered damage and actual economic losses in an amount to be determined at trial.

130.    The false and misleading statements in the Proxy and Joint Proxy/Prospectus were material in that a reasonable shareholder would consider them important in deciding how to vote on an acquisition.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in a proxy and in other information reasonably available to shareholders.  The false and misleading Proxy and Joint Proxy/Prospectus had the intended effect: a materially misinformed vote of the EarthLink shareholders, who voted in favor of the Merger on February 24, 2017.  That vote was required in order to effectuate the Merger.

131.    By reason of the foregoing, Defendants have violated §14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

132.    Because of the false and misleading statements in the Proxy and Joint Proxy/Prospectus, Plaintiff and the members of the Class were harmed.

### COUNT II

**For Violation of §20(a) of the 1934 Act**
**Against the EarthLink Individual Defendants and the Windstream Defendants**

133.    Plaintiff repeats and realleges each allegation set forth herein.

- 48 -

134.    The EarthLink Individual Defendants acted as controlling persons of EarthLink within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of EarthLink, and their participation in and/or awareness of the operations of EarthLink, and/or intimate knowledge of the false statements contained in the Proxy and Joint Proxy/Prospectus filed with the SEC, the EarthLink Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the EarthLink, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

135.    The Windstream Individual Defendants acted as controlling persons of Windstream within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Windstream, and their participation in and/or awareness of the operations of Windstream, and/or intimate knowledge of the false statements contained in the Proxy and Joint Proxy/Prospectus filed with the SEC, the Windstream Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Windstream, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

136.    In particular, each of the EarthLink Individual Defendants and Windstream Individual Defendants had direct and supervisory involvement in the day-to-day operations of EarthLink and Windstream, and, therefore, is presumed to have had the power to control or influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy and Joint Proxy/Prospectus contained the unanimous

- 49 -

recommendation of each of the EarthLink Individual Defendants and Windstream Individual Defendants to approve the Merger.  The EarthLink Individual Defendants and Windstream Individual Defendants were thus directly involved in the making of the Proxy and Joint Proxy/Prospectus.

137.    The Windstream Defendants also acted as controlling persons of the EarthLink Defendants within the meaning of §20(a) of the 1934 Act as alleged herein.

138.    The Windstream Defendants had the contractual right and obligation to "jointly prepare and cause to be filed with the SEC" the Proxy and Joint Proxy/Prospectus together with the EarthLink Defendants, as they did.  The Windstream Defendants participated in the solicitation of proxies through the Proxy and Joint Proxy/Prospectus, recommended in favor of the Merger, and participated in the preparation of the Proxy and Joint Proxy/Prospectus.

139.    By virtue of the foregoing, the EarthLink Individual Defendants and the Windstream Defendants have violated §20(a) of the 1934 Act.

140.    As a direct and proximate result of these defendants' conduct, Plaintiff and all other Class members were harmed.

## COUNT III

### For Violations of §11 of the 1933 Act
### Promulgated Thereunder Against the Windstream Defendants

141.    Plaintiff repeats and realleges each allegation set forth herein.

142.    This count is brought by Plaintiff on behalf of himself and all other Class members who received shares of Windstream common stock traceable to the Registration Statement.

143.    Plaintiff asserts solely strict liability and negligence claims in this count.

144.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements made not misleading, as alleged herein.

145.    Windstream was the issuer of the common stock registered by the Joint Proxy/Prospectus and Registration Statement.   As the issuer of the common stock, Windstream is strictly liable to the members of the Class who received Windstream common stock pursuant to the Registration Statement.

146.    The Windstream Individual Defendants each signed the Registration Statement, were responsible for the contents and dissemination of the Registration Statement, and/or failed to make a reasonable investigation and did not possess reasonable grounds for the belief that the statements contained in the Registration Statement were true and/or did not contain untrue statements of material facts.   The Windstream Individual Defendants are therefore liable to the members of the Class who received shares of Windstream common stock pursuant to the Registration Statement.

147.    Plaintiff and other members of the Class received Windstream common stock traceable to the Registration Statement, and did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements and omissions of material fact contained therein.

148.    Plaintiff and the members of the Class who purchased or acquired Windstream common stock traceable to the Registration Statement suffered substantial damage as a direct and proximate result of the untrue statements of material facts and/or omissions described in this count.

- 51 -

149.    This claim is brought within the applicable statute of limitations because less than one year has elapsed from the time that Plaintiff and the other members of the Class discovered or reasonably could have discovered the facts upon which this count is based. Less than three years have elapsed from the time that Plaintiff and other Class members received the shares of Windstream common stock pursuant to the Registration Statement.

150.    By reason of the foregoing, the defendants named in this count have violated §11 of the 1933 Act.

## COUNT IV

### Violations of §12(a)(2) of the 1933 Act
### Against the Windstream Defendants

151.    Plaintiff repeats and realleges the allegations above.

152.    This count is brought by Plaintiff on behalf of himself and all other Class members who received shares of Windstream common stock in the Merger and pursuant to the Joint Proxy/Prospectus.

