UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| ROBERT MURRAY, On Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> EARTHLINK HOLDINGS CORP., SUSAN D. BOWICK, JOSEPH F. EAZOR, KATHY S. LANE, GARRY K. MCGUIRE, R. GERARD SALEMME, JULIE A. SHIMER, MARC F. STOLL, WALTER L. TUREK, WINDSTREAM HOLDINGS, INC., CAROL B. ARMITAGE, SAMUEL E. BEALL III, JEANNIE H. DIEFENDERFER, ROBERT E. GUNDERMAN, JEFFREY T. HINSON, WILLIAM G. LAPERCH, LARRY LAQUE, KRISTI MOODY, MICHAEL G. STOLTZ, TONY THOMAS and ALAN L. WELLS, <br><br> Defendants. | No. 4:18-cv-00202-JM <br><br> <u>CLASS ACTION</u> <br><br> SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS <br><br><br><br><br><br><br><br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................................1

II.    JURISDICTION AND VENUE.............................................................................4

III.   PARTIES ..............................................................................................................5

IV.   CLASS ACTION ALLEGATIONS ....................................................................10

V.    BACKGROUND OF THE COMPANIES ..........................................................12

      A.     EarthLink Was a "Strong, Consistently Performing Company" Before the Merger ......................................................................................12

      B.     Background of Windstream.......................................................................13

VI.   FORMATION OF THE UNITI ARRANGEMENT ("PROJECT RITE") ......14

      A.     The Ultimate Structure of the Uniti Arrangement .................................14

      B.     Windstream Creates the Uniti Arrangement as an Attempted Short-Term Fix for Mounting Business Challenges ................................15

      C.     In the Spring of 2013, Windstream Sets the Terms of the Uniti Arrangement Through Conflicted "Negotiations" While Windstream Executives Recognize a Problem with the Indenture...........................16

      D.     After Forming Windstream Holdings, Windstream Continues with Project RITE in 2014 Despite Ongoing Indenture and Tax-Related Concerns ...............19

      E.     Windstream Completes the Uniti Arrangement in 2015; Windstream Assumes a Dividend Cut ...................................................25

VII.  WINDSTREAM STRUCTURED THE UNITI ARRANGEMENT WITH MISREPRESENTATIONS TO REGULATORS AND INDENTURE COVENANT VIOLATIONS................................................................................28

      A.     Windstream Now Admits that Its Executives Inflated the $650 Million Annual per Year Payments to an Above Market Level .....................28

      B.     Windstream Misrepresented to the SEC the Likelihood of Renewal of the Lease Terms...............................................................30

            1.     Windstream Internally Assumed It Would Renew ...................30

            2.     Windstream Told State Regulators It Would Renew ...............32

            3.     Windstream Now Concedes It Will Renew .............................33

**Page**

|  |  | 4. | Windstream Misrepresented to the SEC Its Plans to Renew Lease Terms ..................................................................................... 33 |

|  | C. | Windstream Inflated the Useful Life of Assets in the Uniti Arrangement ........... 35 |

|  | D. | Windstream Now Represents that the Uniti Arrangement Was Not a True Lease, But Was a "Disguised Financing" ......................................... 37 |

|  | E. | The Uniti Transaction Also Violated the Sale Leaseback Prohibition in Windstream's Indentures ................................................................... 39 |

| VIII. | BACKGROUND OF THE MERGER .......................................................................... 42 |

| IX. | DEFENDANTS' MATERIALLY MISLEADING AND INCOMPLETE OFFERING DOCUMENTS ........................................................................ 44 |

|  | A. | False and Misleading Statements Regarding the Structuring of the Uniti Arrangement and its Impact on Windstream's Capital Structure and "Rent" Payments ........................................................................ 45 |

|  | B. | False and Misleading Statements Regarding Windstream's Private Letter Ruling from the IRS .......................................................................... 48 |

|  | C. | False and Misleading Statements Regarding Windstream's Long-Term Debt Levels ...................................................................................... 49 |

|  | D. | False and Misleading Statements Regarding Windstream's Dividend Cut and Worsening Operational Trends ................................................. 51 |

|  | E. | Defendants' Additional Disclosure Violations .................................... 56 |

| X. | WINDSTREAM'S STOCK PRICE DETERIORATED AFTER THE CLOSE OF THE MERGER ....................................................................................... 58 |

|  | A. | The Uniti Arrangement Fueled Windstream's Deteriorating Performance and Stock Price Declines ................................................................... 59 |

|  | B. | Windstream Posts Disappointing Numbers in the First Half of 2017 .............. 61 |

|  | C. | Windstream Shocks the Market and Eliminates Its Dividend While Continuing to Release Disappointing Numbers ....................................... 63 |

|  | D. | Windstream's Results Continue to Deteriorate; Windstream Receives a Notice of Default .......................................................................... 65 |

**Page**

     E.     Windstream's Debt Is Again Downgraded, Announces a Reverse Stock Split, Files for Bankruptcy, and Cancels Its Common Stock ............................... 66

CAUSES OF ACTION ........................................................................................... 69

PRAYER FOR RELIEF ......................................................................................... 75

JURY DEMAND ................................................................................................... 76

Lead Plaintiff Robert Murray ("Plaintiff"), individually and on behalf of all others similarly situated, by the undersigned counsel, respectfully brings this class action for violations of §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "1933 Act"), §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, against the herein named defendants.  Plaintiff brings this federal class action against defendants upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which included, without limitation, the review and analysis of: (a) public filings with the SEC; (b) releases and other publications; (c) filings, exhibits, and trial testimony in lawsuits regarding Windstream Holdings, Inc. ("Windstream"),[1] including Windstream's bankruptcy proceeding and other related litigation; and (d) securities analyst reports, news articles, websites, and other publicly available information. Plaintiff believes that substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      INTRODUCTION

1.      This is a securities class action brought by Plaintiff and a proposed stockholder class against EarthLink Holdings Corp. ("EarthLink"), its former Board of Directors (the "EarthLink Board"), Windstream, its former Board of Directors (the "Windstream Board") and certain of Windstream's officers (collectively, "Defendants"), for violations of the federal securities laws in connection with the Merger (defined below) between EarthLink and Windstream.  The claims under the 1933 Act are brought on behalf of Plaintiff and all other persons or entities, except for Defendants, who purchased or otherwise acquired Windstream shares, pursuant and/or traceable to the Offering Documents (defined below).  The claims under the 1934 Act are brought on behalf of

---

[1]    Herein, "Windstream" and "Windstream Holdings" refer to Windstream Holdings, Inc., while "Windstream Services" references Windstream Services, LLC.

Plaintiff and all other persons or entities, except for Defendants, who held EarthLink stock on the record date for the Merger.

2. On February 27, 2017, Windstream completed its merger with EarthLink, pursuant to the terms of the Merger Agreement dated November 5, 2016 (the "Merger"), whereby EarthLink merged into Europa Merger Sub, Inc., a wholly-owned subsidiary of Windstream Services and survived, and immediately following, merged with Europa Merger Sub, LLC, a wholly-owned subsidiary of Windstream Services, with the merger subsidiary surviving and changing its name to EarthLink Holdings, LLC.

3. Through the Merger, each share of EarthLink common stock was exchanged for .818 shares of Windstream common stock. In the aggregate, Windstream issued approximately 93 million shares of its common stock in a transaction valued at approximately $1.1 billion. Upon close of the Merger, Windstream's stockholders owned approximately fifty-one percent (51%) and EarthLink stockholders owned approximately forty-nine percent (49%) of the combined company, post-Merger Windstream.

4. The $1.1 billion Merger has indisputably harmed former EarthLink stockholders. The purportedly safe and reliable Windstream shares that EarthLink stockholders voted to receive in the Merger ultimately plunged from $39.25 per share to zero. On the day that stockholders – including Plaintiff – received Windstream stock in the Merger, those shares were each valued at $39.25. Two years later, Windstream filed for Chapter 11 bankruptcy. And just a short time after that, all of Windstream's common stock – including Plaintiff's shares – were declared "cancelled, discharged and of no force and effect."

5. This lawsuit alleges strict-liability and negligence claims for omissions in the Offering Documents, which Defendants issued to EarthLink stockholders in order to effectuate the Merger between EarthLink and Windstream. In those Offering Documents, Defendants represented

that Windstream had recently reduced its debt and was a stable company, with a stable capital structure, a strong balance sheet, and a reliable dividend.  All of that was false.

6.      Windstream's recent bankruptcy filings have helped shed light on the preexisting, but undisclosed problems with Windstream's business.  During that bankruptcy proceeding and other litigation, various parties – including Windstream, Windstream's creditors, and Uniti Group Inc. ("Uniti") – publicly exposed a subset of Defendants' historical internal emails, board minutes, board presentations, and non-public correspondence with the SEC, IRS, and rating agencies.

7.      It is now clear that, undisclosed in the Offering Documents, and thus unbeknownst to EarthLink investors at that time, Windstream was already crumbling and was mired in a pernicious and structurally flawed "disguised financing" transaction that mandated billions in above-market annual "rent" payments.  In fact, by the time Defendants issued the Offering Documents, recently exposed internal documents show that Windstream had already planned to eliminate its dividend.

8.      In particular, the Offering Documents glowingly touted the purportedly favorable and debt-reducing impact of a previous spin-off whereby Windstream, in a complex series of financial maneuvers, established a new publicly traded REIT, spun a large part of Windstream's network assets to the REIT in exchange for cash and stock, and then retained the use of those same assets for $650 million annual "lease" payments (the "Uniti Arrangement").  Windstream states that the property utilized in that transaction is "mission critical" to Windstream's business and is the "essential and only means" for Windstream to serve its clients.  The Offering Documents, however, did not disclose that:

- as Windstream ultimately admitted in detailed filings throughout its bankruptcy proceeding, the Uniti Arrangement was not a "true lease," but was in actuality a "disguised financing arrangement" representing billions of dollars in additional debt;

- Windstream's $650 million per year payments under the Uniti Arrangement were not set at fair market value and, as a result of the harmful impact of those inflated and over-market payments, Windstream was unable to sufficiently invest in its network to remain competitive;

- Windstream based its accounting and financial reporting of the Uniti Arrangement upon misrepresentations to the SEC regarding both the fair market value of the annual payments and Windstream's economic compulsion to renew the Uniti Arrangement beyond its initial 15-year term, as well as upon inflated figures Windstream provided to the IRS regarding the expected useful life of the distributed assets; and

- the Uniti Arrangement placed Windstream in violation of multiple covenants in its debt indentures.

9.     As a result of the misrepresentations and omissions described herein, former EarthLink stockholders voted in favor of the Merger, thus permitting the Merger to close. Moreover, former EarthLink stockholders and others acquired shares of Windstream common stock traceable to the false and misleading Offering Documents. Plaintiff and the stockholder class were damaged as a result.

## II.    JURISDICTION AND VENUE

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the 1933 Act and §27 of the 1934 Act.

11.    This Court has jurisdiction over each Defendant. Windstream operates and maintains its headquarters within this District. At least two of the Windstream Individual Defendants (defined below) reside in this District. Moreover, each of the Windstream Individual Defendants are or were officers and/or directors of Windstream, and thus have systemic and continuous activity in this District, enjoy benefits of the laws of Arkansas, and the exercise of jurisdiction is reasonable and foreseeable. EarthLink and the EarthLink Individual Defendants (defined below) are a corporation and/or individuals who have sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. EarthLink and the EarthLink Individual Defendants purposely decided to negotiate and enter into a merger with Windstream, a corporation in this District, knowing that the combined company would be located in this District, and that the result of the Merger would be that the EarthLink Individual Defendants would obtain material benefits in the Merger, and previous EarthLink

stockholders (including the EarthLink Individual Defendants themselves) would acquire stock in Windstream. Thus, EarthLink and the EarthLink Individual Defendants purposely directed their actions towards Arkansas, and benefited from same, such that the exercise of jurisdiction is reasonable and foreseeable.

12. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Windstream's headquarters are located in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District, including the issuance of the Offering Documents and the issuance of Windstream common stock to Plaintiff and the Class.

## III. PARTIES

13. Plaintiff was an owner of EarthLink common stock and received Windstream stock in exchange for his EarthLink stock as a result of the Merger, as evidenced by the Certification of Named Plaintiff Pursuant to Federal Securities Laws incorporated herein. ECF No. 1 at 38.

14. Before the Merger, defendant EarthLink was a Delaware corporation that maintained its headquarters at 1170 Peachtree Street, Atlanta, Georgia 30309. Its stock traded on NASDAQ under the symbol "ELNK."

15. Defendant Susan D. Bowick ("Bowick") was a member of the EarthLink Board from May 2008 to the closing of the Merger. Bowick participated in the preparation of the Joint Proxy/Prospectus (defined below) and participated in the solicitation of proxies in support of the Merger Agreement.

16. Defendant Joseph F. Eazor ("Eazor") was EarthLink's CEO and President, and a member of the EarthLink Board, from January 2014 to the closing of the Merger. Eazor participated in the preparation of the Joint Proxy/Prospectus and participated in the solicitation of proxies in support of the Merger Agreement.

17.     Defendant Kathy S. Lane ("Lane") was a member of the EarthLink Board from July 2013 to the closing of the Merger.  Lane participated in the preparation of the Joint Proxy/Prospectus and participated in the solicitation of proxies in support of the Merger Agreement.

18.     Defendant Garry K. McGuire ("McGuire") was a member of the EarthLink Board from July 2011 to the closing of the Merger.  McGuire participated in the preparation of the Joint Proxy/Prospectus and participated in the solicitation of proxies in support of the Merger Agreement.

19.     Defendant R. Gerard Salemme ("Salemme") was a member of the EarthLink Board from October 2013 to the closing of the Merger.  Salemme participated in the preparation of the Joint Proxy/Prospectus and participated in the solicitation of proxies in support of the Merger Agreement.

20.     Defendant Julie A. Shimer Ph.D. ("Shimer") was the Chairman of the EarthLink Board from February 2014 to the closing of the Merger, and a member of the EarthLink Board from July 2013 to the closing of the Merger.  She was appointed to the Windstream Board in connection with the Merger.  Shimer participated in the preparation of the Joint Proxy/Prospectus and participated in the solicitation of proxies in support of the Merger Agreement.  Shimer was a member of the Windstream Board Restructuring Committee that recommended and approved the drafting and filing of the Windstream Adversary Complaint against Uniti.  Each member of the Windstream Board Restructuring Committee reviewed and approved the initial Windstream Adversary Complaint against Uniti before it was filed on July 25, 2019.

21.     Defendant Marc F. Stoll ("Stoll") was a member of the EarthLink Board from April 2016 to the closing of the Merger.  He was appointed to the Windstream Board in connection with the Merger.  Stoll participated in the preparation of the Joint Proxy/Prospectus and participated in the solicitation of proxies in support of the Merger Agreement.

22.     Defendant Walter L. Turek ("Turek") was a member of the EarthLink Board from October 2015 to the closing of the Merger.  He was appointed to the Windstream Board in connection with the Merger.  Turek participated in the preparation of the Joint Proxy/Prospectus and participated in the solicitation of proxies in support of the Merger Agreement.  Turek continued as a member of the Windstream Board and in June 2019 approved the Windstream Adversary Complaint against Uniti.  Each member of the Windstream Board reviewed and approved the initial Windstream Adversary Complaint against Uniti before it was filed on July 25, 2019.

23.     Defendants EarthLink, Bowick, Eazor, Lane, McGuire, Salemme, Shimer, Stoll and Turek are collectively referred to as the "EarthLink Defendants."

24.     Defendants Bowick, Eazor, Lane, McGuire, Salemme, Shimer, Stoll, and Turek are collectively referred to as the "EarthLink Individual Defendants."

25.     Defendant Windstream is a Delaware corporation that maintains its headquarters at Little Rock, Arkansas.  Its stock traded on NASDAQ under the symbol "WIN."  Windstream was the issuer of the shares offered and sold in the Merger.

26.     Defendant Carol B. Armitage ("Armitage") was a member of the Windstream Board at the time of the Merger.  Armitage participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement (defined below) and signed the Registration Statement.

27.     Defendant Samuel E. Beall III ("Beall") was a member of the Windstream Board at the time of the Merger.  Beal participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement and signed the Registration Statement.  Beal continued as a member of the Windstream Board and in June 2019 approved the Windstream Adversary Complaint against Uniti.  Each member of the Windstream Board reviewed and approved the initial Adversary Complaint against Uniti before it was filed on July 25, 2019.

28.     Defendant Jeannie H. Diefenderfer ("Diefenderfer") was a member of the Windstream Board at the time of the Merger.  Diefenderfer participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement and signed the Registration Statement.  Diefenderfer was a member of the Windstream Board Restructuring Committee that recommended and approved the drafting and filing of the Windstream Adversary Complaint against Uniti.  Each member of the Windstream Board Restructuring Committee reviewed and approved the initial Adversary Complaint against Uniti before it was filed on July 25, 2019.