153.    This count is brought against Windstream and the Windstream Individual Defendants.

154.    Plaintiff asserts solely strict liability and negligence claims in this count.

155.    The defendants named in this count were statutory sellers who sold and participated in the sale of Windstream common stock to Plaintiff and other members of the Class by means of the Joint Proxy/Prospectus for their own benefit and the benefit of Windstream.

- 52 -

156.    Plaintiff received Windstream common stock pursuant to the Joint Proxy/Prospectus, and did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements and omissions of material fact contained therein.

157.    As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased or acquired Windstream common stock pursuant to the Joint Proxy/Prospectus sustained substantial damages in connection with their receipt of the stock.  Accordingly, Plaintiff or the other members of the Class who may hold the common stock issued pursuant to the Joint Proxy/Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to the defendants sued in this count.  Class members who have sold their common stock seek damages to the extent permitted by law.

158.    This claim is brought within the applicable statute of limitations because less than one year has elapsed from the time that Plaintiff and the other members of the Class discovered or reasonably could have discovered the facts upon which this count is based. Less than three years have elapsed from the time that Plaintiff and other Class members received the shares of Windstream common stock pursuant to the Joint Proxy/Prospectus.

159.    By reason of the conduct alleged herein, the defendants named in this count violated §12(a)(2) of the 1933 Act.

## COUNT V

### For Violations of §15 of the 1933 Act
### Promulgated Thereunder Against the Windstream Individual Defendants

160.    Plaintiff repeats and realleges each allegation set forth herein.

- 53 -

161.    This count is brought by Plaintiff on behalf of himself and all other Class members who received shares of Windstream common stock traceable to the Offering Documents.

162.    Plaintiff asserts solely strict liability and negligence claims in this count.

163.    The Windstream Individual Defendants were each control persons of Windstream at the time of the Merger in that they exercised actual power over Windstream by virtue of their positions as directors and/or senior officers of Windstream.  As directors and/or senior officers of Windstream, the Windstream Individual Defendants were able to, and did, influence, directly and indirectly, the contents of the Joint Proxy/Prospectus, as well as Windstream's decision to effectuate the Merger, and on what terms.

164.    By reason of the foregoing, the defendants named in this count violated §15 of the 1933 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment, in Plaintiff's favor and in favor of the Class and against Defendants, as follows:

A.    Declaring that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as Class representative and Plaintiff's counsel as Class counsel;

B.    Declaring that Defendants violated §14(a) of the 1934 Act and Rule 14a-9 by disseminating the materially false and/or misleading Proxy and/or Joint Proxy/Prospectus;

C.     Declaring that the EarthLink Individual Defendants and the Windstream Defendants violated §20(a) of the 1934 Act by acting as controlling persons of a person or persons who violated §14(a) of the 1934 and Rule 14a-9;

D.     Declaring that the Windstream Defendants violated §11 of the 1933 Act by issuing the common stock registered by the Joint Proxy/Prospectus and Registration Statement, and being otherwise responsible for the materially false and/or misleading statements and omissions therein;

E.     Declaring that the Windstream Defendants violated §12(a)(2) of the 1933 Act by selling and participating in the sale of Windstream common stock to Plaintiff and other members of the Class by means of the Registration Statement;

F.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

G.     Awarding Plaintiff and the other Class members rescission on their §12(a)(2) claims;

H.     Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

I.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  July 27, 2018

ROBBINS GELLER RUDMAN
  & DOWD LLP
RANDALL J. BARON
DAVID A. KNOTTS
EUN JIN LEE

_____
s/ David A. Knotts
DAVID A. KNOTTS

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dknotts@rgrdlaw.com
elee@rgrdlaw.com

Lead Counsel for Plaintiff

CARNEY BATES & PULLIAM, PLLC
RANDALL K. PULLIAM (ABN 98105)
HANK BATES (ABN 98063)
519 W. 7th Street
Little Rock AR  72201
Telephone:  501-312-8500
501/312-8505 (fax)
rpulliam@cbplaw.com
hbates@cbplaw.com

Local Counsel

JOHNSON FISTEL, LLP
W. SCOTT HOLLEMAN
99 Madison Avenue, 5th Floor
New York, NY  10016
Telephone:  212/802-1486
212/602-1592 (fax)
scotth@johnsonfistel.com

Additional Counsel for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on July 27, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ David A. Knotts
DAVID A. KNOTTS

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  dknotts@rgrdlaw.com

1456292_1

# Mailing Information for a Case 4:18-cv-00202-JM Murray v. EarthLink Holdings Corp et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Joseph Henry Bates , III**
  hbates@cbplaw.com,jcox@cbplaw.com,toldham@cbplaw.com,rpulliam@cbplaw.com

- **David A. Knotts**
  dknotts@rgrdlaw.com,jaimem@rgrdlaw.com

- **Eun Jin Lee**
  elee@rgrdlaw.com,jaimem@rgrdlaw.com

- **Randall Keith Pulliam**
  rpulliam@cbplaw.com,jcox@cbplaw.com,dengelby@cbplaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)