29.     Defendant Robert E. Gunderman ("Gunderman") was Windstream's CFO at the time of the Merger.  Gunderman participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement and signed the Registration Statement.  Gunderman participated in the preparation of the Windstream Adversary Complaint against Uniti before it was filed on July 25, 2019.  Gunderman joined Windstream in 2008 and was appointed CFO in 2014.

30.     Defendant Jeffrey T. Hinson ("Hinson") was a member of the Windstream Board at the time of the Merger.  Hinson participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement and signed the Registration Statement.  Hinson continued as a member of the Windstream Board and in June 2019 approved the Windstream Adversary Complaint against Uniti.  Each member of the Windstream Board reviewed and approved the initial Adversary Complaint against Uniti before it was filed on July 25, 2019.

31.     Defendant William G. LaPerch ("LaPerch") was a member of the Windstream Board at the time of the Merger.  LaPerch participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement and signed the Registration Statement.  LaPerch continued as a member of the Windstream Board and in June 2019 approved the Windstream Adversary Complaint against Uniti.  Each member of the Windstream Board reviewed and approved the initial Adversary Complaint against Uniti before it was filed on July 25, 2019.

32.     Defendant Larry Laque ("Laque") was a member of the Windstream Board at the time of the Merger.  Laque participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement and signed the Registration Statement.

33.     Defendant Kristi Moody ("Moody") was the Senior Vice President and Corporate Secretary of Windstream.  Moody participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement, and signed the Joint Proxy/Prospectus.  Plaintiff is informed and believes that Moody is an individual who resides in this District.  Moody was named Windstream's deputy general counsel in 2013.

34.     Defendant Michael G. Stoltz ("Stoltz") was a member of the Windstream Board at the time of the Merger.  Stoltz participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement and signed the Registration Statement.  Stoltz was a member of the Windstream Board Restructuring Committee that recommended and approved the drafting and filing of the Windstream Adversary Complaint against Uniti.  Each member of the Windstream Board Restructuring Committee reviewed and approved the initial Adversary Complaint against Uniti before it was filed on July 25, 2019.

35.     Defendant Tony Thomas ("Thomas") is Windstream's CEO and President, and a member of the Windstream Board.  Thomas participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement and signed the Registration Statement.  Plaintiff is informed and believes that Thomas is an individual who resides in this District.  During Windstream's bankruptcy proceeding, Thomas attended the 50+ Windstream Board Restructuring Committee meetings as a member of management and participated in the preparation of the Adversary Complaint against Uniti before it was filed on July 25, 2019.  Windstream's corporate website states that Thomas "was instrumental in the development of Windstream's REIT

spinoff and served as president of real estate investment trust operations at Windstream from October to December 2014."

36.     Defendant Alan L. Wells ("Wells") is the Chairman of the Windstream Board and was a member of the Windstream Board at the time of the Merger.  Wells participated in the preparation of the false and misleading Joint Proxy/Prospectus and Registration Statement and signed the Registration Statement.  Wells was a member of the Windstream Board Restructuring Committee that recommended and approved the drafting and filing of the Windstream Adversary Complaint against Uniti.  Each member of the Windstream Board Restructuring Committee reviewed and approved the initial Adversary Complaint against Uniti before it was filed on July 25, 2019.

37.     Defendants Windstream, Armitage, Beall, Diefenderfer, Gunderman, Hinson, LaPerch, Laque, Moody, Stoltz, Thomas, and Wells, are collectively referred to as the "Windstream Defendants."

38.     Defendants Armitage, Beall, Diefenderfer, Gunderman, Hinson, LaPerch, Laque, Moody, Stoltz, Thomas, and Wells, are collectively referred to as the "Windstream Individual Defendants."

## IV.   CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23.  The claims under the 1933 Act are brought on behalf of Plaintiff and all other persons or entities, except for Defendants, who purchased or otherwise acquired Windstream shares, pursuant and/or traceable to the Offering Documents, while the claims under the 1934 Act are brought on behalf of Plaintiff and all other persons or entities, except for Defendants, who held EarthLink stock on the record date for the Merger (the "Class").

40.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

41.     The Class is so numerous that joinder of all members is impracticable.  The precise number of Class members is unknown to Plaintiff at this time, but the names and addresses of many of the Class members can be ascertained from the books and records of EarthLink and through appropriate discovery.  As of the record date, January 23, 2017, there were more than 105.5 million outstanding shares of EarthLink common stock held by hundreds or thousands of individuals and entities scattered throughout the United States.

42.     There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member.  The common questions include, *inter alia*:

        (a)     whether the Offering Documents contained materially false or misleading statements or omissions;

        (b)     whether the EarthLink Defendants and the Windstream Defendants violated the federal securities laws as alleged in this Complaint, including violating §§14(a) and/or 20(a) of the 1934 Act;

        (c)     whether the Windstream Defendants violated the federal securities laws as alleged in this Complaint, including violating §§11, 12(a)(2), and/or 15 of the 1933 Act; and

        (d)     whether Plaintiff and the other members of the Class sustained damages and the proper measure of damages.

43.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interest adverse to the Class.

44.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

45.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class.

46.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

47.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## V.     BACKGROUND OF THE COMPANIES

### A.     EarthLink Was a "Strong, Consistently Performing Company" Before the Merger

48.     EarthLink began operations in 1994 as a provider of nationwide internet services to residential customers.  In 1996, EarthLink expanded into the small to mid-sized business market.  In 2006, EarthLink expanded into the enterprise business market.  During 2010 through 2013, EarthLink acquired eight companies which transformed its business from being primarily an internet services provider to residential customers into a network, communications and IT services provider for business customers.

49.     In 2014 and 2015, EarthLink refocused its business strategy, with the intent "to be a leading managed network, security and cloud services provider for multi-location retail and service businesses."  Throughout 2015 and 2016, EarthLink management continued to successfully execute

the company's business strategy.  During that period, EarthLink consistently announced strong financial results.

50.     On August 8, 2016, EarthLink announced its second quarter 2016 results.  In the press release announcing the results, Eazor stated: "Our overall business performance continued to improve, we strengthened our balance sheet further with a new credit facility, and we were recognized by Forbes as one of America's top 100 most trustworthy companies.  Finally, in early July, we acquired Boston Retail Partners to expand our capabilities as a trusted advisor to retailers." In the earnings call, Eazor confirmed that "[w]e have generated positive net income for the second quarter in a row" and that EarthLink is a "strong, consistently performing company strategically, operationally and financially."  EarthLink's publicly traded status as a strong, consistently performing company, however, was about to end.  EarthLink's management soon began merger negotiations with Windstream.

**B.     Background of Windstream**

51.     Windstream is a provider of network communications for consumers, businesses, enterprise organizations and wholesale customers.  Windstream provides data, cloud solutions, unified communications and managed services to small business and enterprise clients.  Windstream also offers bundled services, including broadband, security solutions, voice and digital television to consumers.  Windstream supplies core transport solutions on a local and long-haul fiber network spanning approximately 147,000 miles, including network assets acquired in the Merger.

52.     On February 25, 2019, Windstream Holdings and all of its subsidiaries, including Windstream Services, filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  On April 1, 2020, Windstream filed a Joint Chapter 11 Plan of Reorganization in the Bankruptcy Court.  The Bankruptcy Court entered an order confirming Windstream's Chapter

11 Plan of Reorganization (the "Plan of Reorganization") on June 26, 2020, and the effective date of the Plan of Reorganization occurred on September 21, 2020 (the "Effective Date").

53.     Under the Plan of Reorganization, Windstream and its related debtor entities were reorganized and a new parent company was formed. ***All of the shares of common stock of Windstream Holdings outstanding immediately prior to the Effective Date, were cancelled, discharged, and of no force and effect***.

## VI.     FORMATION OF THE UNITI ARRANGEMENT ("PROJECT RITE")

### A.     The Ultimate Structure of the Uniti Arrangement

54.     The Uniti Arrangement ultimately involved several component steps: Windstream's spinoff to Uniti of selected Windstream telecommunications assets (the "Transferred Assets"); Uniti's payment to Windstream Services for the Transferred Assets; Windstream's distribution of Uniti stock to Windstream's shareholders and lenders; and Windstream's leaseback from Uniti of the Transferred Assets.  First, on March 26, 2015, Windstream Services spun-off certain of its copper wire and fiber optic cable network assets to Uniti (then-called "Communications Sales and Leasing, Inc." or "CS&L"), which Windstream structured as a REIT for the tax benefits.  The value set by Windstream for the Transferred Assets was $7.45 billion.  In exchange, Windstream Services received Uniti common stock, $1.035 billion in cash, and $2.45 billion in Uniti debt securities.

55.     Windstream then immediately distributed 80.4% of its Uniti shares to Windstream stockholders at that time.  Later, in June 2016, Windstream transferred the remaining 19.6% of Uniti equity to its lenders in exchange for the retirement of $672 million in Windstream debt.

56.     Finally, on April 24, 2015, Windstream Holdings and Uniti entered into a "triple-net" Master Lease that called for Uniti to "lease" the Transferred Assets back to Windstream Services in exchange for annual payments from Windstream Holdings (the "Master Lease").  A "triple-net" lease means that Windstream agreed to pay, in addition to rent, any real estate taxes, insurance, and maintenance costs associated with the property.  The Master Lease had an initial 15-year term, with

- 14 -

four five-year renewal periods.  For the first three years of the term, the Master Lease provided for annual payments by Windstream of $650 million, paid in equal monthly installments.  After the initial three-year period, Windstream's payments to Uniti were subject to annual increases of 0.5% per year.

57.    The following is a timeline of the formation of the Uniti Arrangement:



**B.    Windstream Creates the Uniti Arrangement as an Attempted Short-Term Fix for Mounting Business Challenges**

58.    Windstream now concedes (in filings in the Bankruptcy Court) that it entered into the Uniti Arrangement for the "short term" purpose of "ameliorating some of Windstream's growing economic challenges."   Initially, Windstream owned most of its telecommunications network properties, including local and long-haul fiber-optic networks, as well as related real estate, buildings, fixtures, easements, and other equipment.  Entering 2013, however, Windstream faced a "growing dilemma," that it would later describe (in bankruptcy) as follows:

> Windstream required significant reinvestment in its infrastructure but had little cash to spare as the Company tried to both reinvest in its network and maintain strong dividends to investors.  Maintaining the historical dividend was a natural and necessary strategic goal for Windstream as, like other utility companies, it was largely yield rather than growth oriented.  The dividend was critically important to the Company's continued ability to raise capital.  Thus, failure to upgrade its

broadband network risked Windstream falling behind its competition, but failure to maintain dividends at robust historical levels risked losing the Company's investors' trust and market perception. To upgrade these networks, Windstream needed to make substantial capital investments and improvements. But Windstream's EBITDA was declining, and credit markets were less willing to lend after reevaluating their view of telecommunication companies and reducing the number of EBITDA multiples that they were willing to loan against.

59. To address these problems, Windstream gambled its capital structure on a risky spin-off transaction.

### C. In the Spring of 2013, Windstream Sets the Terms of the Uniti Arrangement Through Conflicted "Negotiations" While Windstream Executives Recognize a Problem with the Indenture

60. As Windstream also disclosed in bankruptcy, "Windstream vetted multiple potential solutions to solve these challenges – from a sale to a traditional financing – before its banker presented a unique solution. At a February 1, 2013 meeting, Windstream's banker proposed to Windstream a first-of-its-kind transaction in the telecommunications space: structuring a REIT based on telecommunications networks." Unlike an ordinary REIT, however, this company would not hold land but would own copper wire and fiber optic cable networks. Windstream described the idea as a "first-of-its-kind transaction in the telecommunications space" and admits that "[t]his solution would have been unthinkable only a few years earlier as these assets had not traditionally been thought of as 'REIT-able.'" Windstream internally code-named the potential transaction, "Project RITE."

61. More specifically, the Windstream banker proposing the concept was Kenneth ("Kenny") Gunderman at Stephens Inc. Kenny Gunderman is the brother of Defendant Bob Gunderman, Windstream's CFO. Upon the spin-off in early 2015, Windstream chose to name Kenny Gunderman as the CEO of Uniti. Kenny Gunderman occupies the CEO position at Uniti to this day, while Bob Gunderman remains Windstream's CFO.

62. At the time, Windstream was burdened by a significant amount of debt, much of which was governed by an Indenture from a January 23, 2013 $700 million note issuance (the

"Indenture").  Windstream has confirmed that, as of September 29, 2017, approximately $3 billion of its outstanding bonds were either issued under the Indenture or under "other indentures with covenants identical in all material respects" to the relevant provisions of the Indenture.  The Indenture contains a number of restrictive covenants, and the Uniti Arrangement would violate certain of those covenants upon its consummation.

63.    On March 29, 2013, at a Windstream board meeting, Windstream management introduced Project RITE.  Defendants Thomas, Armitage, Beall, Hinson, and Wells attended this meeting, among others.  By the time of this initial board meeting, Windstream had already established that the Indenture would be the Uniti Arrangement's major roadblock.  Thomas gave a presentation to the board, identifying one of the "***Critical Issues***" as including "***Compliance with covenants and indentures***," and noting "***debt holder concerns***."

64.    Remarkably, Windstream executives had already unilaterally determined the annual Master Lease payments to Uniti – even though Uniti did not yet exist and had no employees or agents.  The same March 29, 2013 board presentation contained the following "lease revenue" slide:

| Board of Directors Meeting - Project RITE Presentation | | | | | | | |
|---|---|---|---|---|---|---|---|
| **FINANCIAL SUMMARY – PROPCO** | | | | | | | |
| *(Dollars in Millions, Except Per Share)* | | | | | | | |
| | For the Projected Fiscal Year Ending 12/31, | | | | | | CAGRs |
| | 2013 | | 2014 | | 2015 | 2016 | 2017 | PF FY13E - FY17E |
| Lease Revenue | $ | 650 | $   650 | $   650 | $   650 | $   650 | 0.0% |
| Pole Attachment Revenue | | 8 | 8 | 8 | 8 | 8 | 0.0% |
| TRS Revenue (Consumer CLEC) | | 34 | 24 | 16 | 12 | 8 | (30.0%) |
| Total Revenue | $ | 692 | $   682 | $   675 | $   670 | $   666 | (0.9%) |

65.    As described in greater detail below, Windstream now concedes that it set this $650 million per year figure not based on the leaseback's fair market value to Windstream, but on the required returns for the not-yet-formed REIT and its not-yet-existing shareholders and creditors.  At that time, Thomas was slated to earn a promotion from CFO of Windstream to CEO of the spun-off REIT.  Thus, Thomas purported to negotiate on the REIT's behalf.  Thomas sought to set a rate that would allow the REIT to pay dividends to *its* stockholders and obtain needed financing.  The $650

million per year payment remained constant throughout the formation of Project RITE, even though some assets were eventually *excluded* based on regulatory prohibitions (yet Windstream continued to pay rent that was set when it was assumed that such networks were included).

66.     These conflicted "negotiations" were problematic for Windstream.  Because Uniti did not yet exist, Windstream executives negotiated with themselves to set the terms that would be appealing to stockholders and creditors of the other nonexistent entity.  Among those conducting negotiations:

> Ostensibly on Behalf of Uniti:
> Thomas (Windstream CFO, and slated to become CEO of the spun-off REIT)
> Jeff Small (a Windstream employee)
>
> Ostensibly on Behalf of Windstream:
> John Fletcher (general counsel to both Windstream and the spun-off REIT)
> Kenny Gunderman (Windstream's financial advisor at Stephens – Gunderman became
> Uniti's CEO in early 2015 and sits in that position to this day)

67.     In response to a question in Windstream's bankruptcy proceeding inquiring "who were the parties on either side of the negotiation" of the Master Lease, Fletcher responded, "[t]here was only Windstream at this point. . . .  this was not an arm's length transaction.  There really weren't two parties."

68.     Thomas' March 29, 2013 Windstream board presentation also included the following diagram of the proposed transaction, which indicates that Windstream had not yet intended to structure the lease through the use of a holding company (Windstream Holdings).  The March 2013 presentation depicted a structure whereby Windstream's operating subsidiaries (consolidated into Windstream Services or "OpCo") would enjoy the benefits of leasing the Transferred Assets while also bearing the burden of funding the disguised financing through lease payments to the REIT:



69.     On April 15, 2013, Thomas wrote an email to Bob Gunderman expressing the following concern about the Indenture covenants:

> *We need a capital structure that works with the Indenture; we may be able to use the HoldCo strategy here.  Create HoldCo and put Windstream Financial underneath Holdco.  1 – This way the captive can have its own financing outside the indenture.  2 – Remember, the sales – leaseback provision in the Indenture can be a limiting factor here.*

70.     On August 30, 2013, Windstream created Windstream Holdings and as a result, Windstream Services became a wholly-owned subsidiary of Windstream Holdings.

**D.     After Forming Windstream Holdings, Windstream Continues with Project RITE in 2014 Despite Ongoing Indenture and Tax-Related Concerns**

71.     Following an IRS-related delay, Windstream continued its slow march towards finalization of the Uniti Arrangement.  On February 12, 2014, the Windstream Board held another

"Strategic Planning Session" to discuss the proposed transaction.  Windstream discussed again the "significant execution risks to Project RITE including the regulatory approvals [and] financial market risks.  Defendants Thomas, Armitage, Beall, Hinson, and Wells were again among those in attendance.  Management's February 2014 board presentation continued to depict a proposed leaseback structure whereby Windstream Services and its operating subsidiaries (and not Windstream Holdings or "HoldCo") would enjoy the benefits of leasing the Transferred Assets and bear the burden of funding the disguised financing through lease payments to the REIT:



Note that the "Triple Net Lease Payments" and "Use Rights" on the Windstream side of the diagram run from "OpCo" (*i.e.*, Windstream Services) rather than Windstream Holdings.

72.    Around the same time, Windstream privately requested that Moody's Investors Service review the proposed transaction based on a confidential presentation and a series of

telephone conversations from April 15, 2014 to April 29, 2014. Moody's responded in a "strictly confidential" letter to Bob Gunderman on April 29, 2014, expressing the following prescient concerns:

> Moody's believes that the transaction could *amplify the company's downside risk* if it fails to execute a return to growth since its ability to reallocate capital will be more limited going forward. . . .
>
> In the downside scenario where revenues and EBITDA continue to erode, the higher level of fixed costs could lead *to a higher probability of default* and a higher loss given default given the reduction in flexibility to reallocate cash flows and the lower asset coverage from the transfer of assets to Propco. The creation of [Uniti] will complicate the corporate structure of Windstream and could ultimately weaken both companies' credit strength. *This unorthodox and complicated corporate structure may result in unintended consequences or invite capital market risk* as the company attempts to fund its operation from two separate entities whose motive for profits could diverge over time.

73. On May 6 and 7, 2014, Windstream held a board meeting and discussed Project RITE. Defendants Thomas, Armitage, Beall, Hinson, and Wells were among those in attendance. Windstream management (including Thomas) provided the Windstream Board with a large packet of materials, which was noteworthy in at least two respects. First, Windstream described the Moody's confidential report above, *inter alia*, by noting that "[t]he Ratings Agencies . . . continue to think through how to treat the lease in their debt calculations as well as the impact on the recovery analysis of OpCo and [Uniti] *in a distressed/bankruptcy scenario*." Second, the slide deck contained a page regarding the "Bond Indenture Considerations," which noted:

> Key issues to consider are debt incurrence/sale-leaseback covenants as well as RP capacity necessary to bring PropCo outside of the credit group . . . .
>
> – Limitations on sale-leasebacks at Windstream subject to debt incurrence ratio
>
> – Given that lease obligation will be at OpCo/HoldCo, sale-leaseback covenant not implicated at Windstream.

74. Third, the May 2014 presentation also included the following diagram of Project RITE as Windstream tried to work around the Indenture's requirement that a "Sale and Leaseback Transaction" be counted as "Indebtedness" of Windstream Services under the Indenture:



Note that Windstream now made Windstream Holdings the "OpCo" and shifted the "Triple Net Lease Payments" and "Long term, exclusive lease" up to Windstream Holdings.  Internally and for regulatory reasons, however, Windstream Holdings could not suddenly become "OpCo." Windstream's shifting of the leaseback obligation up to Windstream Holdings was simply a fiction solely to avoid "a clear violation" of the Indenture, but this shell game was later exposed. Mechanically shifting the "lease" obligations up one level did not, in substance or in actuality, avoid the fact that the benefits and burdens of the leaseback transaction continued to flow to and from Windstream Services, and therefore the leaseback obligation counted as "Indebtedness" of Windstream Services under the Indenture.

75.     But this quick fix did not address all of Windstream's problems with respect to the Uniti Arrangement, Project RITE had also thorny accounting implications.   A May 22, 2014 Windstream board presentation described Windstream's contemplated accounting as follows:



76.     This accounting treatment, as described below, was based on a series of misrepresentations about the assets which allowed Windstream to underreport the full amount of its actual liabilities.

77.     The Windstream Board met again to discuss Project RITE on June 9, 2014. Defendants Thomas, Armitage, and Wells attended, among others.   Windstream management provided the Windstream Board with a status update, indicating that Windstream had requested a Private Letter Ruling from the IRS for the proposed transaction and that management expected a

response in the near future.  On July 17, 2014, the IRS issued its Private Letter Ruling and approved

the REIT structuring off the spun off company.  As also described below, Windstream secured this

letter ruling through false claims about the Transferred Assets.

78.     On July 29, 2014, Windstream publicly announced the Uniti Arrangement.

Windstream continued to fine-tune Project RITE thereafter, including by adding to the terms of the

Master Lease.  At that time, Windstream did not contemplate retaining an equity stake in the spun-

off entity.

79.     On August 6, 2014, Windstream circulated an "internal RITE Q&A document created

in preparation for investor questions."   Recipients of the email included Defendants Thomas,

Gunderman, Armitage, Beall, Hinson, and Wells.  One question asked, "How will this transaction be

accomplished given the existing indenture and credit agreement?"  The document advised the

following evasive response to investors:

> We do not believe that the Windstream indentures require any consents of waivers to
> effect the transaction (***do not go into detail below unless specifically asked*** on each
> point). . . .
>
> **If pressed on sale / leaseback provision**:  Given that the lease is being implemented
> at Windstream Holdings, it does not impact any covenants in the Windstream
> indentures, including the sale-leaseback provisions.
>
> **If pressed on incurrence test**:  The transaction is a deleveraging transaction and
> therefore gives us more cushion under our debt incurrence covenant.

80.     Elsewhere in the Q&A, Windstream carefully avoided confirming externally (as it

had internally) that the creation of Windstream Holdings as a corporate shell was necessary to

complete the transaction.  These responses were misleading because – as Windstream would later

admit – it structured Project RITE as not as a true lease, but as a "disguised financing," and

Windstream created Windstream Holdings only to purportedly evade the limitations imposed by the

Indenture.

81.     The Windstream Board met again on December 11, 2014.  Defendants Thomas, Gunderman, Armitage, Beall, LaPerch, Stoltz, and Wells were in attendance, among others.  At that meeting, Thomas explained to the board that "management was now projecting *[a] higher leverage profile for Windstream* following the spin-off than was originally expected at the time of announcement of the transaction *due to weaker than expected financial results*."  As a result, Thomas proposed that Windstream retain a 19.9% stake in Uniti stock following the transaction.

82.     At that same meeting, following the departure of Windstream's CEO at the time, the Windstream Board appointed Thomas as Windstream's President and CEO.  Thereupon, Thomas switched sides and was tasked with closing the Uniti Arrangement on behalf of Windstream (as opposed to working on behalf of Uniti, as was his previous role).

**E.     Windstream Completes the Uniti Arrangement in 2015; Windstream Assumes a Dividend Cut**

83.     In March and April 2015, Windstream and Uniti finalized and executed the Uniti Arrangement.   In March 2015, Windstream and Uniti executed a Separation and Distribution Agreement whereby Windstream Services transferred the assets to Uniti.  Along with the spin off, on April 24, 2015, Windstream Holdings executed the Master Lease with Uniti.

84.     Also in April 2015, Windstream and Uniti conducted a series of roadshow presentations for potential investors in Uniti debt, assisted by J.P. Morgan and BAML.  In an email dated April 12, 2015, Bob Gunderman expressed concern to Thomas.  Gunderman explained that J.P. Morgan had retained expensive bankruptcy attorneys to explain *the impact of a Windstream bankruptcy* on the lease payments to Uniti.  Gunderman wrote:

> They [J.P. Morgan] have used them [bankruptcy counsel] to confirm the positive messaging around *how a remote bankruptcy of a regulated entity like WIN [Windstream] would play out and have made the argument for security of the lease payment in a remote bankruptcy which makes for a stronger story for CSL [Uniti]. . . . The next three days will be intense* but I feel better about where we are

with the messaging and the JPM and BAML teams were willing to give more assurances on the call tonight.[2]

Put differently, Gunderman and Thomas privately attempted to convince potential lenders of Uniti that a bankruptcy of Windstream would not impact Uniti's receipt of annual payments from Windstream under the Master Lease. These reassurances were necessary because the annual payments from Windstream represented Uniti's primary source of income and sole ability to service its own debt.

85.     On March 17, 2015 and again on April 16, 2015, the Windstream Board received a solvency analysis from Duff & Phelps, LLC ("Duff & Phelps"). The Duff & Phelps report included non-public multi-year projections from Windstream's management team, as well as "a reasonable downside scenario" based on Windstream management's representations and consent. Windstream management's "Base Case" assumed revenues increasing at a compound annual growth rate ("CAGR") of .8% from 2014 to 2020. The downside case, in contrast, involved moderately decreasing revenues for the same period at a CAGR of negative .6%. In that scenario involving moderate revenue declines, Windstream and its advisors assumed that "[d]ividends are held at the same dollar amount as the base case in 2015 and *no dividends were assumed 2016 onward*." A screen shot of that downside scenario (the "Downside/No Dividend Case") is contained below:

---

[2]     In this context, bankruptcy remote is a term that describes the relative position of one company as it relates to bankruptcy with regard to others within a corporate group. A bankruptcy remote company is a company within a corporate group whose bankruptcy has as little economic impact as possible on other entities within the group.

## Capital Adequacy / Cash Flow Analysis

*Cash Flow / Capital Adequacy Analysis - Sensitivity Case*
*($ in millions)*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Revenue | $5,830 | $5,633 | $5,597 | $5,546 | $5,524 | $5,525 | $5,628 |
| Growth | -2.6% | -3.4% | -3.6% | -0.9% | -0.5% | 0.0% | 1.9% |
| EBITDAR (1) | 2,028 | 1,945 | 1,890 | 1,877 | 1,877 | 1,900 | 1,964 |
| Margin | 34.8% | 34.5% | 33.8% | 33.8% | 34.0% | 34.4% | 34.9% |
| Growth | | -6.3% | -2.8% | -0.7% | 0.0% | 1.2% | 3.3% |

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| EBITDAR (1) | 1,945 | 1,890 | 1,877 | 1,877 | 1,900 | 1,964 |
| New REIT Rent Expense | (489) | (661) | (667) | (671) | (677) | (688) |
| Other Rent Expense | (140) | (142) | (144) | (145) | (147) | (148) |
| Merger and Integration Costs | (75) | 0 | 0 | 0 | 0 | 0 |
| Stock-Based Compensation | 63 | 63 | 63 | 63 | 63 | 63 |
| Taxes | (18) | (9) | 0 | 0 | (56) | (84) |
| Net Working Capital | (31) | (24) | (26) | (27) | (23) | 1 |
| Capital Expenditures (2) | (885) | (759) | (716) | (716) | (712) | (725) |
| Net Proceeds from New REIT Transaction | 3,473 | 0 | 0 | 0 | 0 | 0 |
| New REIT Ownership Liquidation, net of fees (3) | 766 | 0 | 0 | 0 | 0 | 0 |
| Dividend on New REIT shares | 37 | 0 | 0 | 0 | 0 | 0 |
| Other Cash Flows (4) | (111) | (27) | (6) | 0 | 0 | 0 |
| Cash Available for Debt Service | $4,525 | $331 | $351 | $382 | $350 | $384 |
| Cash Interest Expense | (465) | (369) | (362) | (356) | (359) | (356) |
| Premium on Long-Term Debt, Interest Expense | 0 | (0) | (1) | (2) | (2) | 0 |
| Mandatory Amortization | (35) | (28) | (12) | (24) | (24) | (24) |
| Payoff of Contingent Liabilities | 0 | 0 | (15) | 0 | 0 | 0 |
| Repayment of Debt at Maturity | 0 | 0 | 0 | 0 | 0 | (1,245) |
| Debt Refinancing | 0 | 0 | 0 | 0 | 0 | 1,249 |
| Cash Surplus / (Deficit) | $4,005 | ($86) | ($38) | ($0) | ($34) | $4 |
| Revolver Draw/(Repayment) | (592) | 66 | 39 | 2 | 36 | (4) |
| Optional Debt Prepayment | (3,085) | (0) | (1) | (2) | (2) | 0 |
| Dividends | (335) | 0 | 0 | 0 | 0 | 0 |
| Net Cash Flow | $22 | ($0) | ($0) | ($0) | ($0) | ($0) |
| Total Debt | $4,960 | $5,028 | $5,064 | $5,031 | $5,041 | $5,013 |
| Total Cash | 50 | 50 | 50 | 50 | 50 | 50 |
| Revolver Availability (5) | 1,219 | 1,153 | 1,114 | 1,113 | 1,077 | 1,081 |
| Net Debt / LTM EBITDA | 3.6x | 4.3x | 4.4x | 4.4x | 4.4x | 4.3x |
| LTM EBITDA / Cash Interest, Net | 3.0x | 3.1x | 3.1x | 3.2x | 3.2x | 3.3x |
| Fixed Charge Coverage (6) | 1.0x | 1.0x | 1.0x | 1.1x | 1.0x | 1.0x |

(1) Includes stock based compensation expense and restructuring costs
(2) Includes CAF-1 funded capex of $74 million and $17 million in 2015 and 2016, net of broadband stimulus
(3) Based on a valuation of 11.9x 2015 EBITDA
(4) Includes early debt prepayment fees, swap breakage fees, and other cash flows
(5) Revolver availability net of $18.2 million in LOCs outstanding
(6) (EBITDA - Taxes - CapEx) / (Cash Interest + Mandatory Amortization)

CONFIDENTIAL    18    DUFF & PHELPS

Selected data from the analysis above is contained in the chart below:

| Year | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| Revenue | $ 5,633 | $ 5,597 | $ 5,546 | $ 5,524 | $ 5,525 | $ 5,628 |
| Dividends | $ 335 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |

86.     Put differently, Windstream internally assumed that if revenues even moderately declined by just .6% annually, ***it would eliminate its dividends in 2016 and beyond***, in an attempt to stay solvent.  By the time Windstream issued the Offering Documents in late 2016 and early 2017, Windstream's performance was in the process of deteriorating ***well below*** even the Downside/No Dividend Case.  For example, as shown above, in the Downside/No Dividend Case, Windstream projected $5.597 billion in revenue for CY 2016.  In the Joint Proxy/Prospectus, issued in early 2017, Windstream expected just $5.401 billion in revenue for the same period.  Windstream's own

(undisclosed) internal models thus made clear that Windstream planned to eliminate its dividends when it experienced even moderately declining revenues by 2016 and beyond.

## VII.   WINDSTREAM STRUCTURED THE UNITI ARRANGEMENT WITH MISREPRESENTATIONS TO REGULATORS AND INDENTURE COVENANT VIOLATIONS

### A.   Windstream Now Admits that Its Executives Inflated the $650 Million Annual per Year Payments to an Above Market Level

87.     In bankruptcy filings, Windstream concedes that "the assets Windstream chose to transfer to Uniti did not support $650 million in annual rent even at the commencement of the Master Lease."  According to Windstream now, the "*$650 million in annual rent – which will grow to more than $690 million in 2030 – was not market, nor was it intended to be*.  The parties instead chose a non-negotiated base rent with an escalator to appease [REIT] shareholders no longer receiving a Windstream dividend and to mimic traditional REIT structures involving traditional real estate."  Windstream also admits: "Rent was not structured to match the value of the leased network over time. . . .  Rent was not set at market, and Windstream's annual rent plus consideration in the form of Tenant Capital Improvements exceeded the fair market rent value of the 'leased' networks . . . ."  In sum, Windstream stated:  "the sales and rent prices [Windstream] set in the Uniti Arrangement *are unrelated to fair market value and were tailored to generate certain financial outcomes*."

88.     According to Windstream, there are four non-exhaustive reasons explaining how the Master Lease payments were not set at market rates:  (1) Ernst & Young – which had provided a contemporaneous report about the rent – applied no deduction for economic obsolescence and too low of a deduction for functional obsolescence, even though the network was deteriorating in value; (b) Ernst & Young applied too high of a market lease rate; (c) Windstream received no reduction in rent when it agreed that all TCI Replacements would belong to Uniti; and (d) Ernst & Young only valued the network while being leased to Windstream and did not make proper valuation

assumptions assuming the network no longer was leased to Windstream. Windstream concedes that Ernst & Young "*did not reliably or accurately determine the value of the network*." During the pendency of the bankruptcy proceeding, Thomas also stated, twice, on an earnings call on May 25, 2019, that "Windstream believes the current rent under the Uniti master lease is significantly above market." Windstream also concedes, based on citations to its own historical internal documents in a bankruptcy filing, that it was contemporaneously aware of these facts when setting the payments during the inception of the Uniti Arrangement.

89.     In addition, Windstream now admits that its executives purposefully inflated the overall $7.45 billion "valuation" of the assets included in the Uniti Arrangement: "Windstream's copper-intensive networks, in short, were not worth what the $7.45 billion valuation said they were worth."

90.     Windstream misrepresented these issues to the SEC. On August 19, 2014, Thomas wrote to the Office of the Chief Accountant of the SEC requesting a review of Windstream's proposed accounting treatment for Project RITE. The SEC responded by confidential email to Thomas on September 4, 2014 with a series of questions, including the following:

3.  During the call, you described how the group of assets that will be transferred to PropCo were designed to support the $650 million annual lease payment with a 0.5% annual rent escalator beginning in year four. Does the Company believe that the lease payment reflects a market rate for the transferred assets? If so, how did the Company consider the fixed payment for three years and relatively low annual rent escalator in this analysis?

91.     On September 15, 2014, Windstream responded to the SEC as follows:

In applying a reasonable market rate of return to this asset pool, *management concluded that a fair value annual lease payment would fall within a range of $600.0 million to $700.0 million*.

Management believes that a $650.0 million annual payment is an appropriate initial lease rate as it is *within the preliminary range of fair market rentals* previously determined and produces financial stability for both Windstream and PropCo through the initial term of the lease.

The SEC was convinced.  Seven days later, the SEC staff "verbally communicated" its non-objection to Windstream's accounting treatment of the Uniti Arrangement, which Windstream confirmed in a letter to the SEC on October 2, 2014.

92.     In short, Windstream's representations to the SEC were inconsistent with the contemporaneous reality, as Windstream now concedes, that "the sales and rent prices set in the Uniti Arrangement are *unrelated to fair market value and were tailored to generate certain financial outcomes*."

### B.   Windstream Misrepresented to the SEC the Likelihood of Renewal of the Lease Terms

93.     Windstream faced a dilemma in light of its structuring of the Master Lease terms, state regulatory demands for continuity, and its preferred accounting treatment for the lease payments to Uniti.  Internally, Windstream recognized that it was "highly unlikely" that it would terminate the entire master lease at the expiration of the initial term.  Windstream made similar representations to state regulators, which were demanding continuity of operations in exchange for their approval of the spin-off.  Among other issues, Windstream was recognized as a "carrier of last resort" in some markets, which meant that Windstream was obligated to provide basic voice services to any person and for ensuring that certain customers were able to call 911 to obtain emergency assistance.  On the other hand, Windstream preferred the financial reporting and accounting benefits of treating the initial 15-year lease term, as well as the subsequent terms, as divisible periods. Windstream solved this dilemma by misrepresenting facts to federal regulators and, as described below, to investors.

### 1.   Windstream Internally Assumed It Would Renew

94.     A May 22, 2014 Windstream board presentation analyzed the "Lease Renewal Potential Scenarios."  A screen shot of the relevant slide is below:



95.   The highlighted portions show that Windstream internally recognized that lease extensions were likely, would be "viewed favorable by both the equity and debt capital markets," and that terminating the entire master lease at initial term expiration was "***highly unlikely across entire footprint***."

96.   A similar Windstream internal document from June 2014 stated that "it would not be expected that OpCo [Windstream] could or would not renew all of the lease POD's at one time."  A screen shot of that document is below:

| Question | Response |
|---|---|
| Can PropCo refinance, or issue equity, in the future if OpCo does not renew the initial lease? | There will be strong incentives on both sides for stability in the rental payment streams. During the term, PropCo will also spend significant efforts to diversify its portfolio and it would not be expected that OpCo could or would not renew all of the lease POD's at one time. Finally, PropCo does have certain end of lease protections to ensure that a tenant will be available and it will need to ensure those are enforced. |

97.    Windstream now concedes this document means that "Windstream expected to renew all of the leased properties."

### 2.    Windstream Told State Regulators It Would Renew

98.    From the second half of 2014 through 2015, Windstream worked to secure approval of the Uniti Arrangement from state regulators.  Windstream later described these efforts as follows:

> Obtaining approval from state regulators was essential to the Uniti Arrangement's success, and there was a chance regulators may refuse to approve asset transfers to Uniti – an unknown, non-operating REIT.  Therefore, in conjunction with its legal advisors, Windstream worked to confirm with regulators that the Uniti Arrangement, as structured, would not leave their citizens without a provider of critical services.  Should Windstream exit, it would, of course, be challenging for Uniti to find a replacement tenant for networks tailor-made for Windstream.

> To address regulators' concerns, Windstream and Uniti emphasized that the Master Lease had renewal terms allowing Windstream to extend the Master Lease for a total of 35 years.

> In one exchange, Windstream's then-interim CFO and Treasurer (and now current CFO [and Defendant in this case]) Bob Gunderman testified under oath in response to questions from the Kentucky Public Service Commission that Windstream's Master Lease "***should remain in effect for a minimum of 35 years***."

> Q.    ON PAGE 11 OF HIS DIRECT TESTIMONY, MR. BARBER STATES THAT THE APPLICATION DOES NOT DISCUSS WHAT HAPPENS AT THE CONCLUSION OF THE LEASE.  PLEASE ADDRESS THIS ISSUE.

> A.    I would first like to emphasize that the Lease has an initial term of 15 years, and up to four (4) renewal terms of five (5) years each, at Windstream's sole option (provided there is no event of default), ***so that the Lease should remain in effect for a minimum of 35 years***.  At that point, Windstream and CSL could negotiate an extension or a replacement for the Lease, or they could allow it to expire.  Of course it is impossible to predict what technological and economic changes may have occurred by that time; it is at least theoretically possible that, by 2050, the Subject Assets could be considered obsolete and have little practical value.  It is much more likely, however, that there will continue to be demand for some kind of telecommunications capabilities delivered to homes and businesses over fixed transmission facilities, as there has been since telephone technology was developed in the late 19th century, even though the nature of the facilities and the services they enable will probably continue to change.

Likewise, Windstream told the Alabama Public Services Commission that the Master Lease would run on a "long term basis":

The Subject Assets will be transferred to [Uniti], which will lease the use of the Subject Assets back to Windstream for the benefit of the WIN Companies *on an exclusive, long term basis* so that the WIN Companies can continue to operate their telecommunications business as they do currently.  [Uniti] will not provide any transportation or public utility services to any customer in Alabama, nor will [Uniti] operate any of the Subject Assets or any transmission or switching facilities.  Rather, [Uniti] will simply own the Subject Assets and lease them exclusively for the WIN Companies.

Similar statements meant to reassure were provided informally to various regulatory staff, *emphasizing Windstream's ability to renew and maintain the assets for up to 35 years*.

Ultimately, Windstream obtained the requisite approvals from state regulators.

### 3.   Windstream Now Concedes It Will Renew

99.    In a recent bankruptcy filing, Windstream further confirmed its economic compulsion to renew the Master Lease.  In short, Windstream now concedes:  "Windstream was *economically compelled to renew* the Master Lease for each of its four, five-year renewal terms for as long as the network retained material useful life."  In more detail, according to Windstream:

Windstream *was going to continue renewing* the Master Lease to harvest all material value from its network.  The network was the foundation of Windstream's business, and Windstream was the sole operator of the network.  For this reason, to remain competitive, Windstream intended to replace a significant amount of its copper network with fiber.  These investments would be expensive and *ensure renewal of the Master Lease*.  In short, Windstream would not dump hundreds of millions into a network that some unknown successor tenant would harvest. . . .

First, the "leased" network was the foundation of Windstream's business and Windstream required the network to serve its customers. . . . Second, Windstream's capital expenditures created an economic compulsion to renew. . . . Windstream's intended TCI Replacements created an economic compulsion to renew. . . .

### 4.   Windstream Misrepresented to the SEC Its Plans to Renew Lease Terms

100.    On the other hand, Windstream made very different representations to federal regulators and investors for accounting purposes.  As noted, on August 19, 2014, Thomas wrote to the Office of the Chief Accountant of the SEC requesting a review of Windstream's proposed

accounting treatment for Project RITE.  In order to justify Windstream's chosen accounting, Windstream made a series of misrepresentations that conflicted with not only its internal conclusions regarding the likelihood of lease renewal, but also conflicted with Windstream's representations to state regulators regarding the long-term continuity of service.  When describing the issue to the SEC, Windstream stated:

> Given the following reasons, management does not believe it would incur an economic penalty for failing to renew the lease [after the initial 15 year term]. . . .
>
> Win Corp's Carrier of Last Resort Obligations ("COLR"). . . .  Upon the sale or transfer to another regulated entity of its Regulatory Licenses, Win Corp. would be relieved of its COLR obligations and as such, management maintains there is *no economic penalty for failure to renew the lease*. . . .
>
> Five Year Initial Term Extension. . . . As a result, *Windstream would not be reasonably assured of extending the initial term from 15 to 20 years*. . . .
>
> Based on evaluation of all of the above factors, management concluded that it is *not reasonably assured that Windstream would exercise any of the renewal options* under the lease.  Accordingly, management concluded that the appropriate occupancy period for the Transferal Assets and associated term of the financing arrangement would be equal to the non-cancelable lease term of 15 years.

101.    The SEC verbally communicated its non-objection to Windstream's accounting treatment of the Uniti Arrangement seven days later, which Windstream confirmed in a letter on October 2, 2014.

102.    Windstream articulated its motivation for misrepresenting these facts as follows:

> A significant shortcoming of the 35-year financing model would be to recognize a much larger liability at the spin-off date.  This additional liability would include payments due to PropCo during renewal periods even though such payments would [purportedly] not be obligations of [Windstream] after the spin-off date. . . .

103.    The misrepresentations to the SEC thus allowed Windstream to underreport the size of its true liabilities.  In particular, Windstream misstated the amount of its financing obligation when describing and accounting for the Uniti Arrangement.  Windstream measured the amount of the financing obligation by using the present value of lease payments over a 15-year lease term. Because the lease term was actually longer than 15 years (due to Windstream's admitted economic

compulsion to renew), the present value of the lease payments would extend at least to 20 years and as long as 35 years. These payments would be vastly in excess of the reported figures (based on a 15-year divisible lease).

### C. Windstream Inflated the Useful Life of Assets in the Uniti Arrangement

104.   In order to obtain a ruling from the IRS regarding the REIT-able status of the spun off entity, Windstream made representations to the IRS under penalty of perjury regarding the economic life of the Leased Property. For the transaction to work, Uniti had to be a REIT. As Windstream later stated, "[t]his critical concept drove most of the decisions around the Uniti Arrangement, including the creation of the Master Lease. There was no room for error."

105.   Windstream now admits that when it formed the Uniti Arrangement, "[d]ue to the economic obsolescence of copper wire and fiber-optic cables, the remaining economic life was overstated." Correcting for Windstream's strategic use of the passive voice: *Windstream overstated the remaining economic life of the subject assets in the Uniti Arrangement*.

106.   On May 10, 2013, Windstream submitted a Request for Ruling to the IRS regarding the then-contemplated Uniti Arrangement. In that request, Windstream stated that the subject copper and fiber optic networks "have useful lives *in excess of 40 years*." On June 10, 2013, Windstream revised the statement and represented to the IRS that the subject assets "have useful lives of approximately *30-40 years or longer*." The resulting IRS Letter Ruling to Windstream, dated July 16, 2014, stated that it was based in part on "representations that . . . The Distribution Assets have economic useful lives of approximately [30] to [40] years." The IRS letter also stated, "[t]he rulings contained in this letter are based on facts and representations submitted by the taxpayer [Windstream] and accompanied by a penalties-of-perjury statement executed by the appropriate party [Windstream executives]." Even Uniti wrote in the bankruptcy proceeding that "[u]pon information and belief, Uniti understands that *Windstream represented to the IRS under penalty of*

*perjury that the various components of the Leased Property had economic useful lives at the time*
*of the transaction vastly in excess of the lease term*."

107.    Windstream later described its motivation for making these claims as follows:
"Windstream understood in structuring the Master Lease that the leased networks must have a useful
life well-beyond the initial lease term.  It was not enough for such remaining useful life to be
nominal.  There had to be at least 20% to 25% of the residual value at the end of the Master
Lease. . . .  Thus, Windstream and Uniti needed a remaining useful life no less than 20 years based
on a 15-year initial term – and probably much longer.  Otherwise, there is no material residual value,
and no 'true lease.'"  By way of explanation and example, if a Party A were to "lease" a warehouse
to Party B for an initial 15-year term, but that warehouse is only expected to be utilized for ten years
in light of its deteriorating structure, then IRS and accounting regulations would not consider the
warehouse to be part of a "true lease" – the transaction would, in actuality, be a financing/debt
arrangement where all of the value of the warehouse is used up during the term of the purported
"lease."  Windstream now admits that it artificially inflated the useful life of the Transferred Assets
to extend beyond the initial lease term in order to obtain favorable tax treatment.

108.    Regarding a report from Windstream's accountant, Ernst & Young, which assumed a
total economic life of the transferred assets between 40 and 50 years (similar to the figures
Windstream submitted to the IRS), Windstream now states:  "[T]hese assumptions and conclusions
failed to adequately account for the impending economic obsolescence of the assets (particularly of
the copper cable wires composing a significant portion of the value of the transferred networks)."
Windstream admits, "in 2015, copper cables were nearing the end of their economic life.  With
competitors providing increasing speeds through fiber optic cables or other technologies such as
wireless technologies, and with 1 GB speeds on the horizon, copper was becoming obsolete except
in the least competitive markets.  For many locations, Windstream's copper will be uncompetitive on

or around 2025." "Windstream's network had an average remaining useful life of *less than 15 years*." While these statements address "remaining" useful life, they in fact undermine and contradict Windstream's representations about "total" useful life as well.

109. Windstream now explains that there was "extensive *contemporaneous* evidence establishing that Windstream's network had far less remaining useful life than E&Y stated in its report." "Though E&Y concluded that the network had a 28-year average remaining useful life, that conclusion is impossible to square with the assumption it made and then buried in its report: *Windstream intended to replace over half its copper network*." Windstream, for example, was in possession of a Duff & Phelps depreciation report of Windstream's incumbent local exchange carrier ("ILEC") assets and concluded that the copper wire cables had a remaining economic life of *3.9 to 7.7 years*.

### D. Windstream Now Represents that the Uniti Arrangement Was Not a True Lease, But Was a "Disguised Financing"

110. During its bankruptcy proceeding, Windstream affirmatively represented in an adversary complaint against Uniti that "[t]he economic substance of the Uniti Arrangement and the circumstances of its negotiations reveal a disguised financing arrangement." Windstream introduced "compelling evidence that the Uniti Arrangement is indeed a financing arrangement, and the evidence supporting a 'true lease' conclusion in 2015 *was not objectively reasonable*." Windstream also now admits that "[w]hile structuring the Uniti Arrangement, Windstream knew of the recharacterization risk. . . . However, *no amount of legal structuring could deny the true financing nature of the arrangement*."

111. In sum, Windstream states that the Uniti Arrangement is a financing (*i.e.*, an unsecured loan to Windstream Services) because: "First, no material residual value will remain once Windstream exists the Master Lease. Windstream intended to harvest all material value under the Master Lease." "Second, Uniti is not acting as an owner with an economic interest in the

telecommunications network and that bears the economic risk of the fluctuations in value.  Nor is Windstream acting as a tenant with a time-boxed interest in the leased assets."  "Third, the Master Lease was not priced at market to be a lease.  It includes an escalator to annual rent.  Yet the leased networks are declining in value – not appreciating."  "Fourth, the Uniti Arrangement was structured so that [Windstream] Holdings would be the one purporting to lease the telecommunications networks from Uniti."

112.   When recently defending the Uniti settlement that Windstream ultimately procured as a result of these judicial representations, Windstream stated that it "worked tirelessly for months to . . . discount the oft repeated and publicly filed characterizations of [the Uniti] transaction as a lease."  In other words, Windstream demonstrated the falsity of its own public filings and statements – the same statements Windstream issued to EarthLink stockholders in order to consummate the Merger at issue in this case.

113.   The Uniti Arrangement's status as a "disguised financing" implicated covenants in the Indenture.  Section 4.09 of the Indenture, titled "Incurrence of Indebtedness," states:

> "[Windstream Services] shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness; *provided, however*, that the Company or any of its Restricted Subsidiaries that are Guarantors may Incur Indebtedness, if the Company's Consolidated Leverage Ratio at the time of the Incurrence of such additional Indebtedness, and after giving effect thereto, is less than **4.50 to 1**.

114.   The Indenture defines "Indebtedness" as including any "borrowed money," thus, Windstream Services' total Indebtedness, including the Uniti Arrangement, far exceeded the permitted 4.50 to 1 permitted ratio.  For example, adding $5 billion of additional "Indebtedness" to Windstream Services as of December 31, 2015 (to account for the leaseback and disguised financing of Windstream Services) caused the Consolidated Leverage Ratio under the Indenture to be 7.32.  Thus, Windstream's concession that the Uniti Arrangement was actually a disguised financing ("Debt") at Windstream Services implicates a related concession that the Uniti Arrangement tripped

the Indenture's Consolidated Leverage Ratio, which limited new borrowings by Windstream Services.

**E.    The Uniti Transaction Also Violated the Sale Leaseback Prohibition in Windstream's Indentures**

115.    On September 21, 2017, Aurelius Capital Master, Ltd. ("Aurelius") – the beneficial owner of more than 25% of the aggregate principal amounts of certain of Windstream's outstanding senior unsecured notes – provided written notice to Windstream that the Uniti Arrangement breached the Indenture.  In particular, Aurelius stated that the spin-off constituted a Sale and Leaseback Transaction in violation of Section 4.19 of the Indenture, which forbids such transactions unless three enumerated conditions are satisfied.  Because the Uniti Arrangement failed to satisfy those conditions, Aurelius concluded that Windstream was in default.  Four days later, Windstream publicly disclosed its receipt of the Notice of Default in a filing with the SEC.

116.    On February 15, 2019, The Honorable Jesse M. Furman, United States District Judge for the Southern District of New York, issued a post-trial ruling in favor of Aurelius.  In short, Judge Furman ruled:  "the Court concludes that [Windstream's] financial maneuvers – and many of its arguments here – are too cute by half.  That is, the 2015 Transaction qualifies as a Sale and Leaseback Transaction because, in substance, the Transferor Subsidiaries sold the Transferred Assets and then, either directly or indirectly, leased them back; *making [Windstream] Holdings the sole signatory on the Master Lease did not change those facts*."

117.    As supported extensively above, Windstream created Windstream Holdings to avoid a transparent breach of the Indenture, but Windstream recognized that the maneuver would not solve the long-term violation.  Judge Furman noted that "Windstream disclosed to the regulators that there would be a master lease signed by [Windstream] Holdings, but stressed that that was 'just for administrative ease in terms of transacting – transacting the lease between the entities . . . for the

benefit of the operating subsidiaries of Windstream.'"  Windstream's claims to regulators were false in that regard as well.  Judge Furman also ruled:

> Windstream decided that [Windstream] Holdings would be the sole Windstream signatory on the Master Lease and that none of the Transferor Subsidiaries would sign the agreement.  At trial, [Windstream] Services' former General Counsel, John Fletcher, admitted that one reason that [Windstream] Holdings was the only Windstream entity to sign the Master Lease was to avoid "a clear violation" of the Indenture. Tr. 123, 131-32, 269.  *That is, [Windstream] Services understood and believed at the time that if the Transferor Subsidiaries signed the Master Lease and thus leased back the property they had transferred to CS&L [Uniti], the 2015 Transaction would have indisputably constituted a Sale and Leaseback Transaction prohibited by Section 4.19 of the Indenture*.

118.    Fletcher's testimony on this issue from the Aurelius Litigation trial is contained below:

> Q. Yes. The question is, at the time that this transaction was being planned, you were aware that if the transferor subsidiaries signed the master lease, that would have been a clear violation of the indenture at issue in this case.
>
> A. Yes.
>
> *       *       *
>
> THE COURT: All right. Let me ask two questions of my own. Then counsel, if you want to follow up briefly, you may. First, Mr. Friedman just asked you earlier if you were aware at the time that the transferor subsidiaries had signed the master lease that it would have been a violation of the terms of the indenture, and you said yes. That's correct?
>
> THE WITNESS: I did say that, yes. But the transaction scope that we had effected, if you had done it at the transferor-subsidiary level, you probably would have had a smaller transaction.
>
> THE COURT: Well, that's not the question. I think you testified that, had the transferor subsidiaries signed the master lease, that it would have been -- had they been parties to it, it would have been a violation of the indenture.
>
> THE WITNESS: If Services and transferor subs executed, I don't think it would have complied with it.
>
> THE COURT: All right. Keep your voice up. So my question is, was that among the reasons that it was structured in this particular way, where Holdings was the sole tenant under the --

THE WITNESS: Yes. That's why I listed it in my list of reasons as, when we did something, that was part of the reasons why, from the corporate finance standpoint, that we put the agreement -- the lease at Holdings.

119.    As also alleged above, Thomas wrote contemporaneous emails to Bob Gunderman reflecting the fact that Windstream created Windstream Holdings to evade the Indenture, and this fact was also confirmed in internal Windstream board presentations and Q&A documents.

120.    Among other issues, Judge Furman ruled that the Uniti Arrangement constituted a prohibited "Sale and Leaseback Transaction" transaction because:

> First, in seeking and obtaining approval for the 2015 Transaction, Windstream entities made explicit representations to nine state regulatory bodies that the Transferor Subsidiaries would transfer ownership of the Transfer Assets *and* then "lease them back on an exclusive, long-term basis." In sworn testimony, for example, John Fletcher, General Counsel to both [Windstream] Services and Holdings, reassured the Kentucky Public Service Commission that the Transferor Subsidiaries would "have the necessary assets to continue to provide adequate telecommunication service to Kentucky consumers" because they "will have an exclusive long-term lease and right . . . to use and occupy all the assets that are within their system today." And second, the state regulators adopted these representations by relying on them to approve the transaction (or decide that it did not require their approval). . . . ***These representations, which were accepted by multiple state regulatory bodies, are flatly inconsistent with the position [Windstream] Services takes here*** – namely, that the Transferor Subsidiaries did not lease the Transferred Assets. . . . In short, having benefited from repeated statements to state regulators that the Transferor Subsidiaries would lease back the Transferred Assets, [Windstream] Services is estopped from now denying that the Transferor Subsidiaries did in fact lease those assets – even if doing so would now serve its interests. On that basis alone, the Court would, and does, find that the 2015 Transaction constituted a Sale and Leaseback Transaction.

121.    Judge Furman also rejected Windstream's argument that the Uniti Arrangement did not violate the Indenture "because [Windstream] Holdings is the sole Windstream signatory on the Master Lease," finding that this argument "elevate[s] form over substance."

122.    As a result, Judge Furman concluded "that the [Uniti Arrangement] constitutes a Sale and Leaseback Transaction within the meaning of the Indenture. It follows that . . . the 2015 Transaction constitutes a breach of Section 4.19 of the Indenture." In addition, Judge Furman's "Sale and Leaseback Transaction" finding meant that the Uniti Arrangement, upon its

consummation, violated the 4.50 to 1 leverage ratio in the "Incurrence of Indebtedness" provision (Section 4.09) of the Indenture as well.  Judge Furman awarded Aurelius $310,459,959.10 in damages, plus interest.  Windstream chose not to appeal Judge Furman's post-trial ruling in any respect.

## VIII.   BACKGROUND OF THE MERGER

123.   On October 3, 2016, Windstream and EarthLink entered into a confidentiality agreement that allowed both parties to exchange non-public information regarding each company's financial conditions and prospects.  The companies in fact did so, including at an October 4, 2016 due diligence meeting between Windstream's CEO Thomas, EarthLink's CEO Eazor, and other top executives from both companies.  During the diligence process, EarthLink received key non-public financial and business information regarding Windstream.

124.   On October 5, 2016, following a Windstream Board meeting, Windstream submitted an indication of interest to EarthLink contemplating a 0.7 exchange ratio (*i.e.*, each share of EarthLink common stock would be exchanged for 0.7 Windstream shares).

125.   The EarthLink Board met on October 7 and October 10, 2016 to review the proposal and discuss, *inter alia*, Windstream's financial condition.  Following Windstream's representation that its dividend "would likely increase following the transaction," the EarthLink Defendants, on October 10, 2016, submitted a counterproposal with a 0.8 exchange ratio and inserted the following provision:  "the parties must mutually agree before signing upon the dividend for the combined company."

126.   The very next day, October 11, 2016, Windstream submitted a counterproposal at 0.75 and containing the following provision:  "maintenance of Windstream's existing $0.60 per share dividend policy following the transaction, at the discretion of the Windstream Board."  On

October 12, 2016, EarthLink submitted a counterproposal at 0.75 to 0.8, but dropped the contractual requirement for a continued dividend-level post-merger.

127.   Also on October 12, 2016, the parties opened up electronic data rooms and continued non-public due diligence of each other.  As a result, on October 26, 2016, attorneys for EarthLink expressed alarm that under the current merger agreement, Windstream had no committed financing and made no representations or covenants as to Windstream's ability of funds-pre-closing to pay or otherwise discharge EarthLink's outstanding indebtedness.

128.   On October 29, 2016, Windstream verbally agreed to the 0.8 exchange ratio and confirmed the agreement in a revised draft merger agreement on October 31, 2016.  The morning of November 4, 2016, *Reuters* published an article leaking the proposed transaction.  On November 4, 2016, EarthLink's CEO Eazor called Windstream's CEO to, according to the Joint Proxy/Prospectus, "express concern regarding the proposed 0.8 exchange ratio in light of the market's reaction" thereto.  Despite that "concern," the EarthLink Defendants thereafter completed the deal at an exchange ratio of just 0.818, which did not materially differ from the 0.8 exchange ratio that caused EarthLink concern.

129.   On November 5, 2016, the EarthLink Board met and during that meeting – only one month after Windstream's first indication of interest – the EarthLink Board unanimously approved the Merger.  On November 7, 2016, EarthLink and Windstream announced the Merger.

130.   The EarthLink Defendants acted negligently in issuing the Proxy (defined below) and Joint Proxy/Prospectus.  The companies entered into a non-disclosure agreement on October 4, 2016, exchanged extensive data-rooms on October 12, 2016, wherein the EarthLink Defendants received, or had access to, Windstream's non-public confidential internal documents.  The EarthLink Board discussed and received presentations from advisors (Foros Securities LLC and Goldman Sachs & Co. ("Goldman Sachs")) regarding Windstream's business and financial health, or lack thereof, on

October 7, 2016; October 10, 2016; October 12, 2016; October 17, 2016; October 21, 2016; October 26, 2016; October 31, 2016; November 4, 2016; and November 5, 2016.  In addition, at the October 31, 2016 EarthLink board meeting, "management updated the EarthLink Board regarding its due diligence review of Windstream.  [Ernst & Young] also reported to the [EarthLink] Board regarding its review of Windstream ***accounting and tax matters***."  In response to that update, the EarthLink board directed its attorneys to address a scenario where Windstream "breached its financing . . . obligations."  It is reasonably inferable that, through this extensive due diligence process, EarthLink was provided and had access to the above-referenced contemporaneous documents including Windstream's formation of the Unti Arrangement.

131.    Following Windstream's extensive disclosure of non-public information to EarthLink, on November 4, 2016, EarthLink's CEO Eazor called Windstream's CEO to, according to the Joint Proxy/Prospectus, "to express concern regarding the proposed 0.8 exchange ratio in light of the market's reaction" to an article leaking the contemplated merger.  Despite that "concern," the EarthLink Defendants thereafter completed the deal at an exchange ratio of just 0.818, which did not materially differ from the .08 exchange ratio that caused concern.

## IX.    DEFENDANTS' MATERIALLY MISLEADING AND INCOMPLETE OFFERING DOCUMENTS

132.    On December 8, 2016, Windstream filed with the SEC on Form S-4 a registration statement to register 95,959,386 shares of Windstream common stock in connection with the Merger, amended on January 9, 2017, January 13, 2017, and declared effective on January 17, 2017 (the "Registration Statement").  On January 24, 2017, Windstream filed with the SEC under Rule 424(B)(3) a "joint proxy statement/prospectus," dated January 23, 2017 and mailed the same to EarthLink and Windstream stockholders on January 25, 2017 (the "Joint Proxy/Prospectus").  The Joint Proxy/Prospectus incorporated and formed a part of the Registration Statement.  The Joint Proxy/Prospectus also constituted a joint proxy statement for both EarthLink and Windstream under

the 1934 Act.  On January 24, 2017, EarthLink filed the Joint Proxy/Prospectus with the SEC on Schedule 14A as a Proxy Statement Pursuant to Section 14(a) of the 1934 Act (the "Proxy").  The Proxy, which the EarthLink Defendants jointly issued with the Joint Proxy/Prospectus, stated that it was "solicited on behalf of the Board of Directors of EarthLink Holdings Corp."  The Registration Statement, Joint Proxy/Prospectus, and Proxy are collectively referred to as the "Offering Documents."

133.    The Offering Documents were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state the facts necessary to make the statements not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

134.    This lawsuit alleges strict-liability and negligence claims for omissions in the Offering Documents in order to effectuate the Merger between EarthLink and Windstream.  To be clear, the claims asserted herein are based solely on strict liability and negligence, and are not based on any reckless or intentionally fraudulent conduct by or on behalf of the Defendants – *i.e.*, these claims do not allege, arise from, or sound in, fraud.  Plaintiff specifically disclaims any allegation of fraud, scienter, or recklessness in these non-fraud claims.

A.    **False and Misleading Statements Regarding the Structuring of the Uniti Arrangement and its Impact on Windstream's Capital Structure and "Rent" Payments**

135.    The Joint Proxy/Prospectus commenced the "**Background of the Mergers**" section by touting the Uniti Arrangement and its purported reduction in Windstream debt:

> In 2014 and 2015, in addition to strategic business opportunities, Windstream began evaluating other unique ways to accelerate network investments and reduce debt.  In July 2014, Windstream announced plans to spin off certain of its fiber and copper telecommunications network assets and other real estate into an independent, publicly traded real estate investment trust, [Uniti] (which we refer to in this joint proxy statement/prospectus as [Uniti]), and enter into a master lease agreement to lease those network assets back from [Uniti] (which we refer to in this joint proxy statement/prospectus as the REIT Spin-Off).  ***In connection with the REIT Spin-***

*Off, which was completed in April 2015, and the subsequent monetization of Windstream's approximate 20 percent retained equity interest in [Uniti], Windstream reduced its debt by approximately $3.9 billion*. Additionally, in December 2015, Windstream sold its tier one data center business (14 of its 27 data centers) for approximately $575 million in cash, allowing it to further reduce debt and make targeted investments in its core network.

136.   Similarly, upon announcing the Merger on November 7, 2016, Windstream and EarthLink issued a joint presentation entitled Strategic Merger of Windstream and EarthLink ("the November 7th Joint Presentation"). The November 7th Joint Presentation is part of the Offering Documents. The November 7th Joint Presentation included the following "Accomplishments" for Windstream in a reference to the Uniti Arrangement: "*Completed key strategic transactions that enabled debt reduction of ~$4 billion*." Defendants also included a slide entitled, "*Optimizing the Balance Sheet*," which touted Windstream's "*Attractive debt maturity profile, with no near-term maturities*."

137.   Windstream's Annual Report on Form 10-K for the year ended December 31, 2015 ("Windstream's 2015 Annual Report") is part of the Offering Documents as well. Windstream's 2015 Annual Report included the following misleading description of the Uniti Arrangement:

**MASTER LEASE AGREEMENT**

*On April 24, 2015, Windstream Holdings entered into a long-term triple-net master lease with [Uniti] to lease back the telecommunications network assets. Under the terms of the master lease, Windstream Holdings has the exclusive right to use the telecommunications network assets for an initial term of 15 years with up to four, five-year renewal options and Windstream Holdings is required to pay all property taxes, insurance, and repair or maintenance costs associated with the leased property. The master lease provides for an annual rent of $650.0 million paid in equal monthly installments in advance and is fixed for the first three years.* Thereafter, rent will increase on an annual basis at a base rent escalator of 0.5 percent. During December 2015, we requested and [Uniti] agreed to fund $43.1 million of capital expenditures. As a result, the annual lease payment increased at a rate of 8.125 percent of the funds received from [Uniti], or from $650.0 million to $653.5 million. Future lease payments due under the agreement reset to fair market rental rates upon Windstream Holdings' execution of the renewal options. Due to various forms of continuing involvement, including Windstream Services retaining bare legal title (but not beneficial ownership) to the various easements, permits and pole attachments related to the telecommunications network assets, we have accounted for the transaction as a failed spin-leaseback for financial reporting

purposes. *As a result, the net book value of the network assets transferred to [Uniti] continue to be reported in our consolidated balance sheet and all depreciable assets will be fully depreciated over the initial lease term of 15 years*. At inception of the master lease, we recorded a long-term lease obligation of approximately $5.1 billion *equal to the sum of the minimum future annual lease payments over the 15-year lease term discounted to the present value based on Windstream Services' incremental borrowing rate*. Funding received from [Uniti] in December 2015 for capital expenditures was recorded as an increase to the long-term lease obligation. As annual lease payments are made, a portion of the payment will decrease the long-term lease obligation with the balance of the payment charged to interest expense using the effective interest method.

138.     The bold, italicized statements in ¶¶135-137 were materially false and misleading when made because they failed to disclose the following adverse facts:

(a)      that, as Windstream admits, Windstream's $650 million per year Master Lease payments were not set at fair market value;

(b)      that as a result of the inflated and over-market Master Lease payments, Windstream was unable to sufficiently invest in its network to remain competitive;

(c)      that Windstream's accounting and financial reporting of the Uniti Arrangement was based upon misrepresentations to the SEC regarding the fair market value of the Master Lease payments;

(d)      that Windstream's accounting and financial reporting of the Uniti Arrangement was based upon misrepresentations to the SEC regarding Windstream's economic compulsion to renew the Master Lease beyond its initial 15-year term;

(e)      that Windstream's accounting and tax treatment of the Uniti Arrangement was based upon inflated figures provided by Windstream to the IRS regarding the expected useful life of the distributed assets;

(f)      that Windstream was economically compelled to renew the Master Lease beyond its initial 15-year term, which resulted in materially underreported liabilities regarding the Uniti Arrangement;

(g)    that, as Windstream admits, the Uniti Arrangement was not a "true lease," but in actuality, was a "disguised financing arrangement";

(h)    that Windstream, upon execution of the Uniti Arrangement, was in violation of the "Incurrence of Indebtedness" (Section 4.09) restriction in the Indenture;

(i)    that Windstream, upon execution of the Uniti Arrangement, was in violation of the Sale Leaseback provision (Section 4.19) of the Indenture; and

(j)    that the formation, structure, and misrepresentations inherent in the Uniti Arrangement placed Windstream's capital structure in jeopardy upon commencement of the spin-off and Master Lease.

**B.    False and Misleading Statements Regarding Windstream's Private Letter Ruling from the IRS**

139.    In its 2015 Annual Report, Windstream included the following statement regarding the Uniti Transaction:

> <u>Spin-off of Certain Network and Real Estate Assets</u> – On April 24, 2015, we completed the spin-off of certain telecommunications network assets, including our fiber and copper networks and other real estate, into an independent, publicly traded real estate investment trust.  The spin-off also included substantially all of our consumer CLEC business.  The telecommunications network assets consisted of copper cable and fiber optic cable lines, telephone poles, underground conduits, concrete pads, attachment hardware (e.g., bolts and lashings), pedestals, guy wires, anchors, signal repeaters, and central office land and buildings, with a net book value of approximately $2.5 billion at the time of spin-off.  ***We requested and received a private letter ruling from the Internal Revenue Service on the qualification of the spin-off as a tax-free transaction and the designation of the telecommunications network assets as real estate***.

140.    Windstream's 2015 Annual Report also included a misleading boilerplate description of the "Risks Relating to Our Business" as follows:

> We received a private letter ruling from the IRS (the "IRS Ruling") to the effect that, on the basis of certain facts presented and representations and assumptions, the spin-off will qualify as tax-free under Sections 355 and 368(a)(1)(D) of the Code.  ***Although a private letter ruling generally is binding on the IRS, if the factual representations and assumptions made in the letter ruling request are untrue or incomplete in any material respect, then we will not be able to rely on the IRS Ruling***.  In addition, the IRS Ruling does not address certain

requirements for tax-free treatment of the spin-off under Sections 355 and 368(a)(1)(D) of the Code and our use of CS&L indebtedness and common stock to retire certain of our indebtedness (the "debt exchanges"). . . .

141.    The bold, italicized statements in ¶¶139-140 were materially false and misleading when made because they failed to disclose that the IRS Ruling was in fact based upon inflated figures provided by Windstream regarding the expected useful life of the distributed assets and that, as Windstream admits, the Uniti Arrangement was not a "true lease," but was, in reality, a "disguised financing arrangement."

**C.    False and Misleading Statements Regarding Windstream's Long-Term Debt Levels**

142.    Defendants' classification and presentation of Windstream's reported "Long-Term Debt" levels in the Offering Documents was misleading in light of the Uniti Arrangement. While Windstream reported the transaction as a "failed sale leaseback" and thus a "financing" in Windstream's 2015 Annual Report, Windstream failed to classify and present the long-term "disguised financing" (as it now concedes was the case all along) as "Long-Term Debt" in Windstream's financial reports.

143.    As alleged in detail above, Windstream concedes that Windstream Services' obligation under the sale-leaseback was not a "true lease" but was instead a "disguised financing" (*i.e.*, an unsecured loan from Uniti to Windstream Services). Thus, it was misleading for Defendants to not classify and present as "Long-Term Debt" in Windstream's financial reports the debt financing liability that Uniti provided to Windstream Services under the guise of a lease. *See, e.g.*, SEC Regulation S-X, Rule 5-02 (classification of "Long-Term Debt").

144.    Windstream also understated the amount of the financing obligation by using the present value of lease payments over the initial 15-year term of the Master Lease, to arrive at the reported amount of about $5 billion. The reported amount of the financing obligation was materially understated in the Offering Documents because, as Windstream admits, it was reasonably assured

that the lease term would be longer than 15 years due to the economic compulsion of Services to exercise its option to renew the lease term for a long as an additional 20 years. Thus, the present value of future lease payments would extend beyond 15 years, to as long as 35 years. The increase in payment periods would increase the amount of the debt by hundreds of millions of dollars. As Windstream admitted, "a 35-year financing model would … recognize a much larger liability at the spin-off date."

145.    The following representations (among others in the Offering Documents on the same issues) are therefore misleading:

- Windstream's Annual Proxy dated March 31, 2016, also part of the Offering Documents, included the following chart, which supported the statement that "*[t]hroughout 2015 . . . Windstream also completed strategic transactions that enabled substantial debt reduction of nearly $3.5 billion*":



**Total Debt** [3]

Footnote (3) stated: "Total debt amounts for both periods include capital lease obligations."

This statement and supporting chart were misleading because, as part of the Uniti Arrangement, Uniti provided Windstream Services over $5 billion of additional debt financing that Windstream did not report in its "Total Debt" figures. In reality, Windstream did not "reduce" its long-term debt through the Uniti Arrangement. On the contrary, Windstream significantly increased its long-term debt.

- The November 7th Joint Presentation stated that Windstream's "***Net Debt at 9/30/16***" was ***$4.840 billion*** and noted that figure "[e]xcludes transaction fees, includes capital leases." Windstream also stated that its "***Net Leverage***" was just "***3.77x***." These representations were false because, as part of the Uniti Arrangement, Uniti provided

Windstream Services over $5 billion in additional debt financing that Windstream did not include in its presentation of "Net Debt." Thus, Windstream's total "Net Debt" at September 30, 2016 was in excess of $10 billion (not $4.840 billion).

- Windstream's 2015 Annual Report: "*As of December 31, 2015, we had approximately $5,170.5 million long-term debt outstanding, including current maturities.*" This was false because, as part of the Uniti Arrangement, Uniti provided Windstream Services over $5 billion in additional debt financing that Windstream did not include in its "long-term debt" figures. In reality, Windstream's total long-term debt at December 31, 2015 was in excess of $10 billion (not $5.1705 billion).

- Windstream's 2015 Annual Report: "*As part of this [spin-off] transaction, we retained a 19.6 percent ownership interest in [Uniti] and reduced long-term debt by approximately $3.2 billion lowering our cash interest on long-term debt by approximately $80.5 million in 2015.*" This was false because, as part of the Uniti Arrangement, Uniti provided Windstream Services over $5 billion in additional debt financing that Windstream did not include in its "long-term debt" figures. In reality, Windstream did not "reduce" its long-term debt through the Uniti Arrangement, Windstream increased its long-term debt.

### D. False and Misleading Statements Regarding Windstream's Dividend Cut and Worsening Operational Trends

146. Upon announcing the Merger, Defendants also issued a presentation with a slide stating that "*[s]ignificant adjusted FCF accretion supports continued network investment, debt reduction and provides greater coverage of the dividend*." That presentation is part of the Offering Documents.

147. Despite the unsustainability of Windstream's dividend, the same presentation included the following statement: "*Dividend Practice: Maintain Windstream annual dividend of $0.60 / share.*" And despite the undisclosed issues faced by Windstream, that presentation also stated that Windstream had previously "*[c]ontinued to optimize our balance sheet by reducing debt and lowering interest cost.*"

148. The Joint Proxy/Prospectus also repeatedly touted post-Merger Windstream as a "stronger competitor" and that synergies from the Merger would result in debt reduction and a continued dividend. The Joint Proxy/Prospectus included the following among "Windstream's Reasons for the Mergers" and the "Recommendation of Windstream's Board of Directors":

- ***the expectation that the transaction will be significantly accretive to Windstream's adjusted free cash flow per share, allowing greater financial flexibility for strategic network investments and debt reduction and providing support for the continued payment of Windstream's existing dividend after closing of the transaction***; [and]

\*       \*       \*

- the expectation that the similar operating structures and goals of the two companies will drive advancement of products and services, including SD WAN and UCaaS, ***allowing the combined company to be a stronger competitor in a market dominated by larger telecommunication providers***.

149.   Similarly, despite undisclosed headwinds faced by Windstream, the Joint Proxy/Prospectus described Windstream's successful "transforming" of its business and described the strength and stability of Windstream in glowing terms.  The Joint Proxy/Prospectus also touted a "***substantial increase***" in the dividend "***currently received***" by EarthLink stockholders.  The Joint Proxy/Prospectus included the following among "Earthlink's Reasons for the Mergers"; the "Recommendation of Earthlink's Board of Directors"; and the reasons for the EarthLink Defendants "to recommend that EarthLink's stockholders vote 'FOR' the merger proposal":

*Ability to Participate in Future Appreciation and Dividends*

\*       \*       \*

- ***consistent with Windstream's current dividend practice, the Windstream Board expects to maintain its annual dividend of $0.60 per share after the transaction closes, providing meaningful benefits to stockholders in the form of long-term capital returns***; and

- ***this dividend also represents a substantial increase in the annual dividend currently received by EarthLink stockholders***;

\*       \*       \*

*Alternatives*

\*       \*       \*

- Windstream was the most logical strategic partners in a consolidating industry in light of its complementary products and strategic position and the potential realization of synergies, such that ***a business combination with***

> ***Windstream was most likely to provide the highest long-term value to EarthLink's stockholders.***

150.   The bold, italicized statements in ¶¶146-149 were materially false and misleading when made because they failed to disclose the following adverse facts:

(a)   that in a scenario where Windstream's revenues were declining, including at or below $5.597 billion by the end of calendar year 2016 (which is what Windstream in fact experienced at the time of the Offering Documents), Windstream and its advisors internally assumed a permanent dividend cut;

(b)   that, as Windstream now admits, Windstream's $650 million per year Master Lease payments were not set at fair market value;

(c)   that as a result of the inflated and over-market Master Lease payments, Windstream was unable to sufficiently invest in its network to remain competitive;

(d)   that Windstream was suffering worsening revenue trends and was on pace to significantly miss market expectations in its legacy business;

(e)   that Windstream was seeing material declines in its wholesale and enterprise business sectors;

(f)   that Windstream was observing increased and aggressive competition and price cuts by larger telecommunications service providers and cable operators;

(g)   that Windstream did not have the operational capabilities, customer base, or products to reverse worsening revenue trends;

(h)   that Windstream's ability to service its increasing debt load had been materially impaired;

(i)   that Windstream's financial health and standalone business operations were deteriorating; and

(j)       that, as a result of (a)-(i) above, Windstream's dividend was unsustainable and was already set to be eliminated.

151.    In addition to the above allegations, analysts later observed that the unsustainability of the dividend was a fact which existed long before the eventual dividend cut.  On August 3, 2017, Windstream surprised the market by eliminating its dividend, sending shares plummeting.  On September 7, 2017, an analyst from BofA Merrill Lynch, David W. Barden, made the following statement to Windstream's CFO Gunderman at a Bank of America Merrill Lynch Conference, which described the market's belief that Windstream had a preexisting "house-on-fire problem inside the business," leading to dividend cut that Windstream expected:

> And so, the equity market responded to the dividend cut with a 50% haircut on the stock.  And I think, day 1, there was actually what I thought was maybe a fairly logical, for most of the day, fairly logical opposite reaction to the bond market, which was, okay, Windstream has more cash to deploy to the debt holders.  It's a greater interest cover and the rest of it.  But then, all of a sudden, they [investors] didn't believe that anymore.  They actually believed that . . . so much damage had been done to the stock that no management team would have ever knowingly done what they did if there hadn't been some house-on-fire problem inside the business that caused them to create such havoc to the equity market, and the bond market got scared.  Totally unanticipated on your part?

152.    Gunderman responded to simply state that "we were certainly surprised to see the reaction from the fixed income community," *i.e.*, the bond-holders, but Gunderman said nothing to indicate that the dividend cut itself was unexpected or unanticipated on Windstream's part. Gunderman also could not deny that Windstream had major, preexisting problems inside the business.

153.    Defendants' pronouncements regarding the Merger's ability to generate cash flow, reduce leverage, and cover the dividend created a misperception that Windstream was stable and its dividend secure.  To illustrate, as noted above, Defendants' documents formally announcing the Merger on November 7, 2016 stated:

Compelling Strategic and Financial Benefits:

\*       \*       \*

Enhances balance sheet and increases free cash flow: Including run-rate synergies, on a pro forma basis for the 12 months ended Sept. 30, 2016, the combined company would have a net leverage ratio of 3.2x. Further, the transaction will be significantly accretive to Windstream's adjusted free cash flow allowing greater financial flexibility for strategic network investments and debt reduction while increasing dividend coverage.

154.    As a result, Merrill Lynch posted a flash note the same day stating: "We maintain our Buy rating, as we believe the dividend is secure and the current 8.3% yield is too high for the risk proposition the company presents." Three days later, and explicitly based on Defendants' Merger-related statement, *24/7 Wall Street* wrote, "it appears that the super-high dividend is safe for now. That is what the company and analysts are telegraphing." On November 18, 2016, again explicitly based on Defendants' Merger-related statements regarding increasing dividend coverage, Cowen & Company reported: "Windstream management remained adamant that the $0.60/share dividend is still important. Windstream further pointed to the advantages of higher FCF (and improved coverage) that the merger will provide, which not only secures the dividend but makes it less of a burden as the influx of FCF will allow for plenty of capital discretionary opportunities such as de-leveraging, network expansion and other growth-related spending." The Offering Documents fueled and then perpetuated that misperception.

155.    Similarly, on November 7, 2016, Thomas and Eazor held a call describing the status of Windstream's business and the Merger, stated: "With the achievement of the significant synergies, adjusted free cash flow increases meaningfully, in addition to providing great coverage to – greater coverage to the dividend, the enhanced cash flow is supported by continuous strategic network investments and lower leverage." Cowen & Company issued a report regarding that call on November 18, 2016, stating, "[w]e came away more confident in . . . subsequent meaningful FCF growth (and dividend coverage) that we believe will ultimately get the stock to work." A number of

analysts reached similar conclusions based on similar comments in the Offering Documents.  The

Offering Documents fueled and then perpetuated that misperception as well.

### E.   Defendants' Additional Disclosure Violations

156.   In addition, Item 11 of Form S-1 required the Registration Statement to furnish the

information called for under Item 303 of Regulation S-K (17 C.F.R. §229.303), Management's

Discussion and Analysis of Financial Condition and Results of Operations ("MD&A").  As set forth

in the December 29, 2003 interpretative release to Item 303 of Regulation S-K issued by the SEC

(the "2003 Interpretive Release"), the purpose of MD&A is to provide investors with information

necessary to an understanding of a company's results of operations, including the identification and

disclosure of known trends, events, demands, commitments and uncertainties that are reasonably

likely to have a material effect on a company's operating performance.

157.   The instructions to Item 303(a) of Regulation S-K required that the Registration

Statement provide disclosure about and "focus specifically" on material events and uncertainties that

would cause Windstream's reported financial information not to be necessarily indicative of future

operating results, including "matters that would have an impact on future operations and [matters

that] have not had an impact in the past" stating, in pertinent part, as follows:

> The discussion and analysis shall focus specifically on material events and
> uncertainties known to management that would cause reported financial information
> not to be necessarily indicative of future operating results or of future financial
> condition.  This would include descriptions and amounts of (A) matters that would
> have an impact on future operations and have not had an impact in the past, and (B)
> matters that have had an impact on reported operations and are not expected to have
> an impact upon future operations.

158.   The 2003 Interpretive Release also provides that the Registration Statement was

required to provide disclosure about known demands, events or uncertainties, except for those that

management determined: (i) were not reasonably likely to occur; or (ii) would not have a material

effect on Windstream's operating results.  The 2003 Interpretive Release states, in pertinent part, as

follows:

As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty is required unless a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.

159.    As described in detail above, the facts listed in ¶¶138, 141, 150 were not disclosed in the Joint Proxy/Prospectus, and thus the Registration Statement, as required under Item 303. Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503, requires, in the "Risk Factor" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk." The failure of the Registration Statement to disclose the issues described above violated Item 503 because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in shares of Windstream common stock speculative or risky.

160.    Although the Offering Documents included generic warnings that are applicable to any company with a dividend in the telecommunications sector, these conditional and speculative representations were themselves misleading because they failed to disclose material adverse facts that *already* existed or were reasonably likely to occur and the specific risks and the magnitude of the risks that resulted in the massive losses described herein. The boilerplate warnings were insufficient to negate the misleading impression created by the misrepresentations in the Offering Documents, alleged herein, that Windstream was a stable company, that the Uniti Arrangement was favorably structured and had actually reduced Windstream's debt, and that Windstream had a reliable dividend.

\*      \*      \*

161.    The Joint Proxy/Prospectus cautioned EarthLink investors not to look elsewhere for information regarding Windstream, EarthLink, or the Merger:

You should rely only on the information contained in or incorporated by reference into this joint proxy statement/prospectus. No one has been authorized to provide you with information that is different from that contained in, or incorporated by reference into, this joint proxy statement/prospectus. This joint proxy statement/prospectus is dated January 23, 2017, and you should assume that the information contained in this joint proxy statement/prospectus is accurate only as of such date. You should assume that the information incorporated by reference into this joint proxy statement/prospectus is only accurate as of the date of such information. Neither the mailing of this joint proxy statement/prospectus to EarthLink stockholders or Windstream stockholders nor the issuance by Windstream of shares of common stock pursuant to the merger will create any implication to the contrary.

## X.   WINDSTREAM'S STOCK PRICE DETERIORATED AFTER THE CLOSE OF THE MERGER

162.   On February 24, 2017, pursuant to an uninformed vote, EarthLink and Windstream obtained shareholder approval of the Merger.

163.   On February 27, 2017, Defendants completed the Merger. As a result, each share of EarthLink common stock was exchanged for .818 shares of Windstream common stock. In the aggregate, Windstream issued approximately 93 million shares of its common stock in a transaction valued at approximately $1.1 billion. Upon closing of the Merger, Windstream stockholders owned approximately fifty-one percent (51%) and EarthLink stockholders owned approximately forty-nine percent (49%) of the combined company.

164.   The following is a screen shot of Windstream's stock performance vs. its peers, covering the announcement of the Merger through October 2017, as prepared by Windstream's bankers at Citigroup. The Windstream line is annotated with various events:



**A.    The Uniti Arrangement Fueled Windstream's Deteriorating Performance and Stock Price Declines**

165.    Windstream states that the property it leased from Uniti "is '***mission critical***' to Windstream's [ability to run its] business."   Windstream cited testimony from Uniti stating that "'about 90% of Windstream's business runs on our [Uniti] network.'"   Windstream described the Leased Property as "essential and the only means for [Windstream] to serve clients" and stated that the Leased Property is essential for Windstream "to have a business and to continue to generate cash flows."

166.    Leading up to the Merger and beyond, the over-market rent payments were pernicious and crippled Windstream's ability to compete.   Thomas' testimony in a bankruptcy deposition contributed to the conclusion that, "even pre-[bankruptcy]-petition, the structure of the transaction

had strained Windstream's ability to invest in its network to remain competitive." As Windstream's creditors recently put it, "all parties [including Windstream] seem to agree that the Master Lease [with Uniti] was a disaster for [Windstream], causing it to incur hundreds of millions, if not billions, of dollars of unrecoverable expenses in the form of TCIs [Tenant Capital Improvements] and above-market rent."

167.    The Uniti Arrangement put pressure on Windstream through increasing annual payments when Windstream's earnings spiraled downward. The undisclosed and pernicious threat was that these rent payments were established well above market at the inception of the lease, based on Windstream executives' misrepresented valuations of the assets' useful life and overall worth.

168.    Moody's later described these problems in a Credit Opinion on November 7, 2017. Moody's noted that "Windstream faces pressure related to high leverage, a declining top line and margin compression. . . . We view Windstream as having limited leverage tolerance due to its low asset coverage following the 2015 sale and leaseback transaction of its outside plant and real estate assets to Unit Group, Inc." Moody's continued:

> *We believe that the 2015 REIT transaction has amplified Windstream's downside risk* if it fails to execute a return to growth since its ability to reallocate capital is limited going forward and the company has a substantially smaller asset base. Although the transaction positively affected Windstream's after dividend free cash flow, the lease payment reduces the cash flow cushion for debt service from the perspective of bondholders. In the downside scenario where revenues and EBITDA continue to erode, the higher level of fixed costs could lead to a higher expected loss due to the reduction in flexibility to reallocate cash flows and the lower asset coverage from the transfer of assets to Uniti Group.

Similarly, Goldman Sachs explained to its clients in September 2017 that "[t]he impact to WIN from the substantial fixed rent payment it makes to UNIT is magnified by WIN's EBITDA as EBITDAR declines."

169.    In light of these issues, Windstream ultimately could not keep up with the substantial investment in upgrading and expanding the network required to stay relevant in an increasingly

competitive market.  As Windstream and Thomas admitted in bankruptcy, making substantial investments in the network "has been one of Windstream's constant challenges as a network comprised primarily of copper trying to compete in an industry increasingly dominated by fiber."

### B.    Windstream Posts Disappointing Numbers in the First Half of 2017

170.    On March 1, 2017, two days after the close, Windstream issued its 2016 fourth quarter and annual consolidated results of operations.  The very next day, *Seeking Alpha* wrote that Windstream's most recent "results didn't exactly help the investment thesis for Windstream.  The local telecom provider missed revenue estimates by a wide $30 million adding to general concerns about a declining business."  On March 27, 2017, Moody's announced that it had changed its ratings on Windstream's debt from "stable" to "negative" after "the company's weak 2016 results and 2017 guidance."  Moody's concluded that Windstream's "downward trajectory of the business will persist and pressure Windstream's B1 rating."

171.    The situation worsened.  On May 4, 2017, Windstream reported disappointing results for Q2 2017.  UBS reported: "Slow start to the year . . . WIN's 1Q results showed continued operational challenges.  Service revenues declined 6.6%, above mgmt's guidance of ~.4% for the yr.  Revenues fell across all segments, incl. consumer at -0.3%, Enterprise at -2.6%, Carrier at -8.9%, ILEC SME at 5.9%, and CLEC SME at -17.8%."  The same day, May 4, 2017, Robert E. Gunderman, Windstream's CFO, revealed, "[w]holesale has been of a bit of a headwind in terms of the [Windstream] legacy services and the pressures.  That's something that we expected, that's baked within our guidance for the year."  As Jefferies reported the following day, "Windstream reported disappointing results, missing both revenue and EBITDA expectations. . . .  Windstream suffered weak results, falling short of our estimates across every revenue category," including enterprise and wholesale.

172.     Windstream's CFO Bob Gunderman fielded questions from analysts on June 8, 2017 at the Barclays High Yield Bond and Syndicated Loan Conference.  During that conference, Gunderman described increased competitive pressures, aggressive pricing from competitors, and headwinds in the carrier and wholesale business.  The following exchange occurred:

Jeffrey Alan Harlib – Barclays PLC, Research Division – MD:

Okay.  Maybe talk about the wholesale segment.  I know you thought revenue pressures would be somewhat higher in '17 than '16.  Q1, they were somewhat worse than that.  Just talk about whether it's network grooming, carrier consolidation, what are some of the effects there and how can you offset that?

Robert E. Gunderman – Windstream Holdings, Inc. – CFO:

Yes, and I think you hit on 2 things that have certainly been a headwind in our carrier and wholesale business.  The consolidation and grooming that's occurring with our peers and our customers and certainly impacted our top line.  I often say the same thing that we are doing on behalf of our enterprise and SMB businesses, where we buy access from other carriers, well, that's their wholesale revenues.  We're doing the same thing to them.  That's happening to us at some level.  We spend a lot more than we sell in access services, and so there's a little bit of a hedge there.  ***The other thing that certainly happened on the wholesale business is pricing compression has occurred***.  As bandwidth consumption has gone up at a pretty rapid pace, the pricing per bandwidth has certainly come down.  And so we've seen some of that sort of yield pressure, if you will, happen within wholesale.  I'm proud of what the team has done in terms of selling more new logos, and selling more bandwidth to the content companies, to some extent, the cable companies who are now competing more aggressively on the enterprise side, where they don't have network.  They use companies like us on the wholesale side to complete their network.  We're doing a good job with that in expanding our network to capture those opportunities.  I think that's going to pay dividends in the future for us.  ***But in the near term, what we're seeing is the repricing and the renewal of our base.  It's just been too much for us to overcome on top line, and we're still feeling some pressure on that this year***.

173.     Also during that same June 8, 2017 Barclays conference, Bob Gunderman highlighted increased competitive pressures and aggressive pricing from the national cable competitors, and made clear that Windstream had "expected" this to occur.  The Offering Documents did not disclose these facts.  An analyst from Barclays asked the following question:

Jeffrey Alan Harlib – Barclays PLC, Research Division – MD:

Okay.  I'd like to go through the different segments, business performance and outlook.  Maybe we'll start with consumer SMB, ILEC.  Clearly, the sublosses have

significantly moderated with the completion of Project Excel and speed upgrades. Talk about how you further improved gross adds, reduced churn, how you're seeing cable competition from Comcast, spectrum and also video strategy?

174.    After a non-response from Gunderman, the Barclays analyst pressed further:

Jeffrey Alan Harlib – Barclays PLC, Research Division – MD:

Okay.  And just cable competition, Comcast especially.  What are you seeing from them?  And how are you positioned in the market?

Robert E. Gunderman – Windstream Holdings, Inc. – CFO:

Right.  So cable competition has been no less.  It's – Comcast and Charter are our 2 biggest competitors, actually, Charter being the largest at over 30% overlap for our business, Comcast in the kind of mid-teens range.  After that, it falls off pretty significantly from the national cable competitor standpoint.  Around 20% of our footprint today has no cable competition.  ***And so where we see cable competition at the national level, they have been aggressive.  Charter, in particular, has been an aggressive competitor.  I wouldn't say that, that unexpected.  We did expect them to get – stay competitive in their markets, that they overlap with us***.  These markets are Lexington, Lincoln, some of those places.  Those are also places where we have brought more speed capability to the marketplace, to get more on parity with what they're offering.  ***But it's aggressive.  I mean, there's an aggressive push out there with pricing, promoting price that's pretty low for the first year.***  We're doing the same thing.  I think we're holding our own in those areas.  As you look at our opportunity in those markets, we actually have what I call insurgent market share now because of some of the share losses that have happened over the past number of years.  And so we've been able to be aggressive with our pricing and really come after that share and try to win it back, and that's what we'll continue to you.  And then in the more rural markets, which is still a very significant part of our footprint, we could be more defensive in really protecting our base but also growing our base of customers in that wallet share that we have out there.  And so that's how we've gone into market recently.

175.    As described in detail herein, Bob Gunderman was inaccurate about at least one thing in that excerpt: Windstream was not "holding its own" in any of those areas.  Windstream's results were crumbling in the face of "expected" but unusually aggressive price cuts from national cable competitors.

## C.    Windstream Shocks the Market and Eliminates Its Dividend While Continuing to Release Disappointing Numbers

176.    In early August of 2017, Windstream was aware of market rumors that Aurelius intended to issue a notice of default related to the Uniti Arrangement.  Indeed, on September 17,

2017, a Windstream executive privately emailed bankers at Citigroup to discuss issuing an additional $500 million in debt, noting, "One thing that we really need to take into consideration is the market rumor that is out there from Aurelius."

177.    Windstream's internally planned dividend cut was finally exposed on August 3, 2017. On that date, Windstream announced that it was ending its quarterly stockholder dividend effective immediately.  The same day, Windstream also reported a $68 million 2Q 2017 loss (compared with net income of $1.5 million a year prior) and that operating income was $107 million, down 31% from $155 million in the same period a year prior.  UBS titled its analyst report the same day, "Revenues light; Dividend gone."

178.    These announcements were not well received.  *Seeking Alpha*, in an August 3, 2017 article entitled, "The Death of Windstream," explained that "the reason people owned this name, or other high risk telecoms, is for the bountiful dividend. . . .  The problem?  The elimination of the dividend is enough for most investors to throw in the towel."  And in an August 3, 2017 article entitled, "Windstream Stock Tumbles as Dividend Eliminated," *24/7 Wall Street* wrote:  "The company has missed profit estimates by big margins in each of the past four quarters and shares have plummeted from a high of [$52.25] last September to below [$17.50] this morning."  As noted, one analyst recorded the market's belief that "so much damage had been done to the stock that no management team would have ever knowingly done what they did if there hadn't been some house-on-fire problem inside the business that caused them to create such havoc to the equity market."

179.    Jefferies reduced its price target for Windstream stock from $25.00 to $12.50 per share on August 4, 2017, noting, "Elimination of the Dividend Sends Investors Out the Door" and stating that "investors sold [Windstream] shares aggressively on the news."  Jefferies also observed Windstream's underlying and more fundamental problems, writing that "[t]he loss of high-margin legacy revenue, and declining broadband subscribers will continue to weigh on results and

sentiment." On August 7, 2017, Deutsche Bank described the "headwinds across key segments," including "Residential share loss [and] SME/Enterprise slowdowns from slower spend."

180. On August 11, 2017, UBS issued an analyst report expressing concern about Windstream's ability to service its debt: "We believe capital intensity needs to remain at mid-teens to drive profitable revenue growth on a sustainable basis, which combined with low-SD EBITDA declines does not leave much room for leverage to fall. . . . Despite the recent dividend cut, worries remain about the company's ability to stabilize the top line and de-lever over time."

181. Windstream internally recognized in September 2017 that the "[d]ebt and equity markets responded unfavorably to announcement of dividend elimination while the fixed income investors responded unfavorably to the stock buyback program due to fear of underlying business pressures and long term inability to delever. . . . [I]nvestors are concerned about our ability to refinance debt." Windstream also recognized internally in September 2017 that its "[c]urrent overall FCF [free cash flow] is insufficient to significantly pay down debt, requiring Windstream to pursue other inorganic paths to delever and manage debt maturities."

**D. Windstream's Results Continue to Deteriorate; Windstream Receives a Notice of Default**

182. On October 18, 2017, an analyst at *Seeking Alpha* wrote a report about Windstream that opened with the following points:

> Shareholders of Windstream (NASDAQ: WIN) have had a painful last few months. . . .
>
> Windstream has been posting dismal financials over the past few quarters. It has missed the lower end of analyst estimates in six of the past seven quarterly results and discussions about its potential bankruptcy are becoming popular in most investing forums with each passing week. . . . Windstream has gone from being a conservative income play to a speculative investment.

183. Windstream continued to post disappointing results. After Windstream pre-announced 3Q 2017 results, Deutsche Bank reported on October 31, 2017 that "Organic revenue

trends are worsening:  Service revenue of $1.47bn was -0.8% vs. our estimate, and core trends are deteriorating."

184.    On September 21, 2017, Windstream received the notice of default from Aurelius. Moody's reported shortly thereafter, on September 26, 2017, that "Moody's views this disclosure as a negative event that raises uncertainty around Windstream and which could further impede Windstream's ability to access the capital markets.  If the issue is not resolved quickly and in favor of the company, Windstream could encounter difficulties accessing funds to refinance its debt maturities, most notably the company's revolving credit facility and term loan B-6 which, under certain circumstances, both mature in April of 2020."  The report continued:  "Moody's believes that Windstream's limited financial flexibility exposes it to a potential deterioration of liquidity if the issue drags on for a prolonged period, especially if negative market forces continue to be amplified by the disclosure of the notice of alleged default."

185.    On November 3, 2017, Moody's downgraded Windstream's debt to B2 and again reported that the "outlook remains negative" because "Windstream's weak revenues and EBITDA continue to weigh on its ratings, with year over year declines in the 4% to 5% range."

**E.    Windstream's Debt Is Again Downgraded, Announces a Reverse Stock Split, Files for Bankruptcy, and Cancels Its Common Stock**

186.    In February 2018, Windstream reported a fourth-quarter net loss of $1.84 billion, or $10.26 per share, compared to a net loss of $87 million, or 94 cents per share, in the same quarter of the prior year.  Windstream stated that the charge "was primarily due to changes in long-term, cash-flow projections driven by recent operational results and future assumptions as well as changes in cost of capital assumptions."

187.    On February 28, 2018, Moody's downgraded Windstream's debt to B3 and again reported that its "outlook remains negative."  Moody's led the report with the following summary:

New York, February 28, 2018 – Moody's Investors Service, (Moody's) has downgraded the corporate family rating (CFR) of Windstream Services, LLC (Windstream) to B3 from B2 based on the company's sustained weak operating trends and a challenging debt maturity profile.  Moody's has also downgraded Windstream's probability of default rating (PDR) to B3-PD from B2-PD, its secured rating to B3 from B2 and its unsecured rating to Caa1 from B3.  Windstream's speculative grade liquidity rating (SGL) remains at SGL-2, reflecting good liquidity. ***The outlook remains negative due to Moody's expectation of continued pressure on EBITDA, negative free cash flow including persistent restructuring costs, and low asset coverage relative to debt***.

*          *          *

Windstream's B3 corporate family rating reflects its scale as a national wireline operator with a large base of recurring revenues, offset by high leverage, a declining top line and margin pressure. ***Moody's believes that Windstream faces a continued erosion of EBITDA and cash flows as a result of prolonged prior underinvestment***.  Moody's expects Windstream's pro forma EBITDA to decline in the low single digit percentage range for the next several years, although some of this impact could be offset by cost cutting and greater investment into the consumer segment.  Moody's views Windstream as having limited leverage tolerance due to its low asset coverage following the 2015 sale and leaseback transaction of its outside plant and real estate assets to Uniti Group.

188.    Through early 2018, Windstream's results did not materially improve.  In a May 16, 2018 article entitled "10 Shaky Dividends That Could Harm Your Retirement," Kiplinger reported that "Windstream is experiencing major challenges that have sent its own stock price tumbling roughly 80% since the start of 2017.  Many investors are worried about the company going bankrupt given its sizable debt maturities over the next few years, and Moody's downgraded its credit rating further into junk status to B3 from B2 in February 2018."

189.    Effective as of the end of the trading day on May 25, 2018, Windstream completed a 1-for-5 reverse stock split of its issued and outstanding shares of common stock.  On June 15, 2018, analysts noted that the most likely reason for the stock split was that "Windstream sought to avoid being delisted by the exchanges.  If a stock falls under $1 and stays there for 30 consecutive days, the exchanges can initiate a delisting process.  As Windstream's stock hit almost $1.20 per share prior to the split, that was likely too close for comfort for management."

190.    Five days after the reverse-split, Windstream proposed a consent solicitation for debt holders, asking them to allow Windstream to assume more junior debt and amend the credit agreements.  Analysts noted that "Windstream is having to do financial jujitsu just to keep itself afloat at the moment, all while posting net losses of $156 million in its most recent quarter."

191.    Moody's again downgraded Windstream's debt, this time to "distressed" levels.  On June 19, 2018, in a report entitled "Moody's downgrades Windstream to Caa1, rates new second lien notes; outlook remains negative," Moody's stated as follows:

> New York, June 19, 2018 – Moody's Investors Service (Moody's) has downgraded the corporate family rating (CFR) of Windstream Services, LLC (Windstream) to Caa1 from B3 and downgraded the probability of default rating (PDR) to Caa1-PD from B3-PD.  ***The downgrade is based on the company's expected failure to meet its debt service obligations due to its commencement of debt exchange offers at significant discounts to par value with respect to certain series of its senior notes for second lien notes***.  Based on final acceptance levels and exchange allocations, ***Moody's expects this would constitute a distressed exchange and would represent a material amount of unsecured debt***, likely totaling 12% or more of outstanding funded debt.  ***Moody's views this planned action as evidence that Windstream's weak operating trends are worsening*** and that the company's ability to transition to approximately stable EBITDA is proving more difficult than previously anticipated.  Furthermore, Moody's believes that ***Windstream's capital structure has become untenable*** and these exchanges aim to help the company delay or potentially avoid future payment defaults.  Moody's has assigned Caa2 ratings to the company's proposed second lien senior secured notes due 2024 and second lien senior secured notes due 2025.  Moody's has also downgraded Windstream's first lien secured rating to Caa1 from B3 and its unsecured rating to Caa2 from Caa1.  Windstream's speculative grade liquidity rating (SGL) is affirmed at SGL-2, reflecting good near term liquidity.  The outlook remains negative due to Moody's expectation of continued pressure on EBITDA, negative free cash flow including restructuring costs, and low asset coverage related to debt.

192.    On July 26, 2018, the price of Windstream common stock closed at $3.72 per share, 90.5% below their price on the date of the Merger's closing.

193.    As noted, on February 25, 2019, Windstream Holdings and all of its subsidiaries, including Windstream Services and EarthLink, filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code.  Under the Plan of Reorganization, all of the

shares of common stock of Windstream Holdings outstanding immediately prior to the Effective Date, were declared cancelled, discharged and of no force and effect.

## CAUSES OF ACTION

### COUNT I

#### For Violations of §14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against All Defendants

194.    Plaintiff repeats and realleges each allegation set forth herein.

195.    The Proxy and Joint Proxy/Prospectus were prepared, reviewed and/or disseminated jointly by all Defendants.  The Proxy and Joint Proxy/Prospectus contained materially misleading statements and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

196.    Defendants were jointly responsible for the misleading statements in the Proxy and Joint Proxy/Prospectus.  The Proxy and Joint Proxy/Prospectus purport to provide material information in support of Defendants' recommendation of the Merger.  Defendants were provided with or had unlimited access to copies of the Proxy and Joint Proxy/Prospectus and had the ability to prevent or correct the issuance of the statements Plaintiff alleges to be misleading.

197.    Defendants were at least negligent in filing the Proxy and Joint Proxy/ Prospectus with these materially false and misleading statements.

198.    As a direct result of Defendants' negligent preparation, review, and dissemination of the false and/or misleading Proxy and Joint Proxy/Prospectus, Plaintiff and the Class were induced to vote their shares and accept the inadequate Merger consideration in connection with the Merger.

199.    The false and/or misleading Proxy and Joint Proxy/Prospectus used to obtain shareholder approval of the Merger deprived Plaintiff and the Class of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their EarthLink shares.

200.     Thus, as a direct and proximate result of the dissemination of the false and misleading Proxy and Joint Proxy/Prospectus Defendants used to obtain shareholder approval of and thereby consummate the Merger, Plaintiff and the Class have suffered damage and actual economic losses in an amount to be determined at trial.

201.     The false and misleading statements in the Proxy and Joint Proxy/Prospectus were material in that a reasonable shareholder would consider them important in deciding how to vote on an acquisition.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in a proxy and in other information reasonably available to shareholders.  The false and misleading Proxy and Joint Proxy/Prospectus had the intended effect: a materially misinformed vote of the EarthLink shareholders, who voted in favor of the Merger on February 24, 2017.  That vote was required in order to effectuate the Merger.

202.     By reason of the foregoing, Defendants have violated §14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

203.     Because of the false and misleading statements in the Proxy and Joint Proxy/Prospectus, Plaintiff and the members of the Class were harmed.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the EarthLink Individual Defendants and the Windstream Defendants

204.     Plaintiff repeats and realleges each allegation set forth herein.

205.     The EarthLink Individual Defendants acted as controlling persons of EarthLink within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of EarthLink, and their participation in and/or awareness of the operations of EarthLink, and/or intimate knowledge of the false statements contained in the Proxy and Joint Proxy/Prospectus filed with the SEC, the EarthLink Individual Defendants had the power to

influence and control and did influence and control, directly or indirectly, the decision-making of the EarthLink, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

206.     The Windstream Individual Defendants acted as controlling persons of Windstream within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Windstream, and their participation in and/or awareness of the operations of Windstream, and/or intimate knowledge of the false statements contained in the Proxy and Joint Proxy/Prospectus filed with the SEC, the Windstream Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Windstream, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

207.     In particular, each of the EarthLink Individual Defendants and Windstream Individual Defendants had direct and supervisory involvement in the day-to-day operations of EarthLink and Windstream, and, therefore, is presumed to have had the power to control or influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy and Joint Proxy/Prospectus contained the unanimous recommendation of each of the EarthLink Individual Defendants and Windstream Individual Defendants to approve the Merger. The EarthLink Individual Defendants and Windstream Individual Defendants were thus directly involved in the making of the Proxy and Joint Proxy/Prospectus.

208.     The Windstream Defendants also acted as controlling persons of the EarthLink Defendants within the meaning of §20(a) of the 1934 Act as alleged herein.

209.     The Windstream Defendants had the contractual right and obligation to "jointly prepare and cause to be filed with the SEC" the Proxy and Joint Proxy/Prospectus together with the EarthLink Defendants, as they did.  The Windstream Defendants participated in the solicitation of

proxies through the Proxy and Joint Proxy/Prospectus, recommended in favor of the Merger, and participated in the preparation of the Proxy and Joint Proxy/Prospectus.

210.     By virtue of the foregoing, the EarthLink Individual Defendants and the Windstream Defendants have violated §20(a) of the 1934 Act.

211.     As a direct and proximate result of these Defendants' conduct, Plaintiff and all other Class members were harmed.

## COUNT III

### For Violations of §11 of the 1933 Act
### Promulgated Thereunder Against the Windstream Defendants

212.     Plaintiff repeats and realleges each allegation set forth herein.

213.     This count is brought by Plaintiff on behalf of himself and all other Class members who received shares of Windstream common stock traceable to the Registration Statement.

214.     Plaintiff asserts solely strict liability and negligence claims in this count.

215.     The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements made not misleading, as alleged herein.

216.     Windstream was the issuer of the common stock registered by the Joint Proxy/Prospectus and Registration Statement.  As the issuer of the common stock, Windstream is strictly liable to the members of the Class who received Windstream common stock pursuant to the Registration Statement.

217.     The Windstream Individual Defendants each signed the Registration Statement, were responsible for the contents and dissemination of the Registration Statement, and/or failed to make a reasonable investigation and did not possess reasonable grounds for the belief that the statements contained in the Registration Statement were true and/or did not contain untrue statements of

material facts.  The Windstream Individual Defendants are therefore liable to the members of the Class who received shares of Windstream common stock pursuant to the Registration Statement.

218.    Plaintiff and other members of the Class received Windstream common stock traceable to the Registration Statement, and did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements and omissions of material fact contained therein.

219.    Plaintiff and the members of the Class who purchased or acquired Windstream common stock traceable to the Registration Statement suffered substantial damage as a direct and proximate result of the untrue statements of material facts and/or omissions described in this count.

220.    This claim is brought within the applicable statute of limitations because less than one year has elapsed from the time that Plaintiff and the other members of the Class discovered or reasonably could have discovered the facts upon which this count is based.  Less than three years have elapsed from the time that Plaintiff and other Class members received the shares of Windstream common stock pursuant to the Registration Statement.

221.    By reason of the foregoing, the Defendants named in this count have violated §11 of the 1933 Act.

## COUNT IV

### For Violations of §12(a)(2) of the 1933 Act
### Against the Windstream Defendants

222.    Plaintiff repeats and realleges the allegations above.

223.    This count is brought by Plaintiff on behalf of himself and all other Class members who received shares of Windstream common stock in the Merger and pursuant to the Joint Proxy/Prospectus.

224.    This count is brought against Windstream and the Windstream Individual Defendants.

225.    Plaintiff asserts solely strict liability and negligence claims in this count.

226.     The defendants named in this count were statutory sellers who sold and participated in the sale of Windstream common stock to Plaintiff and other members of the Class by means of the Joint Proxy/Prospectus for their own benefit and the benefit of Windstream.

227.     Plaintiff received Windstream common stock pursuant to the Joint Proxy/Prospectus, and did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements and omissions of material fact contained therein.

228.     As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased or acquired Windstream common stock pursuant to the Joint Proxy/Prospectus sustained substantial damages in connection with their receipt of the stock. Accordingly, Plaintiff or the other members of the Class who may hold the common stock issued pursuant to the Joint Proxy/Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to the defendants sued in this count. Class members who have sold their common stock seek damages to the extent permitted by law.

229.     This claim is brought within the applicable statute of limitations because, when it was filed, less than one year has elapsed from the time that Plaintiff and the other members of the Class discovered or reasonably could have discovered the facts upon which this count is based. Less than three years had elapsed from the time that Plaintiff and other Class members received the shares of Windstream common stock pursuant to the Joint Proxy/Prospectus.

230.     By reason of the conduct alleged herein, the Defendants named in this count violated §12(a)(2) of the 1933 Act.

## COUNT V

### For Violations of §15 of the 1933 Act
### Promulgated Thereunder Against the Windstream Individual Defendants

231.     Plaintiff repeats and realleges each allegation set forth herein.

232.    This count is brought by Plaintiff on behalf of himself and all other Class members who received shares of Windstream common stock traceable to the Offering Documents.

233.    Plaintiff asserts solely strict liability and negligence claims in this count.

234.    The Windstream Individual Defendants were each control persons of Windstream at the time of the Merger in that they exercised actual power over Windstream by virtue of their positions as directors and/or senior officers of Windstream.  As directors and/or senior officers of Windstream, the Windstream Individual Defendants were able to, and did, influence, directly and indirectly, the contents of the Joint Proxy/Prospectus, as well as Windstream's decision to effectuate the Merger, and on what terms.

235.    By reason of the foregoing, the Defendants named in this count violated §15 of the 1933 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment, in Plaintiff's favor and in favor of the Class and against Defendants, as follows:

A.    Declaring that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as Class representative and Plaintiff's counsel as Class counsel;

B.    Declaring that Defendants violated §14(a) of the 1934 Act and Rule 14a-9 by disseminating the materially false and/or misleading Proxy and/or Joint Proxy/Prospectus;

C.    Declaring that the EarthLink Individual Defendants and the Windstream Defendants violated §20(a) of the 1934 Act by acting as controlling persons of a person or persons who violated §14(a) of the 1934 and Rule 14a-9;

D.      Declaring that the Windstream Defendants violated §11 of the 1933 Act by issuing the common stock registered by the Joint Proxy/Prospectus and Registration Statement, and being otherwise responsible for the materially false and/or misleading statements and omissions therein;

E.      Declaring that the Windstream Defendants violated §12(a)(2) of the 1933 Act by selling and participating in the sale of Windstream common stock to Plaintiff and other members of the Class by means of the Registration Statement;

F.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

G.      Awarding Plaintiff and the other Class members rescission on their §12(a)(2) claims;

H.      Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

I.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  May 27, 2021

DAVID A. KNOTTS (*admitted pro hac vice*)
ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dknotts@rgrdlaw.com

Lead Counsel for Plaintiff

CARNEY BATES & PULLIAM, PLLC
RANDALL K. PULLIAM (ABN 98105)
HANK BATES (ABN 98063)
519 W. 7th Street
Little Rock AR  72201
Telephone:  501-312-8500
501/312-8505 (fax)
rpulliam@cbplaw.com
hbates@cbplaw.com

Local Counsel

JOHNSON FISTEL, LLP
BRETT M. MIDDLETON
655 West Broadway, Suite 1400
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)
brettm@johnsonfistel.com

Additional Counsel for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on May 27, 2021, I authorized the electronic

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I

hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the

non-CM/ECF participants indicated on the attached Manual Notice List.

DAVID A. KNOTTS
ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  dknotts@rgrdlaw.com

# Mailing Information for a Case 4:18-cv-00202-JM Murray v. EarthLink Holdings Corp et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Joseph Henry Bates , III**
  hbates@cbplaw.com,jcox@cbplaw.com,toldham@cbplaw.com,rpulliam@cbplaw.com

- **Parker M. Justi**
  parker.justi@skadden.com,MLCWIL@skadden.com

- **David A. Knotts**
  dknotts@rgrdlaw.com,jaimem@rgrdlaw.com,dknotts@ecf.courtdrive.com

- **Richard S. Krumholz**
  richard.krumholz@nortonrosefulbright.com,judy.burns@nortonrosefulbright.com

- **Eun Jin Lee**
  elee@rgrdlaw.com,jaimem@rgrdlaw.com,ELeeRGRD@ecf.courtdrive.com

- **Gary D. Marts , Jr**
  gmarts@wlj.com,pjones@wlj.com

- **Randall Keith Pulliam**
  rpulliam@cbplaw.com,jcox@cbplaw.com,dengelby@cbplaw.com

- **Robert S. Saunders**
  rob.saunders@skadden.com,cherie.krebs@skadden.com

- **Peter A. Stokes**
  peter.stokes@nortonrosefulbright.com,julie.wright@nortonrosefulbright.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)